# 25-2570-cr

## In the United States Court of Appeals for the Second Circuit

United States of America,

Appellant,

v.

Payton Gendron,

Defendant-Appellee.

On Appeal from the United States District Court
For the Western District of New York

### BRIEF AND SPECIAL APPENDIX
### FOR APPELLANT UNITED STATES OF AMERICA

MICHAEL DIGIACOMO
United States Attorney
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5838

TIFFANY H. LEE
JOSEPH M. TRIPI
BRETT A. HARVEY
CHARLES M. KRULY
MAEVE E. HUGGINS
Assistant United States Attorneys
*of Counsel*

HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
150 M Street N.E.
Washington, D.C.
(202) 514-3487

MICHAEL S. WARBEL
U.S. Department of Justice
Criminal Division, Capital Case Section
1301 F Street, N.W. Room 505
Washington, D.C. 205530

## TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ............................................................................i

PRELIMINARY STATEMENT.................................................................... 1

STATEMENT OF JURISDICTION............................................................ 3

STATEMENT OF ISSUES PRESENTED FOR REVIEW........................... 8

COMBINED STATEMENT OF THE CASE AND FACTS ........................ 9

      A. Gendron's attack ............................................................................ 9

      B. Gendron's manifesto and Discord journal ...................................... 10

      C. The indictment and notice of intent to seek the death penalty .......... 14

SUMMARY OF THE ARGUMENT............................................................ 17

ARGUMENT ........................................................................................... 22

I.     The district court erred in holding that § 3593(f) prohibits a capital jury from considering Gendron's racist motivation as a stand-alone aggravating factor ........................................................................ 22

      A.    Governing law and standard of review...................................... 22

              i.     Law governing capital sentencing hearings generally........22

              ii.    Motive evidence and 18 U.S.C. § 3593(f) .....................24

      B.    The district court's decision.................................................... 26

      C.    Discussion............................................................................. 26

II. The district court erred in holding that the First Amendment precludes the government from introducing evidence showing that, in preparing for and committing his attack, Gendron was motivated by a desire to incite violence ........................................................... 37

    A. Governing law and standard of review ...................................... 37

    B. The district court's decision .................................................... 38

    C. Discussion ................................................................................ 39

III. The district court erred in holding that evidence from surviving victims is not relevant to a capital jury's sentencing recommendation ...................................................................................... 45

    A. Governing law and standard of review ...................................... 45

    B. The district court's decision .................................................... 46

    C. Discussion ................................................................................ 47

Conclusion ............................................................................................... 55

Certificate of Compliance ................................................................... *Attached*

Special Appendix ............................................................................... SA-1

# TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014) .......................................................................... 29, 34

*Arave v. Creech,*
507 U.S. 463 (1993) ................................................................................ 23

*Barclay v. Florida,*
463 U.S. 939 (1983)......................................................................... 32, 33

*Brandenburg v. Ohio,*
395 U.S. 444 (1969) ..................................... 17, 20, 38, 42, 43

*Davis v. Michigan Dep't of Treasury,*
489 U.S. 803 (1989) ............................................................................... 29

*Dawson v. Delaware,*
503 U.S. 159 (1992)............................................................... *passim*

*Dubin v. United States,*
599 U.S. 110 (2023) .............................................................................. 30

*Environmental Encapsulating Corp. v. City of New York,*
855 F.2d 48 (2d Cir. 1988) ................................................................ 49

*Free Speech Coalition, Inc. v. Paxton*
606 U.S. 461 (2025) .............................................................................. 44

*Gregg v. Georgia,*
428 U.S. 153 (1976) .............................................................................. 23

*Hohn v. United States,*
524 U.S. 236 (1998) .............................................................................. 31

*Jones v. United States,*
527 U.S. 373 (1999)................................................................... *passim*

*Microsoft Corp. v. I4I Ltd. Partnership,*
564 U.S. 91 (2011) ............................................................................... 53

i

*McQuiggin v. Perkins,*
    569 U.S. 383 (2013) .................................................................... 33

*Mississippi ex rel. Hood v. AU Optronics Corp.,*
    571 U.S. 161 (2014) .................................................................... 31

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) .................................................................... 10

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ............................................................... 37, 39

*Payne v. Tennessee,*
    501 U.S. 808 (1991) .................................................................... 51

*Pena-Rodriguez v. Colorado,*
    580 U.S. 206 (2017) .................................................................... 27

*Tison v. Arizona,*
    481 U.S. 137 (1987) ............................................................... 24, 36

*Tuilaepa v. California,*
    512 U.S. 967 (1994) .......................................................... 21, 23, 50

*United States v. Barrett,*
    496 F.3d 1079 (10th Cir. 2007) .................................................. 49

*United States v. Bin Laden,*
    126 F. Supp. 2d 290 (S.D.N.Y. 2001) ...................................... 45, 51

*United States v. Bowers,*
    498 F. Supp. 3d 741 (W.D. Pa. 2020) ........................................ 51

*United States v. Davis,*
    904 F. Supp. 554 (E.D. La. 1995) .............................................. 34

*United States v. Delatorre,*
    157 F.3d 1205 (10th Cir. 1998) .................................................... 5

*United States v. Doka,*
    955 F.3d 290 (2d Cir. 2020) ....................................................... 38

ii

*United States v. Epskamp,*
   832 F.3d 154 (2d Cir. 2016) ....................................................... 25, 46

*United States v. Fell,*
   531 F.3d 197 (2d Cir. 2008) ...................................... *passim*

*United States v. Gonzalez,*
   520 U.S. 1 (1997) ..................................................................... 49

*United States v. Gooch,*
   No. 04-128-23, 2006 WL 3780781 (D.D.C. Dec. 20, 2006) ...... 9, 46, 47, 48

*United States v. Johnson,*
   764 F.3d 937 (8th Cir. 2014) ............................................... 5, 7

*United States v. McVeigh,*
   153 F.3d 1166 (10th Cir. 1998) ........................................... 51

*United States v. McVeigh,*
   944 F. Supp. 1478 (D. Colo. 1996) ...................................... 51

*United States v. Quinones*
   313 F.3d 49 (2d Cir. 2002) .................................................. 4, 8

*United States v. Saipov*
   No. 17-CR-722, 2023 WL 371531 (S.D.N.Y. Jan. 24, 2023) .................. 51

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998) .................................................. 37, 41

*United States v. Sampson,*
   486 F.3d 13 (1st Cir. 2007) ................................................. 24, 46

*United States v. Webster,*
   162 F.3d 308 (5th Cir. 1998) ............................................. 27-28, 34

*United States v. Whitten,*
   610 F.3d 168 (2d Cir. 2010) ............................................... 46, 49

*United States v. Wilson*
   420 U.S. 332 (1975) ........................................................... 4, 8

*United States v. Woolard*,
  981 F.2d 756 (5th Cir. 1993) ................................................................ 8

*Wisconsin v. Mitchell*,
  508 U.S. 476 (1993) ................................................................ *passim*

*Zant v. Stephens*,
  462 U.S. 862 (1983) ................................................................ 33

**Statutes**

18 U.S.C. § 245 ................................................................ 31

18 U.S.C. § 247 ................................................................ 31

18 U.S.C. § 249(a)(1)(B)(i) ................................................................ 3, 14

18 U.S.C. § 249(a)(1)(B)(ii) ................................................................ 3, 15

18 U.S.C. § 924(c)(1)(A)(i) ................................................................ 3

18 U.S.C. § 924(c)(1)(A)(iii) ................................................................ 3, 14, 15

18 U.S.C. § 924(j)(i) ................................................................ 3, 14

18 U.S.C. § 1962 ................................................................ 48

18 U.S.C. § 3231 ................................................................ 3

18 U.S.C. § 3591(a)(2) ................................................................ 22

18 U.S.C. § 3591(a)(2)(A) ................................................................ 15

18 U.S.C. § 3591(a)(2)(B) ................................................................ 15

18 U.S.C. § 3591(a)(2)(C) ................................................................ 15

18 U.S.C. § 3591(a)(2)(D) ................................................................ 15

18 U.S.C. § 3592 ................................................................ *passim*

18 U.S.C. § 3592(c) ................................................................ *passim*

18 U.S.C. § 3592(c)(9) ................................................................ 6, 15

18 U.S.C. § 3592(c)(6) ................................................................ 15

18 U.S.C. § 3592(c)(11) ................................................................ 15

18 U.S.C. § 3592(c)(16) ................................................................ 15

18 U.S.C. § 3593 ................................................................ *passim*

18 U.S.C. § 3593(a) ................................................................ *passim*

18 U.S.C. § 3593(a)(2) ................................................................ 23

18 U.S.C. § 3593(b) ............................................................. 22, 30

18 U.S.C. § 3593(c) ............................................................. *passim*

18 U.S.C. § 3593(d) ................................................................ 30

18 U.S.C. § 3593(e) ............................................................. 22, 30

18 U.S.C. § 3593(f) .............................................................. *passim*

18 U.S.C. § 3731 ................................................................. *passim*

34 U.S.C. § 20141(e)(2) ........................................................ 52, 53

**Rules**

Fed. R. Evid. Rule 404(b) ......................................................... 5

**Other**

Anti-Drug Abuse Act of 1988, Pub. L. 100-690, § 7001 Stat. 4392 ........... 31-32

Federal Death Penalty Act of 1994, Pub. L. 103-322, Title VI, Sec. 60002
(Sept. 13, 1994) ................................................................ 32

Webster's New Collegiate Dictionary (1979) .............................. 53

## PRELIMINARY STATEMENT

Defendant-appellee Payton Gendron is a self-avowed white supremacist who murdered ten Black people and injured three others at a grocery store in Buffalo, New York. (GA 1-12).[1] Gendron spent months planning every detail of his attack, from choosing a gun that would, in his words, "kill quickly and efficiently" (GA 388) to mapping a route through the store that would have the "highest chance of success." (GA 8). Shortly before his attack, Gendron published a self-described manifesto explaining his racist motivations, as well as his goal of "[k]ill[ing] as many blacks as possible." (*Id.*). To that end, Gendron chose his attack location because it had the largest percentage of Black people close to where he lived. (*Id.*). And "to increase coverage[,] . . .spread [Gendron's] beliefs," (*id.*) and "incite violence, retaliation, and further divide between the European people and the replacers," (GA 429), Gendron publicized his manifesto and wore a camera that livestreamed his attack on the internet. (GA 4, 8).

A federal grand jury charged Gendron in a 27-count indictment (GA 13 - 24), and the government filed a notice of its intent to seek the death penalty.

---

[1] References to "GA #" are to pages of the Government Appendix. References to "SD #" are to pages of sealed documents entered on the docket in *United States v. Payton Gendron*, 1:22-CR-109-LJV (W.D.N.Y.), which the government noticed as part of its record on appeal.

(GA 25-29). As part of that notice, the government alleged that Gendron should be sentenced to death because his crimes were aggravated by multiple factors, including that Gendron: (1) was motivated by racial animus; (2) committed the attack in an attempt to incite violence by others; and (3) caused serious physical and emotional injury to three victims whom he shot but who ultimately survived. (GA 28-29).

The district court struck each of these aggravating factors. (GA 415-41). As to the racial animus aggravator, the district court found that 18 U.S.C. § 3593(f)—an anti-discrimination statute prohibiting the jury from considering the defendant's and victims' race as a factor in the jury's sentencing recommendation—precludes a capital jury from considering Gendron's racist motivation as a stand-alone aggravating factor in deciding whether to recommend the death penalty. (GA 425-27). As to the attempt-to-incite-violence aggravator, the district court concluded that, notwithstanding Gendron's decision to commit murder and broadcast it on the internet, Gendron's statements explaining his motive were protected by the First Amendment, thereby invalidating the government's attempted incitement aggravator as a whole. (GA 427-34). And as to the injury-to-surviving victims aggravator, the district court concluded that testimony from those who narrowly survived a

2

mass shooting was irrelevant to whether Gendron should be sentenced to death. (GA 423-24). As explained below, each of these decisions is wrong. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court (Vilardo, J.) had jurisdiction pursuant to 18 U.S.C. § 3231 by reason of an Indictment charging Gendron, in Counts 1 – 10, with committing a hate crime resulting in death, in violation of 18 U.S.C. § 249(a)(1)(B)(i); in Counts 11 – 20, with discharging a firearm to commit murder, in violation of 18 U.S.C. § 924(c)(1)(A)(i), § 924(c)(1)(A)(iii), and § 924(j)(i); in Counts 21 – 23, with committing a hate crime involving an attempt to kill, in violation of 18 U.S.C. § 249(a)(1)(B)(ii); in Counts 24 – 26, with using and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and § 924(c)(1)(A)(iii); and in Count 27, with committing a hate crime involving an attempt to kill, in violation of 18 U.S.C. § 249(a)(1)(B)(ii). (GA 13 –24).

On January 12, 2024, pursuant to 18 U.S.C. § 3593(a), the government filed a notice of its intent to seek the death penalty as to Counts 11 – 20. (GA 25 -29). Pursuant to 18 U.S.C. § 3592(c), the notice alleged multiple statutory and non-statutory aggravating factors justifying a death sentence. (*Id.*). On

3

September 16, 2025, the district court issued a Decision and Order striking, as relevant here, three non-statutory aggravating factors: that Gendron's murders were motivated by racial animus; that in committing his attack, Gendron sought to inspire others to commit violence; and that Gendron caused physical and emotional injuries to three surviving victims. (GA 415-41). The government filed a timely notice of appeal on October 14, 2025. (GA 442-43).

This Court has jurisdiction pursuant to 18 U.S.C. § 3731. Section 3731 permits the government to appeal "a decision or order of a district court suppressing or excluding evidence." 18 U.S.C. § 3731. By its terms, § 3731 "shall be liberally construed to effectuate its purpose." *Id.* This means that "orders in criminal cases are 'appealable unless the appeal is barred by the Constitution.'" *United States v. Quinones*, 313 F.3d 49, 57 (2d Cir. 2002) (quoting *United States v. Wilson*, 420 U.S. 332, 339 (1975)) (finding that § 3731 conferred jurisdiction over government appeal of district court order striking death penalty notice).

Section 3731 therefore permits the government to appeal a district court order that excludes evidence for some, but not all, purposes. "Section 3731 . . . does not require that the order suppress or exclude evidence for all purposes," because "'[s]uch a construction would contravene not only § 3731's plain language, but also Congress's express desire to allow Government appeals from

4

*all* pretrial orders suppressing or excluding evidence in criminal proceedings.'" *United States v. Johnson*, 764 F.3d 937, 941-42 (8th Cir. 2014) (quoting *United States v. Delatorre*, 157 F.3d 1205, 1208-09 (10th Cir. 1998) (quotation and editorial marks omitted; emphasis in original) (in a capital case, finding jurisdiction under § 3731 to entertain government appeal of district court order "permit[ing] [the government] to introduce . . . evidence underlying the substantial planning and premeditation of . . . murders, so long as it was not introduced for the purpose of proving that statutory aggravating factor as to the murders" of certain victims)). *See also Delatorre*, 157 F.3d at 1208-09 (in a capital case, finding jurisdiction under § 3731 where the order disallowed evidence for purposes of proving guilt on specified charges, even where the district court "reserved ruling" on whether the government could introduce evidence under Rule 404(b) or at the penalty phase).

The district court struck three non-statutory aggravating factors from the government's notice of intent to seek the death penalty, thereby "excluding," 18 U.S.C. § 3731, evidence supporting those factors. As to the incitement and injury-to-surviving victims aggravators, the district court's order precludes the government from using evidence of Gendron's intent to inspire violence (GA 427-34) and evidence about injuries to surviving victims to establish those

5

aggravating factors. (GA 423–24). The district court's order therefore "suppress[es] or exclude[es] evidence," 18 U.S.C. § 3731, supporting those factors.

The district court's order also precludes the government from using evidence in support of the racial animus aggravator. (GA 425–27). The district court noted that evidence of Gendron's racist motivation would "absolutely . . . come in," (GA 426) (quoting statement from defense counsel at oral argument)—but not at sentencing in support of the racial animus aggravator. Rather, the district court stated that evidence of Gendron's racism would be admissible in the trial's guilt phase to prove the underlying hate crimes charges and in support of a different aggravating factor concerning Gendron's planning and preparation. (*Id.*). The district court's order nonetheless prevents the government from using *any* evidence of Gendron's racist motivation in support of the racial animus aggravator.[2] This Court therefore has jurisdiction to

---

[2] In any event, the district court's order provides the government with little guidance about what evidence will actually be admitted at sentencing. The district court stated that evidence of Gendron's racial animus may be admissible to prove the statutory aggravating factor that Gendron engaged in substantial planning and premeditation. (GA 426). *See* 18 U.S.C. § 3592(c)(9). But when Gendron moved to strike the substantial planning aggravator, the district court was equivocal about whether evidence of Gendron's racist motivation would be admissible: it stated that it was "*inclined* to admit *some*" evidence of Gendron's racist motivation in support of the substantial planning aggravator, but it

entertain the government's appeal as to that aggravator. *See Johnson*, 764 F.3d at 941-42 ("Section 3731 . . . does not require that the order suppress or exclude evidence for all purposes," because "[s]uch a construction would contravene not only § 3731's plain language, but also Congress's express desire to allow Government appeals from *all* pretrial orders suppressing or excluding evidence in criminal proceedings") (quotation marks omitted; emphasis in original).

Section 3731 also permits the government to appeal a district court order "dismissing an indictment . . . as to any one or more counts, or any part thereof." 18 U.S.C. § 3731. The non-statutory aggravating factors the district court struck were alleged in the government's notice of intent to seek the death penalty, rather than in the indictment. *See United States v. Fell*, 531 F.3d 197, 236-38 (2d Cir. 2008) (finding that the Fifth Amendment's Indictment Clause permits this practice). But this Court has held that § 3731 permits the government to appeal the dismissal of a notice to seek the death penalty, even where that notice is

---

ultimately concluded that "these issues are better suited for motions *in limine*." (GA 421-22) (emphases added). It is therefore unclear whether or to what extent—in a hate crimes trial where evidence of the defendant's racist motivation is overwhelming—the district court will admit evidence of Gendron's racial motivation for *any* purpose at sentencing.

7

provided separately from the indictment. *See Quinones*, 313 F.3d at 58. *See also United States v. Woolard*, 981 F.2d 756, 757 (5th Cir. 1993) (where notice of intent to seek death penalty was filed separately from indictment, finding jurisdiction to entertain government appeal of order striking death penalty notice because "[t]he district court effectively removed a discrete basis of criminal liability"). If § 3731 permits the government to appeal the dismissal of a notice to seek the death penalty, § 3731 should necessarily also permit the government to appeal the dismissal of *part* of a notice to seek the death penalty, particularly given Congress's intention to allow the government to appeal pretrial orders "unless the appeal is barred by the Constitution." *Wilson*, 420 U.S. at 339. Construing § 3731 "liberally . . . to effectuate [this] purpose[]," § 3731 therefore permits the government to appeal the district court's order as a decision "dismissing an indictment . . . or any part thereof." 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in concluding that 18 U.S.C. § 3593(f) bars a capital jury from considering Gendron's racist motivation for committing mass murder as a stand-alone aggravating factor justifying a death sentence.

2. Whether the district court erred in concluding that the First Amendment prohibits a capital jury from considering evidence of Gendron's

8

motivation to incite and inspire others to commit racially-motivated mass murder as an aggravating factor justifying a death sentence.

3. Whether the district court erred in concluding, based on *United States v. Gooch*, Crim. Action No. 04-128-23 (RMC), 2006 WL 3780781 (D.D.C. Dec. 20, 2006), that a capital jury may not consider evidence from surviving victims as an aggravating factor justifying a death sentence.

## COMBINED STATEMENT OF THE CASE AND FACTS

### A. Gendron's attack

On May 14, 2022, Gendron drove to a Tops Friendly Markets grocery store in Buffalo, New York, and pulled up to the front of the store. (GA 5). He was wearing a tactical-style helmet, camouflage clothing, body armor, and carrying a loaded Bushmaster XM-15 .223 caliber rifle on which he had written the names of racist mass shooters, racial slurs, and phrases such as, "Here's your reparations!," and "The Great Replacement." (GA 5-6). Gendron was also wearing a Go-Pro video camera that livestreamed a video feed to the internet. (GA 4-7).

Gendron exited his car and immediately shot four Black victims in the parking lot, three of whom died. (GA 5). As he approached the store's entrance, Gendron shot one of his victims a second time. (*Id.*). Gendron entered Tops, turned to his left, and shot and killed two more Black customers. (*Id.*). At that

9

point, Aaron Salter, an armed security guard (who was Black), exchanged gunfire with Gendron. (*Id.*). Gendron eventually shot and killed Salter. (*Id.*).

During the shootout with Salter, C.B. and J.W., two Tops employees, were shot and injured. (GA 5-6). After killing Salter, Gendron approached C.B., who is White, and pointed his gun at C.B. (GA 5). Gendron then told C.B., "sorry," and ran past C.B. without shooting him again. (GA 6). After passing C.B., Gendron observed a Black customer in a different checkout aisle. (*Id.*). Gendron shot that customer multiple times, killing him. (*Id.*). Gendron then stalked through the aisles, killing three more Black victims. (*Id.*).

By this point in the attack, Gendron had shot and killed ten Black victims, and he had shot three more victims, including a Black victim and two White victims, who ultimately survived. Gendron then returned to the front of the store and eventually surrendered to authorities. (*Id.*).

**B.     Gendron's manifesto and Discord journal[3]**

In the months preceding the attack, Gendron wrote a 180-page self-described "manifesto," which he posted online shortly before beginning his

---

[3] "'Discord is a real time messaging service with over 150 million active monthly users who communicate within a huge variety of interest-based communities[] or servers.'" (GA 429) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 787 (2024) (Alito, J., concurring)).

attack. (GA 7–8). *See generally* SD 411-1 (sealed copy of Gendron's manifesto). The manifesto made clear that Gendron's attack was the result of considerable tactical and strategic planning. The manifesto also made abundantly clear that Gendron acted out of a desire to, in his words, "[k]ill as many blacks as possible." (GA 8).

Gendron wrote that he was carrying out the attack to prevent Black people from replacing White people. (*Id.*). He also expressed his desire to incite others to commit similar racially-motivated attacks. (GA 429) (district court summarizing relevant portions of manifesto). To those ends, Gendron detailed his plan to shoot and kill as many Black people as possible in and around Tops. (GA 8). For example, Gendron's manifesto included a diagram of the interior layout of Tops (*id.*), and he explained his decisions to use a Bushmaster XM-15 .223 caliber rifle and wear a helmet, body armor, and a Go-Pro video camera. *See generally* SD 411-1 at 59-60.[4] In addition, Gendron made the following relevant statements (among many others):

- That he is "a White man seeking to protect and serve my community, my people, my culture, and my race," (GA 8);

---

[4] References to page numbers in SD 411-1 refer to the CM/ECF pagination in the header of each page.

11

- That his goals were to "[k]ill as many blacks as possible," "[a]void dying," and "[s]pread ideals," (*id.*);

- That one of his reasons for carrying out the attack was "[t]o incite violence, retaliation and further divide between the European people and the replacers," (GA 429);

- That he had targeted Black people because "[t]hey are an obvious, visible, and large group of replacers . . . that seek to occupy my peoples [sic] lands and ethnically replace my own people . . .," (GA 8);

- That he had selected a target in the zip code 14208 (where Tops is located) because it has the highest percentage of Black people within an area close to his home (*id.*);

- That he made a map of the inside of the Tops store "and decided the best plan of attack for highest chance of success," (*id.*);

- That he was inspired to commit the attack by other racially-motivated mass murderers (*id.*); and

- That he would livestream a video of the attack and publish the manifesto online "to increase coverage and spread [his] beliefs." (*Id.*).

12

In addition to his manifesto, Gendron used Discord to keep a lengthy running journal of his preparations and motivations. (GA 9). In his Discord journal:



- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████████████;[5]

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████;

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████;

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ███████;

---

[5] References to page numbers in Sealed Document 210 refer to the CM/ECF pagination in the header of each page.



- ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  █████████████████████ ;

- ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████ .

## C.     The indictment and notice of intent to seek the death penalty

On July 14, 2022, a federal grand jury sitting in the Western District of New York returned a 27-count indictment. (GA 13-24). For each of the ten murders, the indictment charges Gendron with committing a hate crime resulting in death, in violation of 18 U.S.C. § 249(a)(1)(B)(i); and discharge of a firearm causing death during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and § 924(j)(i). (GA 14-16). For the non-fatal shootings of Z.G., C.B., and J.W., the indictment charges Gendron with separate counts of committing a hate crime involving an attempt to kill, in

14

violation of 18 U.S.C. § 249(a)(1)(B)(ii); and use and discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (GA 17-19). The indictment also includes an additional charge of committing a hate crime involving an attempt to kill to encompass Gendron's attempt to kill Black people (other than the listed victims) because of their actual and perceived race and color. (GA 19). Finally, the indictment lists special findings that, if proven beyond a reasonable doubt at trial, make Gendron eligible for the death penalty. (GA 22-24).

On January 12, 2024, the government filed its notice of intent to seek the death penalty. (GA 25-29). The notice alleges that Gendron was 18 years or older at the time of his attack and that his conduct satisfies each of the four gateway intent factors listed in 18 U.S.C. § 3591(a)(2)(A)-(D). (GA 25-27). The notice also alleges the following statutory aggravating factors: grave risk of death to additional persons, *id.* § 3592(c)(6); substantial planning and premeditation, *id.* § 3592(c)(9); vulnerable victim, *id.* § 3592(c)(11); and multiple killings or attempted killings, *id.* § 3592(c)(16). (GA 27).

The notice also alleges five non-statutory aggravating factors: (1) that Gendron's crimes caused "injury, harm, and loss to the families and friends" of each person Gendron murdered; (2) that Gendron caused "serious physical and

emotional injury, and severe psychological impact" to three victims whom Gendron shot during his attack, but who ultimately survived; (3) that Gendron's "bias, hatred, and contempt toward Black persons . . . played a role" in the murders; (4) that "in preparation for and in committing the acts of violence charged in this case," Gendron "attempted to incite violent action by others;" and (5) that Gendron chose his attack location "in order to maximize the number of Black victims of the offense." (GA 28-29).

Gendron moved to strike each of the non-statutory aggravating factors.[6] *See* SD 268 (sealed motion to strike aggravating factors, other than surviving victim aggravator); GA 198-240 (publicly-filed redacted version of motion); SD 309 (sealed motion to strike surviving victim aggravating factor and establish procedures for testimony from other victims); GA 30-70 (publicly-filed redacted version of motion). After the government responded and the district court heard oral argument,[7] the district court issued a Decision and Order striking each of

---

[6] Gendron also moved to strike the statutory aggravating factors. The district court largely denied these motions, except as to one factor, which the district court found was better suited to a motion *in limine*. (GA 418-23).

[7] *See* SD 289 (government's sealed response to motion to strike aggravating factors); GA 128-97 (publicly-filed redacted version of response); GA 71-115 (government's response to motion to strike surviving victims aggravator); SD 341 (Gendron's sealed reply in support of motion to strike aggravating factors); GA 241-77 (publicly-filed redacted version of reply); GA 116-27 (Gendron's

the non-statutory aggravating factors, except for the impact of Gendron's crimes on the families of the deceased victims. (GA 415-41). As discussed in more detail below, the district court held: (1) that an anti-discrimination statute, 18 U.S.C. § 3593(f), required that the racially-motivated killings factor be struck (GA 425-27); (2) that *Brandenburg v. Ohio*, 395 U.S. 444 (1969), prevented the government from using Gendron's own words to prove that he was motivated by a desire to provoke additional race-based mass violence (GA 427–34); and (3) that evidence from victims of non-capital crimes, *i.e.*, the surviving victims, is not relevant at a capital sentencing hearing. (GA 423-24).[8]

## SUMMARY OF THE ARGUMENT

1.     A capital jury's ability to consider a defendant's motive—including his racist motive—when deciding whether to recommend a death sentence is firmly rooted in caselaw. The Federal Death Penalty Act (FDPA) prohibits a

---

reply in support of motion to strike surviving victim aggravator); GA 366-96 (government's post-argument supplemental brief in opposition to motion to strike); GA 397-414 (Gendron's response to government's post-argument supplemental brief); GA 278-365 (transcript of oral argument).

[8] The district court also struck the non-statutory aggravating factor alleging that Gendron selected his attack location to maximize the number of Black victims. (GA 434-35). The government does not appeal the district court's order striking this factor.

17

capital jury from "consider[ing]" a defendant's or victim's race in deciding whether to recommend a death sentence, and it requires capital juries to certify that they "would have made the same recommendation regarding a sentence for the crime in question no matter what the race . . . of the defendant or any victim may be." *See* 18 U.S.C. § 3593(f). But the statute that imposes that prohibition, 18 U.S.C. § 3593(f), does not prohibit a capital jury from considering a defendant's motive when selecting a sentence.

Section 3593(f) therefore does not disturb a jury's long-established ability to punish a defendant's blameworthy motive while also codifying the defendant's right to a jury that is free of racial animus. The statute's text, context, and broader legal framework support this conclusion. The statute's text simply prohibits the jury from recommending a death sentence *because* of the defendant's or victim's race. The law's intent, in other words, is to prohibit a *jury's* race-based motives. This is fundamentally different from recommending a death sentence because of a defendant's racist motives for committing the offense. Section 3593(f)'s surrounding statutory context underscores this conclusion. And nothing in § 3593(f) suggests that Congress intended the statute to overrule a contemporaneous Supreme Court decision that expressly permits

18

a capital sentencer to consider a defendant's racist motive when selecting a sentence.

2. It is beyond question that the government may introduce evidence of a defendant's speech and conduct to prove his motive or intent. *See Wisconsin v. Mitchell,* 508 U.S. 476, 489 (1993). This is true even in a capital sentencing hearing: Evidence of a defendant's beliefs is admissible at a capital sentencing if it is "relevant to prove" "motive or aggravating circumstances." *Fell*, 531 F.3d at 228. A defendant may not, of course, be punished for his abstract beliefs about race and violence. *Mitchell*, 508 U.S. at 485-86. But a capital jury must "consider all of the circumstances of the crime in deciding whether to impose the death penalty." *Jones v. United States*, 527 U.S. 373, 401-02 (1999) (plurality opinion). And if those "circumstances," *id.*, include a particularly blameworthy motive, the First Amendment does not prevent the jury from considering the defendant's speech as evidence of that motive.

Gendron killed his victims to fuel others to commit acts of racial violence. He also livestreamed his attack on the internet and publicized his manifesto and Discord journal with the express goal of spurring others to commit similar acts of mass violence. Gendron's motivation to provoke others to join him in committing acts of racial violence is outside the First Amendment's protections, and a capital

19

jury may properly consider those facts when recommending a sentence. Gendron's writings simply explain why he chose to commit his attack in the way he did. Allowing the admission of Gendron's speech in this way is classic motive evidence that focuses the jury on a particularly blameworthy aspect of Gendron's crimes. The district court therefore erred by viewing evidence of Gendron's speech through the framework of *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

3.      Surviving victims are "victims," as the FDPA defines that term, and evidence about injuries to surviving victims is "relevant," 18 U.S.C. § 3593(c), within the FDPA's framework.

The FDPA permits the government to present evidence about "any other [non-statutory] aggravating factor for which notice has been given." 18 U.S.C. § 3592(c). And other parts of the FDPA permit the government to allege as aggravating factors "the effect of the offense on the victim and the victim's family" as well as "any other relevant information." 18 U.S.C. § 3593(a). The FDPA's use of the word "any" signals Congress's intent to allow capital juries to consider a wide range of aggravating factors. The sole statutory limit is that aggravating factors must be "relevant," *id.*, to the jury's selection of the appropriate punishment. The selection decision requires the jury to make "an *individualized* determination on the basis of the character of the individual and the

20

circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (quotation marks and internal citation omitted; emphasis in original). A non-statutory aggravating factor is therefore "relevant," 18 U.S.C. § 3593(a), if it "direct[s] the jury to the individual circumstances of the case." *Jones*, 527 U.S. at 402. The aggravating factor in this case directs the jury to consider the injuries Gendron caused to three victims whom he shot in the course of murdering ten other victims. The factor is therefore relevant.

Other provisions of the FDPA make clear that the statute does not preclude testimony from surviving victims. The FDPA defines the term "victim" broadly and without distinguishing deceased from surviving victims. Likewise, the FDPA permits the government to introduce evidence about "the effect of the offense on the victim." 18 U.S.C. § 3593(a). If the term "victim" were limited to deceased victims, that language would serve no purpose, because the "effect of the offense on the victim" would always be the same: the offense killed the victim. Finally, the FDPA contemplates that a victim may have "attended or observed the trial," 18 U.S.C. § 3593(c), which would be impossible if the statute were limited to victims killed during the commission of the offense.

21

## ARGUMENT

I.     **The district court erred in holding that § 3593(f) prohibits a capital jury from considering Gendron's racist motivation as a stand-alone aggravating factor.**

A.     **Governing law and standard of review**

1.     **Law governing capital sentencing hearings generally**[9]

Capital trials proceed in two phases: guilt and punishment. If a defendant is found guilty of a death-eligible offense, the case proceeds to "a separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C. § 3593(b).

Juries in capital sentencing hearings make two decisions. The jury must first decide whether a defendant is eligible for the death penalty, which requires the jury to find "a statutory intent element or threshold mental culpability factor under [18 U.S.C.] § 3591(a)(2), and at least one of the statutory aggravating factors in [18 U.S.C.] § 3592(c)." *Fell*, 531 F.3d at 216. If the jury finds that the defendant is eligible for the death penalty, it then selects a sentence by deciding whether the aggravating factors "sufficiently outweigh" any mitigating factors "to justify a sentence of death." 18 U.S.C. § 3593(e).

---

[9] The governing law discussed here is also applicable to, and incorporated within, Issues II and III.

The FDPA requires the government to notify the defendant of the aggravating factors the government "proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a)(2). The FPDA identifies several statutory aggravating factors (such as the whether the defendant created a grave risk of death to others or engaged in substantial planning and premeditation), but it also permits the jury to "consider whether any other aggravating factor for which notice has been given exists." *Id.* § 3592(c). Statutory aggravating factors focus on circumstances "particularly relevant to the sentencing decision," *Gregg v. Georgia*, 428 U.S. 153, 192 (1976), by "enabl[ing] the sentencer to distinguish those who deserve capital punishment from those who do not." *Arave v. Creech*, 507 U.S. 463, 474 (1993).

A non-statutory aggravating factor is relevant to the jury's selection decision of "whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id.* (quotation marks and internal citation omitted; emphasis in original). Thus, a non-statutory aggravating factor "need only 'direct the jury to the individual circumstances of the case.' So long as it meets this requirement, a non-statutory aggravating factor ordinarily

23

will pass constitutional muster." *United States v. Sampson*, 486 F.3d 13, 46 (1st Cir. 2007) (quoting *Jones*, 527 U.S. at 401-402 (citation omitted)). At bottom, non-statutory aggravating factors are "relevant to the selection phase decision" because they ensure that "the sentencer . . . consider[s] all of the circumstances of the crime in deciding whether to impose the death penalty." *Jones*, 527 U.S. at 401-02.

### 2. Motive evidence and 18 U.S.C. § 3593(f)

"[T]he mental state with which the defendant commits the crime" is often "[a] critical facet of the individualized determination of culpability required in capital cases." *Tison v. Arizona*, 481 U.S. 137, 156 (1987). After all, "[d]eeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious the offense, and, therefore, the more severely it ought to be punished." *Id.* Thus, it is long-settled that a defendant's motive for committing a crime—including his racist motive—is relevant to how severely he should be punished. *Mitchell*, 508 U.S. at 485-86. This principle applies just the same in a capital case: the law allows the government to introduce evidence of a defendant's racist beliefs in a capital sentencing hearing so long as that evidence is "relevant to prove, for example, motive or aggravating

24

circumstances, to illustrate future dangerousness, or to rebut mitigating evidence." *Fell*, 531 F.3d at 228.

Before a capital jury makes a sentencing recommendation, the court must instruct the jury about factors it may not consider when making its recommendation. Specifically, 18 U.S.C. § 3593(f) requires a court to instruct a capital jury that, "in considering whether a sentence of death is justified, [the jury] shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and . . . the jury is not to recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be." 18 U.S.C. § 3593(f). The statute then requires each juror to sign a certificate stating that they have not considered the protected characteristics of the defendant and victim and that the juror "would have made the same [sentencing] recommendation" regardless of the defendant and victim's protected characteristics. *Id.*

This Court reviews "questions of statutory interpretation *de novo*." *United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016) (quotation marks omitted).

25

### B. The district court's decision

The district court held that 18 U.S.C. § 3593(f) required that the racial animus aggravator be stricken. Section 3593(f) prohibits a capital jury from "consider[ing]" a defendant's or victim's race in deciding "whether a sentence of death is justified." 18 U.S.C. § 3593(f). The district court held that the racially-motivated killings aggravator "asks the jury to focus on the victims' race as a reason to select a death sentence." (GA 427). That, the district court held, would violate § 3593(f)'s "proscription against even 'consider[ing]' the victims' race for that purpose." *Id.* In its briefing, the government argued that § 3593(f) does not prevent a capital jury from considering the defendant's racist *motives* for committing a capital crime; it simply requires a capital jury to certify that it would have returned the same sentence regardless of the defendant's and victims' race. The district court rejected this argument as inconsistent with § 3593(f) and something that "likely would be . . . perplexing to a lay jury." *Id.*

### C. Discussion

Section 3593(f) does not prohibit a capital jury from considering a defendant's *motive*—including his racist motive—for committing a capital crime. To the contrary, the statute's text, context, and broader legal framework show

that § 3593(f) does nothing to displace well-established law permitting a jury to consider a defendant's racist motives at a capital sentencing hearing.

To start, § 3593(f)'s text contains a single prohibition: when "considering whether a sentence of death is justified," a jury "may not consider" the defendant's or victims' race or other protected characteristics. 18 U.S.C. § 3593(f). A defendant has a right to a jury that acts free of "racial stereotypes or animus." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017). Section 3593(f) therefore does nothing more than codify that right. The rest of § 3593(f) confirms the statute's limited (though important) function. After prohibiting a jury from "consider[ing]" a defendant's or victim's race, the statute requires each juror to certify that he or she "would have made the same recommendation regarding a sentence for the crime in question no matter what the race . . . of the defendant or any victim may be." 18 U.S.C. § 3593(f).

In other words, § 3593(f)'s prohibition on "consider[ing]," 18 U.S.C. § 3593(f), a defendant's or victim's race means that the jury must ask itself whether it would have recommended the same sentence if the defendant's and victim's race were different. Section 3593(f) therefore furthers the prohibition established in caselaw against "using race . . . as a proxy" for whether a defendant is deserving of capital punishment, *United States v. Webster*, 162 F.3d

27

308, 356–57 (5th Cir. 1998). This simply means that a defendant's or victim's race cannot be a reason for a jury to recommend a death sentence. By contrast, § 3593(f) does not prohibit a jury from considering a defendant's motive, including a race-based motive, when deciding whether to recommend a death sentence. Punishing a defendant differently because he committed his crime with an especially abhorrent motive is far different than punishing a defendant because of what a juror may think about his or his victim's race. Section 3593(f)'s text prohibits only the latter.

A capital jury's ability to consider a defendant's motive is firmly rooted in case law. Sentencers have "[t]raditionally . . . considered a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant." *Mitchell*, 508 U.S. at 485. One such "important factor" is the "defendant's motive for committing the offense." *Id.* And motive may, of course, include whether a defendant committed his crime out of racial animus. *See id.* at 485-87. The law requires only that motive-based aggravating evidence be "related to" the crime for which the defendant is being punished. *Id.* at 486. Stated differently, a jury may not consider a defendant's racist beliefs if those beliefs are not related to a permissible aggravating factor. *See Dawson v. Delaware*, 503 U.S. 159, 166 (1992) (holding that evidence of defendant's

28

membership in Aryan Brotherhood was not admissible in capital sentencing because evidence "was not tied in any way to murder of [defendant's] victim"). Nothing in § 3593(f)'s text changes this well-established law.

To the contrary, statutory context underscores § 3593(f)'s limited purpose. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[Courts] must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose."). Put in "context and with a view to [its] place in the overall statutory scheme," *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989), § 3593(f) is best understood not as a substantive prohibition on what is (or is not) a permissible aggravating factor, but as a procedural rule governing the process a court must follow in instructing the jury and the process a jury must follow in submitting its death-related findings.

An adjoining section, 18 U.S.C. § 3592, confirms § 3593's procedural role. Section 3592 is titled "Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified." As its title suggests, § 3592 contains a lengthy list of potential aggravating and mitigating factors the jury may consider. Had Congress intended § 3593(f) to function as a prohibition on certain aggravating factors, it would have made much more sense for Congress to have made § 3593(f) a part of § 3592—not § 3593.

29

Read as a whole, § 3593 then confirms that § 3593(f) is part of a procedural section, rather than a substantive prohibition on permissible aggravating factors. Section 3593 contains multiple procedural rules governing capital sentencing hearings. The section, for instance, describes the content of the government's notice of intent to seek the death penalty, *id.* § 3593(a); the circumstances under which the court or a jury will decide the sentence, *id.* § 3593(b); the governing evidentiary rules, *id.* § 3593(c); which party opens a sentencing hearing and bears the burden of proof, *id.*; and the manner in which the jury must report its special findings and recommended sentence. *Id.* § 3593(d); *id.* § 3593(e). At the end of that long list of procedural rules is § 3593(f), which is titled, "Special Precaution To Ensure Against Discrimination." The provision's placement at the end of a procedural section of the FPDA shows that Congress intended § 3593(f) to function as a procedural rule governing the jury's instructions and post-verdict certification. And § 3593(f)'s section title demonstrates that Congress was focused on preventing jury discrimination (rather than precluding evidence of a defendant's motive). *See Dubin v. United States*, 599 U.S. 110, 121 (2023) (observing that a statute's "title and place in the statutory scheme" can "shed light on its text").

30

Section 3593(f)'s placement in the larger statutory scheme likewise shows that Congress did not intend the provision to prevent a capital jury from considering a defendant's racial animus. Indeed, Congress has authorized capital punishment for certain crimes that are committed "*because of*" a person's race, color, religion, or national origin. *See* 18 U.S.C. § 245, § 247. Yet upholding the district court's reading of § 3593(f) would prevent the government from addressing the nature of these crimes when seeking the death penalty, even though Congress made them death eligible. Interpreting § 3593(f) to preclude a capital jury from considering a defendant's racist motivation as an aggravating factor would place § 3593(f) in tension with certain capital crimes for which a defendant's racist motivation is an element of the crime. *See, e.g.*, *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) ("[W]e presume that Congress is aware of existing law when it passes legislation." (quotation omitted)); *Hohn v. United States*, 524 U.S. 236, 249 (1998) ("We are reluctant to adopt a construction making another statutory provision superfluous.").

Section 3593(f)'s history supports this interpretation. What ultimately became § 3593(f) was first enacted as part of the death penalty procedures in Title VII of the Anti-Drug Abuse Act (ADAA) of 1988. *See* Pub. L. 100-690, § 7001,

31

102 Stat. 4392.[10] That statute was passed just five years after the Supreme Court held in *Barclay v. Florida*, 463 U.S. 939 (1983) (plurality opinion), that the Constitution permits a sentencer to consider a defendant's racist motives when imposing a capital sentence.

In *Barclay*, the defendant was "part of a group that termed itself the Black Liberation Army . . . whose apparent sole purpose was to indiscriminately kill white persons and to start a revolution and race war." 463 U.S. at 942 (quotation marks omitted and capitalization normalized). The defendant murdered a white man and left evidence explaining his racist motivations for doing so. *Id.* at 942-44. After being convicted of murder, the defendant was sentenced to death. In imposing a death sentence, the district court "found [the defendant's] desire to start a race war relevant to several aggravating factors." *Id.* at 948.

The Supreme Court affirmed, holding that, when deciding whether to impose a capital sentence, the Constitution does "not prohibit a trial judge from taking into account the elements of racial hatred" that motivated the defendant to commit murder. *Barclay*, 463 U.S. at 948. As the Supreme Court later summarized, *Barclay* held that "it [is] permissible for the sentencing court to

---

[10] Section 3593(f) was passed as part of the Federal Death Penalty Act of 1994. *See* Pub. L. 103-322, Title VI, Sec. 60002 (Sept. 13, 1994). In all relevant respects, § 3593(f) is nearly identical to the relevant provisions of the ADAA.

consider the defendant's racial animus in determining whether he should be sentenced to death, surely the most severe [sentencing] enhancement of all." *Mitchell*, 508 U.S. at 486 (quotation marks omitted); *see also Dawson*, 503 U.S. at 166 (observing it was "most proper" for the sentencing court to consider "'the elements of racial hatred' in [the victim's] murder'" (quoting *Barclay*, 463 U.S. at 949)). Indeed, "the Constitution does not require the jury to ignore other possible [non-statutory] aggravating factors in the process of selecting, from among that class [of death-eligible defendants], those defendants who will actually be sentenced to death." *Zant v. Stephens*, 462 U.S. 862, 878 (1983). To the contrary, "the sentencer should consider all of the circumstances of the crime in deciding whether the impose the death penalty." *Jones*, 527 U.S. at 401-02. *Barclay*, then, stands for the self-evident principle that when a defendant's entire reason for committing a crime is racism, a capital jury is permitted to consider that fact in making "an individualized determination," *Zant*, 462 U.S. at 879 (emphasis omitted), of what sentence to recommend.

Congress, of course, "legislates against the backdrop of existing law," including decisions from the Supreme Court. *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013). If Congress had intended § 3593(f) to overrule *Barclay*—which is

the effect of the district court's decision in this case—it surely would have said so explicitly.[11] Yet nothing in § 3593(f) displaces this case law.

Finally, this interpretation of § 3593(f) aligns with "common sense, which is a fortunate (though not inevitable) side-benefit of construing statutory terms fairly." *Abramski*, 573 U.S. at 179. Section 3593(f)'s plain purpose was "to prevent prejudice and bigotry from influencing the jury's findings." *United States v. Davis*, 904 F. Supp. 554, 563 (E.D. La. 1995). Gendron killed ten Black people because of his racist motivations and now seeks to use a statute meant "to prevent prejudice and bigotry," *id.*, as a shield to prevent the jury from considering his racist motives as a stand-alone sentencing factor in a *hate crimes trial.* As even the district court recognized, "[i]t seems completely incongruous to have [§ 3593(f)] undercut this argument here." (GA 329). But that

---

[11] What is more, when Congress added § 3593(f)'s predecessor to the ADAA, it passed another statute—which immediately follows the ADAA's anti-discrimination provision—requiring that a study be performed to assess whether, in different states, certain aggravating and mitigating factors "may account for any evidence that the race of the defendant, or the race of the victim, influences the likelihood that defendants will be sentenced to death." 102 Stat. 4392. This directive sheds light into Congress's intent in passing what ultimately became § 3593(f): Congress sought to ensure that defendants were not sentenced to death *because of* their or their victims' race. In other words, Congress's concern was that race would not be used "as a proxy" for whether a defendant is deserving of capital punishment. *Webster*, 162 F.3d at 356–57. Section 3593(f)'s text, as described above, confirms this understanding.

34

"incongru[ity]," (*id.*) signals that the common-sense interpretation of § 3593(f) is also the correct one. Gendron's argument would require the jury to find, in the trial's guilt phase, that Gendron killed his victims because of their race. But, as Gendron would have it, the jury would then be prohibited from considering that fact, standing alone, in the sentencing hearing. Using § 3593(f) in the way Gendron seeks is far afield of what Congress intended.

As alleged, the racially-motivated killings aggravator fits comfortably alongside § 3593(f) and case law governing the use of motive evidence as an aggravating factor. The aggravating factor alleges that Gendron "expressed bias, hatred, and contempt towards Black persons," and it then alleges that Gendron's "animus towards Black persons played a role in the killings" of each of the victims. (GA 28). In other words, the aggravating factor draws the required connection between Gendron's racial animus and his crimes by alleging that Gendron's racial animus was "related to" the crimes for which he is being punished. *Mitchell*, 508 U.S. at 486. The aggravating factor therefore asks the jury to punish Gendron more severely because he had a racist motive for committing murder—not because of the jury's improper reliance on prejudice or bigotry.

The district court therefore erred by applying § 3593(f) to the racial animus aggravating factor. The district court read the aggravating factor to allege that

35

Gendron expressed "bias and animus" towards Black people and then concluded that "that specific focus on the victims' race . . . conflicts with the FDPA." (GA 427). But that is not what the aggravating factor alleges; as the law requires, the factor alleges that Gendron's bias and animus "played a role" in his crimes (GA 28)—in other words, that his crimes were motivated by bias. The district court ignored this language in the aggravator. And based on that cramped reading, the district court erred when it found that § 3593(f) prohibited the jury from considering Gendron's motive.

The district court's remaining concern was that it would be "perplexing" to ask the jury to separate Gendron's motivation from his victims' race. (GA 426 – 27). But a jury is surely capable of distinguishing between these straightforward concepts. And regardless, the apparently "perplexing" nature of this distinction is contrary to the principle that "the sentencer should consider all of the circumstances of the crime in deciding whether to impose the death penalty." *Jones*, 527 U.S. at 401-02. Gendron is being tried for murdering ten people based on his racial hatred. Precluding the jury from considering that fact, standing alone, in making an "individualized determination of [Gendron's] culpability" in a capital case, *Tison*, 481 U.S. at 156, asks the jury to ignore reality. Section 3593(f) does not require that result.

36

**II.  The district court erred in holding that the First Amendment precludes the government from introducing evidence showing that, in preparing for and committing his attack, Gendron was motivated by a desire to incite violence.**

**A.  Governing law and standard of review**

The First Amendment "does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). And, of course, "a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment." *Mitchell*, 508 U.S. at 484. It is likewise "beyond cavil that 'the First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.'" *United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998) (quoting *Mitchell*, 508 U.S. at 489 (quotation and editorial marks omitted)). The government thus "may introduce evidence" of what would otherwise be protected by the First Amendment if doing so is "relevant to prove, for example, motive or aggravating circumstances." *Fell*, 531 F.3d at 228. The government, of course, cannot offer First Amendment-protected conduct "to prove nothing more than" a defendant's "abstract beliefs." *Dawson*, 503 U.S. at 166. But if that evidence is "relevant to help prove any aggravating circumstances," it is admissible. *Id.* (observing that "[i]n many cases . . . associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society," such as "[a] defendant's

37

membership in an organization that endorses the killing of any identifiable group").

This Court reviews legal questions, "including questions of constitutional interpretation," *de novo*. *United States v. Doka*, 955 F.3d 290, 293 (2d Cir. 2020).

**B.    The district court's decision**

The incitement-to-violence aggravator alleges that, "in preparation for and in committing the acts of violence charged in this case," Gendron "attempted to incite violent action by others." (GA 28). The district court rejected the government's argument that this aggravator is outside the First Amendment's protections because it seeks to punish Gendron's motive, not speech. The district court instead accepted Gendron's invitation to apply the test for incitement in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and, thus, categorically rejected the incitement-to-violence factor, finding that Gendron's statements evidencing a desire to inspire other racist mass shooters were constitutionally protected speech. (GA 428). The district court found that there was "certainly evidence" that Gendron had the "intent to incite unlawful violence." (GA 429). The district court, however, concluded that the government had presented insufficient evidence that Gendron's words were likely to lead to imminent violence. (GA 432-33). In so doing, the district court

ignored that Gendron's actions themselves—committing mass murder and broadcasting it on the internet—are not constitutionally protected conduct, and it rejected the government's argument that Gendron's words are simply evidence of motive and intent that explain Gendron's actions.

## C. Discussion

The First Amendment does not prohibit the evidentiary use of Gendron's speech and conduct to prove that "in committing the acts of violence charged in this case," Gendron sought to, in his own words, "incite" violent action by others. (GA 28). *See also* GA 429 (district court quoting Gendron's manifesto, which stated that Gendron sought "[t]o incite violence, retaliation and further divide between the European people and the replacers."). This factor does not seek to punish Gendron for his speech. It instead uses Gendron's words to explain why his conduct is particularly blameworthy.

Gendron committed racist mass murder in a way, and with the intent, to encourage others to do as he had done. To start, Gendron committed his attack at mid-day at a popular neighborhood grocery store at which Gendron knew he could inflict mass casualties upon Black victims. This conduct, of course, enjoys no First Amendment protection. *See Claiborne Hardware Co.*, 458 U.S. at 916 ("The First Amendment does not protect violence."). Gendron's words explain

39

why he committed his attack and chose to broadcast it over the internet. Gendron's words are therefore "relevant to prove" his unique "motive [and] aggravating circumstances." *Fell*, 531 F.3d at 228. As Gendron wrote, he was inspired to commit his attack after watching a video of another white supremacist, Brenton Tarrant, who livestreamed himself killing 51 people at a mosque in Christchurch, New Zealand. *See* GA 387 (citing SD 411-1 at 9) ("Is there a particular person that radicalized you the most? Yes and his name is Brenton Harrison Tarrant. Brenton's livestream started everything you see here."). Gendron, in other words, was inspired to commit racially-motivated mass murder by watching another racially-motivated mass murderer's livestreamed attack. Gendron chose to livestream his own attack with the intent of inspiring others, just as Tarrant had inspired him. *See* GA 429 (citing Sealed Document 411-1 at 60). And in doing so, Gendron wrote that he hoped to "incite violence, retaliation and further divide between the European people and the replacers." (GA 429).

Gendron's speech, then, cannot be divorced from his decision to commit and livestream the attack; to the contrary, his words explain why he did what he did. This is classic motive evidence for which the First Amendment offers no protection. Indeed, as this Court has observed, "[i]t is difficult to comprehend"

the argument that the government may not prove motive or intent using otherwise First Amendment-protected speech. *Salameh*, 152 F.3d at 111-12 (making this observation to reject argument that defendant's First Amendment rights were violated by "admission of . . . terrorist materials" to prove "existence of the bombing conspiracy and its motive").

To the extent that any part of Gendron's speech is, standing alone, protected by the First Amendment, the only question is whether such speech is "relevant to the issues involved" at sentencing. *Dawson*, 503 U.S. at 164. That standard is met here. The incitement aggravator "direct[s] the jury to the individual circumstances of the case," *Jones*, 527 U.S. at 402, by identifying reasons why Gendron's motive is particularly blameworthy. Not every murderer is motivated by a desire to spur mass violence, and not every murderer who is so inspired takes concrete steps to inspire other would-be mass murderers. *See Mitchell*, 508 U.S. at 488 ("As Blackstone said long ago, 'it is but reasonable that among crimes of different natures those should be most severely punished, which are the most destructive of the public safety and happiness.'" (quoting 4 W. Blackstone, *Commentaries* \*16)). Nothing else is required for the government to use Gendron's speech to explain his motive.

41

Rather than considering the totality of the evidence supporting this aggravator—including, importantly, the attack itself and Gendron's decision to livestream the attack—the district court analyzed this aggravator solely through the lens of *Brandenburg v. Ohio*, 395 U.S. 444 (1969). That approach is mistaken. This aggravating factor does not (and could not) seek to punish Gendron for speech *qua* speech or his "abstract beliefs," *Dawson*, 503 U.S. at 166, about race and violence. Rather, the factor seeks to prove that Gendron had a particularly abhorrent reason for committing this particular attack. The aggravating factor alleges that "in committing" murder, Gendron "attempted to incite violent action by others." (GA 28). In other words, unlike the defendant in *Brandenburg*, who was convicted under a syndicalism statute for his comments at a KKK rally, Gendron is not being punished for his words. His words merely help explain his reason for "committing the acts of violence charged in this case." (*Id.*). And it is well settled that "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Mitchell*, 508 U.S. at 489.

The district court acknowledged that the First Amendment does not prohibit the "'evidentiary use of speech to establish the elements of a crime or to prove motive or intent.'" (GA 433) (quoting *Mitchell*, 508 U.S. at 485, 498). But

42

the district court isolated Gendron's speech from his actions and analyzed his speech in a vacuum. By limiting its analysis to whether Gendron's words constitute "incitement" under *Brandenburg*, the district court failed to consider that Gendron's words explain Gendron's conduct and action—that is, the attack itself, as well as Gendron's decision to livestream the attack. The district court instead concluded that "the aggravating factor the government seeks to prove is that Gendron attempted to incite violence," rather than his motivation. (GA 433).

The district court's reasoning is flawed. The incitement aggravator alleges motive evidence through and through: it ties Gendron's stated goal—"incit[ing] violent action by others"—to his conduct: "committing the acts of violence charged in this case." (GA 28). The incitement aggravator therefore alleges that one of Gendron's reasons for "committing . . . acts of violence," (*id.*) was to inspire and effectuate further violence. Moreover, the district court failed to acknowledge the incitement aggravator's reference to Gendron "prepar[ing] for and . . . committing acts of violence." (*Id.*). That allegation, however, is critical to understanding why Gendron's speech here may be used as motive evidence.

Finally, the district court treated the aggravating factor as implicating the First Amendment principle of "incitement" because the factor alleged happens

43

to use the word "incite." (GA 433-434). That was mistaken. Incitement is a First Amendment principle that permits certain speech, referred to as "incitement," to be punished because it "fall[s] outside the scope of the First Amendment." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 471 (2025). But that principle plays no role here, because the aggravating factor does not seek to *punish* Gendron for his speech. Rather, it uses Gendron's own speech, which happens to include the word "incite," to show that Gendron carried out his attack with a particularly blameworthy motive: to "incite" or encourage others to do the same. There is no reason why Gendron can shield himself from the evidentiary use of his own speech by using First Amendment buzzwords such as "incitement" to describe his motive.

At bottom, the incitement aggravator "direct[s] the jury to the individual circumstances of the case," *Jones*, 527 U.S. at 402, by identifying one of Gendron's particularly blameworthy motives for committing his attack. The First Amendment does not protect Gendron from the use of his own words to explain his actions.

44

**III. The district court erred in holding that evidence from surviving victims is not relevant to a capital jury's sentencing recommendation.**

**A. Governing law and standard of review**

In a capital case, the Constitution permits the government to allege non-statutory aggravating factors so long as those factors "ha[ve] a core meaning that criminal juries should be capable of understanding" and "direct the jury to the individual circumstances of the case." *Jones*, 527 U.S. at 400, 402. This broad authority ensures that "the sentencer . . . consider[s] all of the circumstances of the crime in deciding whether to impose the death penalty." *Id.* at 401-02. To that end, "Congress allowed for the admission of non-statutory aggravating factors precisely because it could not foresee every criminal circumstance that might arise." *United States v. Bin Laden*, 126 F. Supp. 2d 290, 302 (S.D.N.Y. 2001). In addition to sixteen enumerated statutory aggravating factors, the FDPA therefore permits a jury to "consider whether *any* other aggravating factor for which notice has been given exists." 18 U.S.C. § 3592(c) (emphasis added).

Permissible aggravating factors "include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." 18 U.S.C. § 3593(a). As its text

45

makes clear, this is "language of inclusion, not exclusion." *United States v. Whitten*, 610 F.3d 168, 188 (2d Cir. 2010) (rejecting argument that § 3593(a) limits victim impact evidence to impact on family members alone, and upholding introduction of victim impact testimony given by victims' police colleagues). *See also Sampson*, 486 F.3d at 44 ("The FDPA broadly provides that the government may present any information relevant to an aggravating factor for which notice has been provided." (quotation and editorial marks omitted)). The statute further provides that, at the sentencing hearing, "information may be presented as to any matter relevant to the sentence." 18 U.S.C. § 3593(c).

This Court reviews "questions of statutory interpretation *de novo*." *Epskamp*, 832 F.3d at 160 (quotation marks omitted).

## B.     The district court's decision

The district court precluded the government from introducing evidence regarding the physical and emotional effects that Gendron's attack had on the individuals who survived his attack. (GA 423-34). Relying on a single district court decision, *United States v. Gooch*, Crim. Action No. 04-128-23 (RMC), 2006 WL 3780781 (D.D.C. Dec. 20, 2006), the district court effectively concluded, as a matter of law, that evidence from a person who survives a death-eligible offense is "not relevant to . . . capital sentencing" because those persons are not

46

"victims" under the FDPA. *Gooch*'s analysis of this issue is, in its entirety, as follows:

> Clearly, the FDPA refers to the victims of a capital crime. Whether Mr. Gooch committed additional, noncapital murders will be determined in the guilt phase by the jury and may be noted as a nonstatutory aggravating factor if the trial advances to the selection phase. That does not mean, however, that the families of his other alleged victims can properly testify at the selection phase. Mr. Gooch's sentence for any noncapital crimes of which he is found guilty will be determined by the Court. The families of any other murder victims will have the opportunity to address the Court for that sentencing. Their losses and emotions are not relevant to whether the jury selects the death penalty for the alleged murders of Mr. Cooper and Ms. Miller and would also be more prejudicial than probative. *See* 18 U.S.C. § 3593(c).

*Id.* at *22 (footnote related to the Crime Victims' Rights Act omitted). The district court here held, without further discussion, that it "agrees with the court in *Gooch* that victim impact evidence related to the non-capital crimes is not relevant to the capital sentencing." (GA 424).

## C.    Discussion

In the course of murdering ten people, Gendron also shot three victims who ultimately survived. (GA 6). The government alleged as an aggravating factor that Gendron "caused serious physical and emotional injury, and severe psychological impact" to those victims. (GA 28). The district court relied on *Gooch* to conclude

47

that these victims may not offer evidence of their injuries because they are not victims of capital crimes.

By relying on *Gooch*, the district court appears to have determined that the term "offense" in 18 U.S.C. § 3593(a) is limited to capital offenses and that, as a result, victim testimony about non-capital offenses is not "relevant." But nothing in § 3593's text supports that conclusion. The district court's interpretation, based solely on *Gooch*, of who is a "victim" entitled to present victim impact evidence, is wrong.[12]

The FDPA's plain text confirms that the government may present testimony from surviving victims. To start, § 3592(c) permits the government to present evidence about "*any* other aggravating factor for which notice has been given." 18 U.S.C. § 3592(c) (emphasis added). Section 3593(a) then repeats that expansive language by permitting the government's notice of intent to allege as

---

[12] In this regard, *Gooch* is also factually distinguishable from this case. In *Gooch*, the government sought to introduce testimony from family members of five murder victims, two of whom were victims of capital murder charges. Although it is unclear, the noncapital victims appear to have been murdered in the course of separate criminal events that were connected to the capital charges through the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. Here, by contrast, the government intends to introduce testimony from the surviving victims themselves. And unlike *Gooch*, the surviving victims in this case were injured during the same conduct that gave rise to the capital charges.

48

aggravating factors "the effect of the offense on the victim and the victim's family" as well as "*any* other relevant information." 18 U.S.C. § 3593(a) (emphasis added). *See Whitten*, 610 F.3d at 188 ("The final phrase ('and any other relevant information'), though ambiguous, is read most naturally as a catch-all for what may be deemed 'relevant' by the court"). Finally, § 3593(c) provides that information may be presented at the sentencing hearing "as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." 18 U.S.C. § 3593(c). The FDPA thus uses the word "any" to describe permissible aggravating factors. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). Other parts of the FDPA similarly show Congress's intent to place few limits on aggravating factors. *See United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007) ("[The FDPA's] use of the phrases 'may include' and 'any other relevant information' clearly suggests that Congress intended to permit the admission of any other relevant evidence."); *cf. Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 54-55 (2d Cir. 1988) (noting that the phrase "includes" does not mean "is limited to").

49

The sole limit on non-statutory aggravating factors is relevance. As noted, § 3593(a) states that aggravating factors "may include" various types of victim impact evidence "and any other *relevant* information." 18 U.S.C. § 3593(a). (emphasis added). And § 3593(c) provides that, at the penalty phase, "information may be presented as to any matter *relevant* to the sentence." 18 U.S.C. § 3593(c) (emphasis added).

Evidence about the effect of Gendron's crimes on surviving victims is "relevant" within the framework of the FDPA. The FDPA requires that aggravating factors be "relevant to the sentence." *Id.* At the selection phase of a sentencing hearing, the jury is asked to make "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972 (quotation marks omitted; emphasis omitted). Thus, a non-statutory aggravating factor is "relevant to the sentence," 18 U.S.C. § 3593(c), if it "direct[s] the jury to the individual circumstances of the case." *Jones*, 527 U.S. at 402.

When a defendant commits an offense that harms multiple victims, such as a mass shooting, the effect of his crimes on surviving victims is "relevant" to the sentencing determination because it focuses on "the individual circumstances of the case." *Id*. Evidence from surviving victims is

50

individualized—and, thus, relevant—because it "inform[s] the sentencing authority about the specific harm caused by the crime," and it allows the jury "to assess meaningfully the defendant's moral culpability and blameworthiness." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). As the Supreme Court has observed, "there is nothing unfair about allowing the jury to bear in mind [the] harm [the defendant caused] at the same time as it considers the mitigating evidence introduced by the defendant." *Id.* at 826. Reflecting this understanding, courts have permitted testimony from surviving victims, and several have done so by rejecting the same argument Gendron makes here.[13] Impact evidence from surviving victims is, then, "relevant to the sentence." 18 U.S.C. § 3593(c).

---

[13] *See United States v. McVeigh*, 153 F.3d 1166, 1216-17 (10th Cir. 1998) (observing that victim testimony included testimony from three surviving victims); *United States v. Saipov*, S1 17-CR-722 (VSB), 2023 WL 371531 at *13 (S.D.N.Y. Jan. 24, 2023) (rejecting argument based on analysis of FDPA's text, and observing that "it is hard to imagine why Congress would have intended the phrase to be read as narrowly as Saipov urges without explicitly limiting it"); *United States v. Bowers*, 498 F. Supp. 3d 741, 757 (W.D. Pa. 2020) (rejecting argument concerning evidence from surviving victims because it "lacks support in the caselaw"); *Bin Laden*, 126 F. Supp. 2d at 300-301 (finding that injury to surviving victims aggravator was duplicative of injury to victims aggravator, but permitting testimony from surviving victims); *United States v. McVeigh*, 944 F. Supp. 1478, 1491 (D. Colo. 1996) ("Congress expressly provided for victim impact consideration in the [FDPA] but it did not put any limits on what can be considered.")

51

Nothing in the FDPA limits victim impact evidence to evidence only about deceased victims. Indeed, such an interpretation would be nonsensical: if § 3593(a)'s reference to "effect of the offense on the victim" were limited to deceased victims, it is difficult to understand what purpose that language would serve, because the "effect of the offense on the victim" would be straightforward and identical in every case: the offense caused the victim's death. Section 3593(a)'s text thus contemplates testimony from surviving victims.

Section 3593(c) supports this interpretation. That provision describes the procedures at a sentencing hearing and states that "the fact that a victim, as defined in section 3510, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Section 3510 defines the term "victim" by cross referencing 34 U.S.C. § 20141(e)(2), which defines a victim as "a person who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime." 34 U.S.C. § 20141(e)(2).

Two conclusions follow from the text of § 3593. First, nothing in the text of § 3593—nor in any of the statutes that § 3593 cross references—limits victim impact testimony to victims who died as a result of a defendant's crimes. To the contrary, the definition of "victim" is expansive and focuses only on whether a

52

person suffered "harm as a result of the commission of a crime," 34 U.S.C. § 20141(e)(2)—not on whether that person survived. This definition is consistent with the ordinary meaning of the term "victim." *See* Webster's New Collegiate Dictionary 1295 (1979) (defining "victim" to include "one that is injured, destroyed, or sacrificed under any of various conditions").

Second, § 3593(c)'s reference to victims who "attended or observed the trial" plainly contemplates surviving victims. Section 3593's text does not suggest that the term "victim" in § 3593(c) has a different meaning than it does in § 3593(a). As a result, interpreting § 3593(a) to prohibit testimony from surviving victims would render § 3593(c) superfluous. That is reason enough to conclude that § 3593(a) permits impact testimony from surviving victims. *See Microsoft Corp. v. I4I Ltd. Partnership*, 564 U.S. 91, 106 (2011) (noting that "the canon against superfluity assists only when a competing interpretation gives effect to every clause and word of a statute" (quotation marks omitted)).

Even assuming that the district court was correct in concluding that § 3593(a)'s authorization of victim impact testimony is limited to victims of capital offenses, this evidence is admissible under other portions of the FDPA that the district court never addressed. The FDPA allows the jury to consider "whether any other aggravating factor for which notice has been given exists,"

53

18 U.S.C. § 3592(c), and it permits the government to "present any information relevant to an aggravating factor for which notice has been provided." 18 U.S.C. § 3593(c). Additionally, the FDPA states that at the sentencing hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." 18 U.S.C. § 3593(c). Put differently, the government can present information "relevant to" (1) any aggravating factor for which notice has been provided, and (2) the sentence for the death-eligible offenses.

Here, the government alleged injuries to surviving victims as an aggravating factor. Testimony from the surviving victims would undisputably be "information relevant to" the injury-to-surviving-victims aggravating factor. 18 U.S.C. § 3593(c); *see also id*. § 3592(c). The surviving victims also witnessed the capital offenses and experienced significant trauma as a result; testimony about the trauma they experienced is "relevant to" the sentence Gendron should receive for those capital offenses. *See Jones*, 527 U.S. at 401-02 (stating that evidence of "victim impact in a particular case" is "surely relevant to the selection phase decision, given that the sentencer should consider all of the circumstances of the crime in deciding whether to impose the death penalty").

54

Accordingly, the district court erred in concluding that victim impact evidence from the three surviving victims is "not relevant to the capital sentencing." (GA 424).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Decision and Order to the extent it strikes the racial animus aggravating factor, the incitement-to-violence aggravating factor, and the injury-to-surviving-victims aggravating factor.

Dated: January 2, 2026, Buffalo, New York.

Respectfully submitted,

MICHAEL DIGIACOMO
United States Attorney
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5838

CHARLES KRULY
Digitally signed by CHARLES KRULY
Date: 2026.01.02 16:50:33 -05'00'

CHARLES M. KRULY
JOSEPH M. TRIPI
BRETT A. HARVEY
TIFFANY H. LEE
MAEVE E. HUGGINS
Assistant United States Attorneys
*of Counsel*

HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
150 M Street N.E.
Washington, D.C.
(202) 514-3487

MICHAEL S. WARBEL
U.S. Department of Justice
Criminal Division, Capital Case Section
1301 F Street, N.W. Room 505
Washington, D.C. 205530

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

                Appellant,                         CA # 25-2570-cr

    -v-

PAYTON GENDRON,

                Defendant-Appellee.

_____

I, Charles M. Kruly, Assistant United States Attorney for the Western District of New York, hereby certify that the foregoing brief complies with this Court's Local Rule 32.1(a)(4)(A) 14,000 word limitation in that the brief is calculated by the word processing program to contain approximately 12,181 words, exclusive of the Table of Contents, Table of Authorities and Addendum of Statutes and Rules.

CHARLES KRULY

Digitally signed by
CHARLES KRULY
Date: 2026.01.02
16:51:06 -05'00'

Charles M. Kruly
Assistant U.S. Attorney

# SPECIAL APPENDIX

## TABLE OF CONTENTS

Page No.

**SPECIAL APPENDIX**

Decision and Order re Motion to Strike Aggravating Factors
(WDNY Docket 22-CR-109, Doc. 464) .......................................... SA-1

18 U.S.C. § 3592 ............................................................. SA-28

18 U.S.C. § 3593 ............................................................. SA-32

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

     v.

PAYTON GENDRON,

     Defendant.

22-CR-109-LJV
DECISION & ORDER

_____

The defendant, Payton Gendron, has moved to strike aggravating factors from the government's notice of intent to seek the death penalty, Docket Item 268, and to establish procedures for the admission of victim impact evidence, Docket Item 309. After the government responded to each motion, Docket Items 289 and 350, Gendron replied, Docket Items 341 and 372. This Court then held oral argument on June 17, 2025, *see* Docket Item 388, and the parties submitted supplemental briefs about the aggravating factors, Docket Items 411 and 414. Having carefully reviewed the parties' submissions and arguments, and for the reasons explained below, the Court grants Gendron's motions in part and denies them in part.

## BACKGROUND

A federal indictment charged Gendron with twenty-seven felony counts in connection with a shooting that killed ten people and injured three at a Tops grocery store in Buffalo, New York, on May 14, 2022. Docket Item 6. On January 12, 2024, the government filed a notice of intent to seek the death penalty. Docket Item 125. That notice included nine aggravating factors that the government proposed asking the jury to consider when deciding whether Gendron should be sentenced to death. *Id.*

## SA - 001

The Federal Death Penalty Act ("FDPA") enumerates certain aggravating factors and allows the jury to consider "other aggravating factor[s]" as well.  *See* 18 U.S.C. § 3593(d).  The government alleged four enumerated factors in this case: grave risk of death to additional persons, substantial planning and premeditation, vulnerable victim, and multiple killings and attempted killings.  Docket Item 125 at 3.  And the government added five other aggravating factors: victim impact, injury to surviving victims, racially motivated killings, attempt to incite violence, and selection of site.  *Id.* at 4-5.

### DISCUSSION

Juries at capital sentencing hearings make an "eligibility decision" and a "selection decision."  *United States v. Fell*, 531 F.3d 197, 240 (2d Cir. 2008) ("*Fell I*"); *see* 18 U.S.C. § 3593(b)-(e).  A jury will find a defendant *eligible* for the death penalty "if [it] finds the charged homicide, a statutory intent element or threshold mental culpability factor under [18 U.S.C.] § 3591(a)(2), and at least one of the statutory aggravating factors in [18 U.S.C.] § 3592(c)."  *Fell I*, 531 F.3d at 216.  If the jury finds a defendant eligible, it will then *select* a sentence by deciding whether the aggravating factors "sufficiently outweigh" the mitigating factors "to justify a sentence of death."  18 U.S.C. § 3593(e).  The purpose of aggravating factors is "to limit the death penalty to the most culpable defendants and the most serious offenses."  *United States v. Fell*, 2017 WL 10809983, at *5 (D. Vt. Jan. 20, 2017) ("*Fell II*") (citing *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).

Aggravating factors must meet certain criteria.  A factor "must not be so vague as to lack 'some common[]sense core [of] meaning . . . that criminal juries [are] capable of understanding.'"  *United States v. Bin Laden*, 126 F. Supp. 2d 290, 298 (S.D.N.Y. 2001)

SA - 002

(quoting *Tuilaepa v. California*, 512 U.S. 967, 972 (1994)), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).  And a factor "cannot be overbroad such that a sentencing juror 'fairly could conclude that [it] applies to every defendant eligible for the death penalty.'"  *Id.* (quoting *Arave v. Creech*, 507 U.S. 463, 474 (1993)).  An aggravator also must be "sufficiently relevant to the consideration of who should live and who should die."  *U.S. v. Davis*, 912 F. Supp. 938, 943 (E.D. La. 1996).

Some courts have found duplicative factors to be impermissible.  In *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), the Tenth Circuit held that duplicative aggravating factors result in "double counting," which "creates an unconstitutional skewing of the weighing process."  *Id.* at 1111-12.  Likewise, several district courts have rejected certain aggravating factors because they were impermissibly duplicative.  *See, e.g.*, *United States v. Regan*, 228 F. Supp. 2d 742, 751-52 (E.D. Va. 2002) (striking two factors about removal of documents from government facilities as duplicative because the elements of one factor "includ[ed] the elements" of the other); *Bin Laden*, 126 F. Supp. 2d at 300-01 (consolidating "serious injury to surviving victims" and "victim impact evidence" factors because the former was subsumed within the latter); *United States v. Nguyen*, 928 F. Supp. 1525, 1543-44 (D. Kan. 1996) (striking "low potential for rehabilitation" factor as duplicative of "future dangerousness" factor).  In addition to potentially skewing the weighing process by double counting, a "duplicative factor does not limit the field [of death penalty cases] since its fellow, already applied, has either included or excluded the same case."  *Fell II*, 2017 WL 10809983, at *5.  But factors that "arguably overlap to a certain degree" are not duplicative unless "one factor

3

SA - 003

necessarily subsumes another."[1]  *Fell I*, 531 F.3d at 236.  As for the evidence that the
government may use to prove aggravating factors, "information may be excluded if its
probative value is outweighed by the danger of creating unfair prejudice, confusing the
issues, or misleading the jury."  18 U.S.C. § 3593(c); *see id.* (explaining that "the rules
governing admission of evidence at criminal trials" do not apply during capital
sentencing proceedings).

## I.    STATUTORY AGGRAVATING FACTORS

### A.    Grave Risk of Death to Additional Persons

The government alleges that Gendron "in the commission of the offense . . .
knowingly created a grave risk of death to one or more persons in addition to the victim
of the offense."  Docket Item 125 at 3.  Knowingly creating a grave risk of death means
that a defendant "was conscious and aware that his conduct in the course of committing
the offense might have this result."  Leonard B. Sand et al., *1 Modern Federal Jury*

---

[1]  In *Fell I*, the Second Circuit declined to decide whether "a capital jury may
permissibly be presented with duplicative aggravating factors" and instead found that
certain aggravating factors at issue were not duplicative.  531 F.3d at 235-36.  The
three factors were that (1) the defendant abducted a victim "to facilitate [the defendant's]
escape from the area in which he and an accomplice had committed a double murder";
(2) the defendant helped murder that victim "to prevent her from reporting the
kidnapping and carjacking"; and (3) the defendant helped murder that victim "after
substantial premeditation to commit the crime of carjacking."  *Id.* at 234.

Along the same lines, a plurality of the Supreme Court addressed a claim of
duplicative aggravating factors by first noting that it had never held that duplicative
factors were constitutionally invalid and then concluding that "accepting, for the sake of
argument, [the] 'double counting' theory," the factors at issue were not duplicative.
*Jones v. United States*, 527 U.S. 373, 398-99 (1999).  The two factors at issue were (1)
"[the victim's] personal characteristics and the effect of the instant offense on [her]
family" and (2) "[the victim's] young age, her slight stature, her background, and her
unfamiliarity with" the city where she was kidnapped.  *Id.* at 378 n.3, 398-99.

4

*Instructions-Criminal*, ¶ 9A.03, Instr. 9A-10 (2025).  In its briefing, the government proposed applying this factor to everyone in and around the store: the ten people Gendron shot and killed, the three people he shot and injured, and "all store patrons and employees."[2]  *See* Docket Item 289 at 11.

Gendron argues that the grave risk aggravating factor has a mens rea of *recklessness*, whereas charges involving some of the alleged victims require a *specific intent to kill* those same people.  Docket Item 268 at 3-8.  He also argues that the multiple killings and attempted killings factor is duplicative of this factor.  Docket Item 341 at 16-19.

At oral argument, the government maintained that there was no inconsistency between the charges and this factor and that it could allege the same victims for this factor and the multiple killings and attempted killings factor.  Docket Item 387 at 13.  But it conceded that it would be "cleaner for the jury, perhaps, if we choose one or the other" factor for each alleged victim.  *Id.*  The government therefore proposed applying the multiple killings and attempted killings factor to the ten victims who were killed as well as Z.G., the one Black victim who was shot and survived.  *Id.* at 15.  And it proposed applying the grave risk factor to everyone else: all Black people present who were not shot and all white people present, for whom "there's no allegation of an intent to kill."  *Id.*

Gendron took issue with one aspect of that proposal: the inclusion of Black people who were not shot within the grave risk factor.  *Id.* at 15-16.  He argued that if

---

[2] The government has described its position somewhat inconsistently.  For example, in its supplemental brief, it asserted that Gendron "created a grave risk of death for all the other people in front of and throughout the grocery store *that he did not shoot or kill*," Docket Item 411 at 9-10 (emphasis added), thus suggesting that the first two groups listed in his original response should be excluded.

SA - 005

the jury finds him guilty of Count 27, it will have determined that he intended to kill all the Black people whom he did not shoot.  *Id.* at 16-17.  And that would be inconsistent with the intent of the grave risk factor, Gendron says.  *Id.*

The Court will not strike the grave risk factor.  The government may pursue this factor at least as to the white people in and around the store.  The Black people who were shot fit best within the multiple killings and attempted killings factor.  To avoid duplication and juror confusion, the Court will not allow the government to cite the killing or attempted killing of those 11 people again as part of the grave risk factor.  The Court reserves decision as to whether the government may argue that this factor applies to all remaining Black people.  If the jury finds that Gendron is not guilty of Count 27, the Court is inclined to find that Gendron's argument is moot and to allow the government to allege that group within the grave risk factor.  If the jury finds that Gendron is guilty of Count 27, the Court is inclined not to allow the government to include this group within the grave risk factor.[3]

_____

[3] Gendron also makes a factual argument:  Some alleged victims of this factor were outside the zone of danger, he says, so he did not put them at grave risk of death.  Docket Item 268 at 8-15.  He cites, for example, people who hid in nonpublic areas of the store and never saw him.  *Id.* at 12-13.

Gendron's argument is based on the incorrect premise that the government can prove the grave risk factor only if it proves it as to every single person that the government alleged in its informational outline were victims.  *See id.* at 11-12.  But the factor requires the government to prove only that Gendron put "[one] or more persons" at grave risk.  *See* 18 U.S.C. § 3592(c)(5); Docket Item 125 at 3.  The jury will need to unanimously determine the person or persons whom Gendron put at grave risk, but the government can prove this factor without proving it as to everyone.  The Court therefore will not strike the factor on this ground, either.

In the alternative, Gendron asks the Court to preclude the government "from presenting evidence regarding any individual who was not within the 'zone of danger.'"  Docket Item 268 at 15.  Gendron has not demonstrated as a matter of law that certain

6

**B.    Multiple Killings and Attempted Killings**

The government alleges that Gendron "intentionally killed and attempted to kill more than one person in a single criminal episode."  Docket Item 125 at 3.

Gendron asks the Court to remove the "attempted to kill" language from this factor based on a statement that the government made in its response to his request for an informational outline.  Docket Item 268 at 21.  Essentially, he argues that the government conceded that it is trying to prove this factor only as to the killings.  *See id.*

But the plain language of the factor includes attempts to kill, and the government did not concede otherwise.  *See* Docket Item 289 at 40-41.  The Court therefore denies Gendron's request to remove the "attempted to kill" language.  As explained in the previous section, *see supra* Section I.A., the government may argue that this factor applies to the ten victims who were killed and the one Black victim who was shot and survived.

**C.    Substantial Planning and Premeditation**

Gendron asks the Court not to strike this factor but to preclude the government from introducing certain evidence to support it.  *See* Docket Item 268 at 15-19.  As this Court stated during oral argument, it is inclined to exclude evidence of specific locations that Gendron allegedly considered as other potential targets, *see id.* at 16-17, and his beliefs about what might happen after he committed the attack, *see id.* at 18.  The Court is inclined to admit some "evidence of [Gendron's] alleged 'ideological rational[e]'"

---

people were "insufficiently close . . . to have been at risk of being hit" for the entirety of the shooting.  *See id.*  The Court therefore denies this request without prejudice to Gendron's raising it in a motion in limine.

7

related to his planning.  *See id.* at 15, 17.  Ultimately, these issues are better suited for motions in limine, however, so the Court denies this request without prejudice.

### D.     Vulnerable Victim

The government alleges that Gendron committed the offenses charged in five of the capital counts "against a victim who was particularly vulnerable due to old age."[4] Docket Item 125 at 3.  Those counts pertain to the killings of Pearl Young, Heyward Patterson, Ruth Whitfield, Celestine Chaney, and Katherine Massey.  *See id.*; Docket Item 6 at 3-4.

To find this factor, a jury must find "a connection between the victim's vulnerability and the offense(s) committed upon the victim."  Leonard B. Sand et al., *1 Modern Federal Jury Instructions-Criminal*, ¶ 9A.03, Instr. 9A-14 (2025).  The "connection does not mean that the defendant targeted the victim because of the vulnerability" but that "once targeted, the victim was more susceptible to death due to the vulnerability."  *Id.*; *see United States v. Sampson*, 486 F.3d 13, 33-34 (1st Cir. 2007).

Gendron asserts that the government will not be able to show a nexus between the victims' alleged vulnerabilities and their deaths.  *See* Docket Item 268 at 19-21. Because Gendron used a "high-powered, semiautomatic rifle capable of firing dozens of rounds in seconds," he says, age "had no bearing on the likelihood that [these five victims] would be killed."  *Id.* at 20.  In other words, Gendron contends that once

---

[4] The government originally alleged that the vulnerability was due to "old age and infirmity," Docket Item 125 at 3, but it later conceded the infirmity prong and said that it would "proceed at trial only on the 'old age' prong," Docket Item 167 at 34 n.15.

SA - 008

targeted, no one—young or old—could have escaped and that these five victims therefore were no more susceptible to death than anyone else.

The government disagrees. It responds that "[u]nlike others in the store who were able to run to safety, or at least attempt to run to safety or take cover, the [vulnerable] victims were unable to do so due to, at least in part, limitations in mental and physical capacity that were natural results of their advanced ages." Docket Item 289 at 39.

Gendron has not demonstrated that the government cannot prove its theory, and this factor "must await factual development at trial." *See United States v. Walker*, 910 F. Supp. 837, 849 (N.D.N.Y. 1995). For example, it appears that three of the allegedly vulnerable victims were inside the store when the shooting began outside. *See* Docket Item 125 at 3; Docket Item 6 at 2. Their age may have affected their ability to hear the shooting and to react to protect themselves as the government alleges other people did. The Court therefore denies the motion to strike this factor without prejudice.

## II.    NON-STATUTORY AGGRAVATING FACTORS

### A.    Injury to Surviving Victims

The government alleges that Gendron "caused serious physical and emotional injury[] and severe psychological impact to individuals who survived the offense and are listed in Counts 21 through 26 of the Indictment (Z.G., C.B., and J.W.)." Docket Item 125 at 4. Gendron argues that the Eighth Amendment and the FDPA "preclude the use of evidence of the impact upon victims of non-capital crimes as a basis upon which to seek a death sentence for other, death-eligible offenses." Docket Item 309 at 35.

9

The FDPA specifies that the notice of intent to seek the death penalty "may include factors concerning the effect of the offense"—that is, a death-eligible offense—"on the victim and the victim's family."  18 U.S.C. § 3593(a).  But the statute does not specify whether the government may include victim impact evidence related to other, non-capital offenses as a factor.  *See id.*; *United States v. Sampson*, 335 F. Supp. 2d 166, 193 (D. Mass. 2004).

In *United States v. Gooch*, 2006 WL 3780781 (D.D.C. Dec. 20, 2006), the court concluded that "losses and emotions" related to noncapital crimes "[we]re not relevant to whether the jury selects the death penalty for the alleged [capital crimes] and would also be more prejudicial than probative."  *Id.* at *22.  The court therefore precluded the families of the defendant's other alleged non-capital murder victims from testifying during the capital sentencing.  *Id.*; *but see United States v. Bowers*, 498 F. Supp. 3d 741, 757 (W.D. Pa. 2020) ("declin[ing] to adopt" this argument).

This Court agrees with the court in *Gooch* that victim impact evidence related to the non-capital crimes is not relevant to the capital sentencing.  If the jury finds Gendron guilty of the offenses relating to Z.G., C.B., and J.W., evidence of the impact of those crimes on the victims and their families will be important and relevant to the sentencing for those offenses.  But the Court, not the capital jury, will determine Gendron's sentence for those offenses in a separate sentencing proceeding during which Z.G., C.B., and J.W. will have an opportunity to be heard.  *See* Fed. R. Crim. P. 32(i)(4)(B); 18 U.S.C. § 3771(a)(4).

The Court therefore grants Gendron's motion to strike this factor.

SA - 010

**B.      Racially Motivated Killings**

The government alleges that Gendron "expressed bias, hatred, and contempt toward Black persons and his animus toward Black persons played a role in the killings of [the ten victims]." Docket Item 210 at 21. Gendron contends that "race is an impermissible aggravator under the . . . FDPA." Docket Item 268 at 23.

The FDPA forbids the jury from "consider[ing] the race . . . of the defendant or of any victim" when it "consider[s] whether a sentence of death is justified." 18 U.S.C. § 3593(f). The jury cannot "recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or of any victim may be." *Id.* "[U]pon return" of the jury's sentencing verdict, jurors "shall also return to the court a certificate, signed by each juror, that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race . . . of the defendant or any victim may be." *Id.*

Gendron argues that "the racially motivated killing aggravator flatly violates the antidiscrimination intent of section 3593(f)[] and creates an unconstitutional risk that juror bias, confusion, or passion will influence the verdict in violation of the Eighth Amendment." Docket Item 268 at 31. He argues that "[t]he Court cannot, in one breath, instruct the jury to weigh the 'racially motivated' nature of the offense on death's side of the scale, and in another breath, admonish them not to consider the victims' or the defendant's race." *Id.*

The government responds that this is a "new and novel claim," Docket Item 289 at 55, but the claim's novelty says little about its merit. The government also argues

11

SA - 011

that "[i]t defies common sense to suggest the anti-discrimination clause would preclude the government from seeking the death penalty in any case involving murder motivated by racial or religious animus." *Id.* But that argument overstates Gendron's position: He is not arguing that the antidiscrimination clause precludes the death penalty for racially motivated murders but only that it precludes the government from using racial motivation as a specific aggravating factor.[5]

The government argues that "[t]he very plain purpose of [section 3593(f)] is for the jurors to say that the sentence . . . would be the same for any defendant, regardless of his race or that of his victims." Docket Item 411 at 17. To that end, it proposes instructing jurors that they cannot "choose [a] sentence based simply upon the race of the defendant or the victim" and that "there is no room for [them] to express any racial bias in [their] decision-making process." *Id.* But the FDPA covers more ground than the government's interpretation and proposed instruction. The government reads out the requirement not to "consider" race at all. *See* 18 U.S.C. § 3593(f). The proposed instruction cannot cure the conflict between the factor and section 3593(f).

The government also submits that this factor does not ask the jury to select a death sentence because the victims were Black but instead "because [Gendron] killed the victims because of their race and his desire to eliminate Black people living on white

---

[5] Gendron conceded at oral argument that, "[b]ecause [the charges involve violations of the] Hate Crimes Act, the fact that these crimes were committed because of the race of the victims is absolutely go[ing to] come in." Docket Item 387 at 46. And the defense conceded in the context of the substantial planning factor that the government "certainly" would be "allowed to prove [Gendron's] motive." *Id.* at 30; *see also id.* at 34 ("[A]nything he wrote that is his reasons for what he did is absolutely fair game."). But he contended that the issue was whether the government should be allowed to ask the jury to "focus . . . specifically" on racial motivation as an aggravating factor during sentencing. *Id.* at 46-47.

12

SA - 012

lands." Docket Item 289 at 57. That distinction is perplexing to the Court; it likely would be even more perplexing to a lay jury. Indeed, during oral argument the government itself characterized this as "a difficult word problem." Docket Item 387 at 44.

In its supplemental briefing, the government argued that "[t]here is . . . a difference between allowing a jury to punish an offender more severely because [of] the defendant's racist motives and not permitting the jury to act with any racial biases of their own." Docket Item 411 at 19. But as framed by the government in its notice of intent, this factor is not about a general racist motive but about bias and animus towards "Black persons." *See* Docket Item 210 at 21. And it is that specific focus on the victims' race that conflicts with the FDPA.

Because this factor asks the jury to focus on the victims' race as a reason to select a death sentence despite the statute's proscription against even "consider[ing]" the victims' race for that purpose, the Court strikes this factor.[6] But the government may offer evidence about Gendron's racist motives in connection with other factors relevant to those motives.

## C.    Attempt to Incite Violence

The government alleges that Gendron, "in preparation for and in committing the acts of violence charged in this case, attempted to incite violent action by others." Docket Item 125 at 4. Gendron says that this factor "rests upon constitutionally protected speech under the First Amendment." Docket Item 268 at 31. He contends

---

[6] The Court need not and does not address other reasons that Gendron raised for striking this factor, including that the factor punishes constitutionally protected speech. *See* Docket Item 268 at 22-31.

13

SA - 013

that the evidence generally contains only "vague exhortations to 'act' in unspecified ways, or ways that have nothing to do with violent attacks." *Id.* at 34. These "thoughts and words," he says, "do not rise anywhere near the level of incitement" and therefore "are constitutionally protected speech under the First Amendment that cannot be the basis of an aggravating factor." *Id.* at 35. And because the government's evidence is not enough to prove incitement or even attempted incitement, he argues, the factor also is insufficiently relevant to the jury's sentencing decision. *Id.* at 36.

The government responds that the evidence supporting this factor is not constitutionally protected and that even if it is, courts are allowed to introduce some protected speech if it is relevant to sentencing. *See* Docket Item 289 at 58-62.

Based on the evidence that the government has presented, a jury could not find that what Gendron did constituted incitement. The Supreme Court laid out the test for incitement in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). It explained that "the constitutional guarantees of free speech and free press do not permit [the government] to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. In other words, to punish someone for speech that incites violence, the government must prove that the speaker intended unlawful violence to occur, unlawful violence was likely to occur, and unlawful violence was imminent. *Id.* "[U]nsurprisingly, '[t]here will rarely be enough evidence to create a jury question on whether a speaker was intending to incite imminent crime.'" *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 244 (6th Cir. 2015) (quoting Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1190 (2005)).

SA - 014

Here, there certainly is evidence of the first factor—intent to incite unlawful violence.  According to the government, before the attack Gendron "disclosed the links to his journal, manifesto, and livestream of the attack to approximately 65 Discord recipients,"[7] and made these materials "available to a wider audience" by "publish[ing] a post on [two Discord channels] containing links to his manifesto, journal, and livestream of the attack."  Docket Item 210 at 29-30.  The government says that Gendron's livestreaming the shooting is its "primary evidence of [his] attempt to incite violence."  Docket Item 411 at 21.

Moreover, Gendron's writings explicitly evince an intent to incite violence.  His manifesto lists as a reason for the attack "[t]o **incite violence**, retaliation and further divide between the European people and the replacers."  Docket Item 268 at 32.  And his journal says that he livestreamed the attack and published his manifesto online "to increase coverage and spread [his] beliefs."  Docket Item 411 at 60.  It also says that Gendron's "wish from the attack is that you[,] and I mean YOU the reader[,] become[] red-pilled and decide to fight back yourself."  Docket Item 210 at 30; *see also id.* ("I hope to inspire YOU to attack against the replacers as I did[.]").  The government also alleges that Gendron's writings were "meant to serve as a 'guidebook'" for others to commit violence by "teaching others how to select the site for the attack, what gear is best, how to train, etc."  Docket Item 289 at 63.

---

[7] "Discord is a real time messaging service with over 150 million active monthly users who communicate within a huge variety of interest-based communities[] or servers."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 787 (2024) (Alito, J., concurring) (citation and quotation marks omitted).

Gendron describes his writings as "adolescent ramblings" and emphasizes that he "copied and pasted verbatim" or "paraphrase[d]" some of his statements from another shooter's manifesto. Docket Item 268 at 33 & n.12, 34 n.14, 37. But that is an argument for the jury—which could agree with Gendron that his statements were not serious and did not reflect his real intent, or with the government that when Gendron said he attacked Black people "[t]o incite violence," he meant it. *See* Docket Item 268 at 32; Docket Item 289 at 60. There is ample evidence of intent.

But intent alone is not enough. Inciting violence outside the protection of the First Amendment has two additional requirements—likelihood and imminence. And the government does not explain how its evidence meets either of those requirements.

Instead, the government relies on *Rice v. Paladin Enters., Inc.*, 128 F.3d 233 (4th Cir. 1997), a case from a different circuit in an entirely different context. *See* Docket Item 411 at 20-23. In *Rice*, the survivors of homicide victims sued the publisher of a how-to guide for hitmen. *Id.* at 241. The book was "so comprehensive and detailed that it is as if the instructor were literally present with the would-be murderer not only in the preparation and planning, but in the actual commission of, and follow-up to, the murder." *Id.* at 249.

The publisher moved for summary judgment on First Amendment grounds. For the purpose of the motion, the publisher stipulated to facts that "establish[ed] as a matter of law that [it was] civilly liable for aiding and abetting [a killer in a triple homicide] unless the First Amendment absolutely bar[red] the imposition of liability upon a publisher in the commission of criminal acts." *Id.* at 241. The court found that the book was "devoid . . . of any political, social, entertainment, or other legitimate discourse" and

16

SA - 016

that "[i]f there is a publication that could be found to have no other use than to facilitate unlawful conduct, then this would be it." *Id.* at 255.  The court explained that *Brandenburg*'s imminence requirement "generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting[] because culpability in such cases is premised[] not on defendants' advocacy of criminal conduct, but on defendants' successful efforts to assist others." *Id.* at 246 (internal quotation marks omitted); *see also United States v. Miselis*, 972 F.3d 518, 533 (4th Cir. 2020) (*Rice* "effectively recognizes a second category of unprotected speech . . . which may be proscribed without regard to whether it's directed and likely to produce imminent lawlessness.").  The court ultimately held that speech "tak[ing] a form other than abstract advocacy," such as speech that "constitutes . . . aiding and abetting of criminal conduct," does not implicate the First Amendment and that a reasonable jury could find that the publisher aided and abetted murder.  *Rice*, 128 F.3d at 243.

The government suggests that Gendron's writings are like those in *Rice* because "analyzing and recommending gun components . . . and body armor . . . largely amount[] to aiding and abetting other racially[ ]motivated mass shooters."  Docket Item 411 at 22-23.  But to prove aiding and abetting, the government must prove that "someone other than the defendant" committed an "underlying crime." *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996).  Among other obvious differences between *Rice* and this case, there was an underlying crime in *Rice* but not here.  And because Gendron did not aid and abet anyone, this Court cannot ignore *Brandenburg*'s imminence and likelihood requirements.

17

SA - 017

To meet the likelihood requirement, there must be "a high probability that [the] incitement would be effective." *Collin v. Chicago Park Dist.*, 460 F.2d 746, 753 (7th Cir. 1972). And "it is a long leap" from an action's being "foreseeable" to its being "likely" under *Brandenburg*. *James v. Meow Media, Inc.*, 300 F.3d 683, 699 (6th Cir. 2002).

To meet the imminence requirement, the time between the speech and lawless conduct must be less than "weeks or months." *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982); *see also United States v. Fullmer*, 584 F.3d 132, 155 n.10 (3d Cir. 2009) (explaining that imminence requirement was not met when "events occurred a minimum of three weeks apart"). "[A]dvocacy of illegal action at some indefinite future time" does not meet the imminence requirement. *Hess v. Indiana*, 414 U.S. 105, 107-08 (1973) (finding that defendant's statement that "[w]e'll take the fucking street later" or "[w]e'll take the fucking street again" did not meet the imminence requirement). Something like "persistent exposure" to speech that "gradually undermine[s]" another person's "moral discomfort with violence to the point that" the other person eventually "solved . . . social disputes with a gun" is "far from the temporal imminence . . . required to satisfy the *Brandenburg* test." *James*, 300 F.3d at 698.

Here, the government has not argued that there was a "high probability" that Gendron's incitement would be effective, nor has it argued that any violence occurred— or even that it was likely to occur—within the temporal bounds of *Brandenburg*. Nor are those elements apparent from the evidence the government has identified in support of the incitement aggravating factor.

The government is correct that there is evidence Gendron "sought to inspire others just as he had been inspired." *See* Docket Item 411 at 22. But it is at best

SA - 018

"foreseeable," not "likely," *see James*, 300 300 F.3d at 699, that someone "at some indefinite future time," *see Hess*, 414 at 108, might be so "inspired." On these facts, Gendron's actions do not satisfy the incitement test.

The government argues that its aggravating factor nevertheless can be saved because "[e]ven if [Gendron]'s statements and postings that support this aggravator are found to not pass the incitement test under *Brandenburg*, . . . [it] may still introduce evidence of protected speech for relevant evidentiary purposes, such as to prove motive or aggravating factors." Docket Item 289 at 61.

"[A] defendant's abstract beliefs, however obnoxious"—or worse—"may not be taken into consideration by a sentencing judge," but "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 485, 489 (1993); *see also Fell I*, 531 F.3d at 228 ("[T]he government may introduce evidence of beliefs or associational activities, so long as they are relevant to prove, for example, motive or aggravating circumstances, to illustrate future dangerousness, or to rebut mitigating evidence."). Put another way, a defendant's beliefs and protected speech cannot be used *as* an aggravating factor, but they can be used to *prove* another aggravating factor.

Here, however, the aggravating factor the government seeks to prove is that Gendron attempted to incite violence. The term "incite" is a legal term of art, and as this Court has explained, the evidence does not meet the high standard of incitement. Thus, the speech cannot successfully be used to prove that aggravating factor. And that leaves only the protected speech *as* the aggravating factor, which would amount to

19

SA - 019

punishing Gendron for his protected speech.[8]  That is precisely what the law prohibits. *See Brandenburg*, 395 U.S. at 447.

For all those reasons, the Court strikes the alleged attempt to incite violence as an aggravating factor.

### D.    Selection of Site

The government alleges that Gendron "selected the Tops Friendly Market, located at 1275 Jefferson Avenue in Buffalo, New York, in order to maximize the number of Black victims of the offense."  Docket Item 125 at 5.  Gendron argues that this factor is duplicative of other factors, including substantial planning and premeditation.  Docket Item 268 at 38-42.

This Court agrees with Gendron and finds that the substantial planning and premeditation factor "necessarily subsumes" the selection of site factor.  *See Fell I*, 531 F.3d at 235-36; *Bin Laden*, 126 F. Supp. 2d. at 300 ("[T]he [g]overnment's attempt to spin off multiple freestanding aggravators from what should really only be one represents a strategy that should not be permitted.").  Selecting the site is one aspect of planning.  Indeed, the government apparently intends to introduce the same evidence and argument in support of both site selection and planning.  *Compare* Docket Item 210

---

[8] *Barclay v. Florida*, 463 U.S. 939 (1983), in which a plurality of the Supreme Court approved a Florida sentencing judge's consideration of "the elements of racial hatred" that motivated a defendant's committing murder, *id.* at 949, does not support the government's position.  First, *Barclay* did not address the First Amendment.  What is more, the speech itself was not the aggravating factor in *Barclay*.  Instead, the trial court found that the racial motive supported other aggravating factors, including the defendant's causing "great risk of death to many persons" and "disrupt[ing] or hinder[ing] the lawful exercise of any governmental function or the enforcement of the laws."  *Id.* at 949 & n.7.

# SA - 020

at 9-12 (citing in informational outline the government's intent to introduce evidence of "[t]he defendant's selection of a target location for the attack" and the racial reasoning for it as part of substantial planning) *with id.* at 32-36 (same for site selection).

As Gendron acknowledges, "a decision to preclude the jury from considering a separately submitted and duplicative factor in no way affects the *evidence* that the government may present and the jury may consider."  Docket Item 268 at 39 n.15.  So the government may present evidence about Gendron's selection of site, subject to future evidentiary rulings, but it may do so only within the statutorily enumerated factor of substantial planning and premeditation.  The Court therefore strikes site selection as a separate factor.

## III.   VICTIM IMPACT PROCEDURES

"Victim Impact" is another aggravating factor in the government's notice of intent. Docket Item 125 at 4.  That factor alleges that Gendron "caused injury, harm, and loss to the families and friends of [the ten people who were killed]" and that "[t]he injury, harm, and loss" Gendron caused "with respect to each victim is evidenced by the victim's personal characteristics and by the impact of the victim's death upon his or her family and friends."  *Id.*

The Supreme Court held in *Payne v. Tennessee*, 501 U.S. 808 (1991), that victim impact evidence is admissible in capital sentencing proceedings.  But such evidence is subject to limits:  For example, allowing a victim's family member to testify about his or her "characterizations and opinions [of] the crime, the defendant, and the appropriate sentence" would violate the Eighth Amendment.  *See Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam).  Moreover, courts have the "authority and

21

**SA - 021**

responsibility to control the proceedings consistent[] with due process." *Payne,* 501

U.S. at 836 (Souter, J., concurring); *see also United States v. McVeigh*, 944 F. Supp.

1478, 1491 (D. Colo. 1996) (explaining that the Court must ensure that the jury is not

"influenced by passion or prejudice"). The Court therefore addresses the trial

procedures designed to avoid violating those Eighth Amendment and due process

proscriptions.

### A.      General Procedures

Given the potential prejudice of victim impact evidence, Gendron asks the Court

to adopt certain procedures "to ensure that [he] receives a fair trial." Docket Item 309 at

18. More specifically, he asks the Court to (1) "order the government to produce written

victim impact statements," (2) weigh each specific point of proffered testimony to

determine the relevance and whether the probative value is substantially outweighed by

the risk of undue prejudice and misleading the jury, (3) "direct the government to instruct

its witnesses to read from those statements before the jury," and (4) "take all available

measures to limit the possibility of prejudicial emotional outbursts during victim impact

testimony." *Id.* at 18-20. The Government responded with its own proposed

procedures, Docket Item 350 at 43-44, which the Court addresses in the context of

ruling on Gendron's requests.

The Court grants Gendron's first request and will require the government to

provide a written summary of the proposed testimony for each victim impact witness.

The government contends that this procedure "would run afoul of the victims' statutory

rights" and create a "significant hardship" for witnesses. Docket Item 350 at 31. But the

risk of prejudice to Gendron is high, and several district courts have adopted this

22

**SA - 022**

procedure to protect against such prejudice.  *See United States v. Sampson*, Case No. 01-cr-10384, Docket Item 2430 at 4 & n.3 (D. Mass. Aug. 26, 2016); *United States v. Northington*, 2013 WL 2147947, at *5 (E.D. Pa. May 16, 2013); *United States v. Wilson*, 493 F. Supp. 2d 491, 505-06 (E.D.N.Y. 2007); *United States v. Henderson*, 485 F. Supp. 2d 831, 849-50 (S.D. Ohio 2007); *United States v. O'Driscoll*, 203 F. Supp. 2d 334, 340-41 (M.D. Pa. 2002); *United States v. Glover*, 43 F. Supp. 2d 1217, 1235 (D. Kan. 1999); *but see United States v. Bowers*, 2023 WL 3979375, at *10 (W.D. Pa. June 13, 2023) (denying similar request).  The government must provide a proposed written statement for each witness no later than May 1, 2026.  As the Court explained on the record, the statements must be thorough and complete, covering every topic about which the witness will testify; each statement may be in the form of a victim impact statement written by the witness or a summary written by the government.[9]  *See* Docket Item 387 at 68-69.

The Court also grants Gendron's second request:  The Court "will review the proposed statement[s] and weigh each specific point of the proffered testimony to

_____

[9] The government argues that its informational outline already provided the victim impact information that Gendron requests.  Docket Item at 350 at 32.  Instead of providing statements, the government proposes updating its informational outline at least 14 days before voir dire begins with "any new information relating to the witnesses identified in the original [o]utline and to identify any additional victim impact witnesses." *Id.* at 43; *see* Docket Item 387 at 66 (clarifying that request was "no less than 14 days" rather than "no more than 14 days").

The Court denies this request in favor of Gendron's proposal.  The informational outline merely lists the anticipated victim impact witnesses for each victim and "briefly summarize[s] personal characteristics of each victim and the type and scope of the loss, injury, and harm suffered by the victims' family and friends."  Docket Item 210 at 13-19.  There is a single paragraph of information for each person who was killed.  *See id.*  This is insufficiently detailed, especially because it does not address the topics about which the witnesses will testify.

SA - 023

ensure that its probative value is not substantially outweighed by the danger of unfair prejudice." *See Glover*, 43 F. Supp. 2d at 1236.

But the Court denies the third request:  It will not require witnesses to read their statements verbatim.  That would be a significant deviation from this Court's ordinary procedures and would be unfair to the witnesses and the government.  Additionally, Gendron offers almost no federal precedent for it.  *See* Docket Item 309 at 18-20 (citing only *Henderson*, 485 F. Supp. 2d at 849-50, as an example in federal court).  Some victim impact procedures are appropriate to ensure a fair trial, but this goes too far.  The Court therefore rejects this proposal.

The Court grants the fourth request in part.  Gendron asks the Court to "require the government to inform the Court and the defense in advance of the hearing if it anticipates that any of its witnesses may have difficulty controlling their emotions on the witness stand" so that the Court can take additional measures such as playing a video recording of the testimony or having a third party read it.  Docket Item 309 at 20.  He also asks the Court to "admonish all victim impact witnesses prior to taking the stand that they must . . . 'refrain from reflecting excessive emotion and that the witnesses' failure to do so might result in the Court's decision to terminate their testimony.'"  *Id.* at 21 (quoting *Henderson*, 485 F. Supp. 2d at 850).

The government opposes a preemptive admonishment by the Court and instead proposes that the *government* "advise witnesses that they must make reasonable efforts to control their emotions and maintain the dignity of the proceedings."  Docket Item 350 at 33-34, 44.  It also proposes remedial measures, such as having a recess to

SA - 024

allow "overly emotional" witnesses to "regain composure" and "instruct[ing] the jury to disregard any inappropriate comments."  *Id.* at 44.

The Court agrees with the government that the government can advise the witnesses about the need to maintain composure and decorum.  But the government shall make a good faith effort to advise the Court of witnesses who it believes may not be able to do that so that the Court may take remedial measures, such as explaining to the witness what is expected during his or her testimony.

### B.     Specific Evidentiary Requests

Gendron also asks the Court to "exclude[,] . . . at the outset," certain categories of information that he says are "categorically inadmissible," Docket Item 309 at 22, and he provides specific examples of statements within those categories, *see, e.g.*, *id.* at 22-25.  The statements are taken largely from FBI reports that memorialized interviews with potential witnesses.  *See, e.g.*, *id.*  In response, "the government submits that each category of challenged testimony is admissible" and "opposes each of [Gendron]'s requests to preclude specific evidence."  Docket Item 350 at 2 n.2.  But it also says that "some of the [FBI reports] may include statements [that] the government would not try to introduce at trial."  *Id.*

Because the Court is requiring the government to provide detailed victim impact statements, the Court will not decide the admissibility of hypothetical testimony now. Gendron's requests therefore are denied without prejudice to his raising them in a motion in limine.[10]

---

[10] The government seeks to introduce unspecified photos and mementos of the victims.  Docket Item 350 at 44.  The Court grants this general request and will rule about specific evidence later.  Gendron's briefing discusses the potentially prejudicial

25

**SA - 025**

Because the government "submits that each category of challenged testimony is admissible," *id.*, however, the Court notes that the category of "[v]ictims' family members' characterizations and opinions about the crime, [Gendron], and the appropriate sentence" is inadmissible under *Bosse*, 580 U.S. at 2.  The government seems to agree, proposing that it "instruct its witnesses prior to testifying that they may not opine upon [Gendron], the circumstances of the offense, or their desired sentence." Docket Item 350 at 44.  Witnesses must comply with those restrictions, and the Court agrees that the government must tell its witnesses about these requirements.

The government offers a few other proposals limiting its ability to introduce evidence, so the Court rules on those now.  The government proposes having "up to two-to-three witnesses per deceased victim"; generally limiting testimony to "the deceased victim's background and character" and "the victim's life at or near the time of his/her death, as well as the harm and loss suffered by the witness and his/her loved ones as a result of the murders"; and requiring witnesses to "refrain from directly addressing the defendant."  *Id.* at 43-44.  The Court will limit the government to two witnesses per deceased victim, with the possibility of some flexibility as explained on the record.  *See* Docket Item 387 at 66.  Because Gendron neither addressed nor objected to the other requests, *see generally* Docket Item 372, the Court grants them.

---

nature of videos about victims, Docket Item 309 at 7-8, but the government's proposal makes no mention of videos.  All that can await another day.

SA - 026

## CONCLUSION

For the reasons stated above, Gendron's motions to strike aggravating factors and for victim impact procedures are GRANTED IN PART and DENIED IN PART.

The government shall provide a proposed testimonial statement for each victim impact witness no later than **May 1, 2026**.  Any objections to the statements shall be filed with motions in limine.


SO ORDERED.

Dated:   September 16, 2025
         Buffalo, New York



       */s/ Lawrence J. Vilardo*
       LAWRENCE J. VILARDO
       UNITED STATES DISTRICT JUDGE

SA - 027

**18 U.S.C. 3592:**

§ 3592. Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified

(a) Mitigating factors.--In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

(1) Impaired capacity.--The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(2) Duress.--The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

(3) Minor participation.--The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

(4) Equally culpable defendants.--Another defendant or defendants, equally culpable in the crime, will not be punished by death.

(5) No prior criminal record.--The defendant did not have a significant prior history of other criminal conduct.

(6) Disturbance.--The defendant committed the offense under severe mental or emotional disturbance.

(7) Victim's consent.--The victim consented to the criminal conduct that resulted in the victim's death.

(8) Other factors.--Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

(b) Aggravating factors for espionage and treason.--In determining whether a sentence of death is justified for an offense described in section 3591(a)(1), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(1) Prior espionage or treason offense.--The defendant has previously been convicted of another offense involving espionage or treason for which a sentence of either life imprisonment or death was authorized by law.

(2) Grave risk to national security.--In the commission of the offense the defendant knowingly created a grave risk of substantial danger to the national security.

(3) Grave risk of death.--In the commission of the offense the defendant knowingly created a grave risk of death to another person.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

(c) Aggravating factors for homicide.--In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

SA - 028

(1) Death during commission of another crime.--The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of, an offense under section 32 (destruction of aircraft or aircraft facilities), section 33 (destruction of motor vehicles or motor vehicle facilities), section 37 (violence at international airports), section 351 (violence against Members of Congress, Cabinet officers, or Supreme Court Justices), an offense under section 751 (prisoners in custody of institution or officer), section 794 (gathering or delivering defense information to aid foreign government), section 844(d) (transportation of explosives in interstate commerce for certain purposes), section 844(f) (destruction of Government property by explosives), section 1118 (prisoners serving life term), section 1201 (kidnapping), section 844(i) (destruction of property affecting interstate commerce by explosives), section 1116 (killing or attempted killing of diplomats), section 1203 (hostage taking), section 1992 (wrecking trains), section 2245 (offenses resulting in death), section 2280 (maritime violence), section 2281 (maritime platform violence), section 2332 (terrorist acts abroad against United States nationals), section 2332a (use of weapons of mass destruction), or section 2381 (treason) of this title, or section 46502 of title 49, United States Code (aircraft piracy).

(2) Previous conviction of violent felony involving firearm.--For any offense, other than an offense for which a sentence of death is sought on the basis of section 924(c), the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person.

(3) Previous conviction of offense for which a sentence of death or life imprisonment was authorized.--The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute.

(4) Previous conviction of other serious offenses.--The defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person.

(5) Grave risk of death to additional persons.--The defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense.

(6) Heinous, cruel, or depraved manner of committing offense.--The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim.

(7) Procurement of offense by payment.--The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

(8) Pecuniary gain.--The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

(9) Substantial planning and premeditation.--The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

(10) Conviction for two felony drug offenses.--The defendant has previously been convicted of 2 or more State or Federal offenses punishable by a term of imprisonment of

more than one year, committed on different occasions, involving the distribution of a controlled substance.

(11) Vulnerability of victim.--The victim was particularly vulnerable due to old age, youth, or infirmity.

(12) Conviction for serious Federal drug offenses.--The defendant had previously been convicted of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise.

(13) Continuing criminal enterprise involving drug sales to minors.--The defendant committed the offense in the course of engaging in a continuing criminal enterprise in violation of section 408(c) of the Controlled Substances Act (21 U.S.C. 848(c)), and that violation involved the distribution of drugs to persons under the age of 21 in violation of section 418 of that Act (21 U.S.C. 859).

(14) High public officials.--The defendant committed the offense against--

(A) the President of the United States, the President-elect, the Vice President, the Vice President-elect, the Vice President-designate, or, if there is no Vice President, the officer next in order of succession to the office of the President of the United States, or any person who is acting as President under the Constitution and laws of the United States;

(B) a chief of state, head of government, or the political equivalent, of a foreign nation;

(C) a foreign official listed in section 1116(b)(3)(A), if the official is in the United States on official business; or

(D) a Federal public servant who is a judge, a law enforcement officer, or an employee of a United States penal or correctional institution--

(i) while he or she is engaged in the performance of his or her official duties;

(ii) because of the performance of his or her official duties; or

(iii) because of his or her status as a public servant.

For purposes of this subparagraph, a "law enforcement officer" is a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, or prosecution or adjudication of an offense, and includes those engaged in corrections, parole, or probation functions.

(15) Prior conviction of sexual assault or child molestation.--In the case of an offense under chapter 109A (sexual abuse) or chapter 110 (sexual abuse of children), the defendant has previously been convicted of a crime of sexual assault or crime of child molestation.

(16) Multiple killings or attempted killings.--The defendant intentionally killed or attempted to kill more than one person in a single criminal episode.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

(d) Aggravating factors for drug offense death penalty.--In determining whether a sentence of death is justified for an offense described in section 3591(b), the jury, or if there is no jury,

SA - 030

the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(1) Previous conviction of offense for which a sentence of death or life imprisonment was authorized.--The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or death was authorized by statute.

(2) Previous conviction of other serious offenses.--The defendant has previously been convicted of two or more Federal or State offenses, each punishable by a term of imprisonment of more than one year, committed on different occasions, involving the importation, manufacture, or distribution of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) or the infliction of, or attempted infliction of, serious bodily injury or death upon another person.

(3) Previous serious drug felony conviction.--The defendant has previously been convicted of another Federal or State offense involving the manufacture, distribution, importation, or possession of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which a sentence of five or more years of imprisonment was authorized by statute.

(4) Use of firearm.--In committing the offense, or in furtherance of a continuing criminal enterprise of which the offense was a part, the defendant used a firearm or knowingly directed, advised, authorized, or assisted another to use a firearm to threaten, intimidate, assault, or injure a person.

(5) Distribution to persons under 21.--The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 418 of the Controlled Substances Act (21 U.S.C. 859) which was committed directly by the defendant.

(6) Distribution near schools.--The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 419 of the Controlled Substances Act (21 U.S.C. 860) which was committed directly by the defendant.

(7) Using minors in trafficking.--The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 420 of the Controlled Substances Act (21 U.S.C. 861) which was committed directly by the defendant.

(8) Lethal adulterant.--The offense involved the importation, manufacture, or distribution of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), mixed with a potentially lethal adulterant, and the defendant was aware of the presence of the adulterant.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

SA - 031

**18 U.S.C. 3593:**

§ 3593. Special hearing to determine whether a sentence of death is justified

(a) Notice by the government.--If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice--

      (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
      (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the attorney for the government to amend the notice upon a showing of good cause.

(b) Hearing before a court or jury.--If the attorney for the government has filed a notice as required under subsection (a) and the defendant is found guilty of or pleads guilty to an offense described in section 3591, the judge who presided at the trial or before whom the guilty plea was entered, or another judge if that judge is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted--
      (1) before the jury that determined the defendant's guilt;
      (2) before a jury impaneled for the purpose of the hearing if--
            (A) the defendant was convicted upon a plea of guilty;
            (B) the defendant was convicted after a trial before the court sitting without a jury;
            (C) the jury that determined the defendant's guilt was discharged for good cause; or
            (D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary; or
      (3) before the court alone, upon the motion of the defendant and with the approval of the attorney for the government.

A jury impaneled pursuant to paragraph (2) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate, with the approval of the court, that it shall consist of a lesser number.

SA - 032

(c) Proof of mitigating and aggravating factors.--Notwithstanding rule 32 of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads guilty to an offense under section 3591, no presentence report shall be prepared. At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. For the purposes of the preceding sentence, the fact that a victim, as defined in section 3510, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury. The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death. The government shall open the argument. The defendant shall be permitted to reply. The government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

(d) Return of special findings.--The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist. A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established. A finding with respect to any aggravating factor must be unanimous. If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by law.

(e) Return of a finding concerning a sentence of death.--If, in the case of--
(1) an offense described in section 3591(a)(1), an aggravating factor required to be considered under section 3592(b) is found to exist;
(2) an offense described in section 3591(a)(2), an aggravating factor required to be considered under section 3592(c) is found to exist; or
(3) an offense described in section 3591(b), an aggravating factor required to be considered under section 3592(d) is found to exist,

SA - 033

the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

(f) Special precaution to ensure against discrimination.--In a hearing held before a jury, the court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon return of a finding under subsection (e), shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

SA - 034