# 25-2570

To be argued by: **DANIEL HABIB**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
**Docket No. 25-2570**

UNITED STATES OF AMERICA,

Appellant,

-against-

PAYTON GENDRON,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK

**REDACTED BRIEF AND SUPPLEMENTAL APPENDIX FOR**
**DEFENDANT-APPELLEE PAYTON GENDRON**

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street, 9th Floor
New York, New York 10007
Tel. No.: (212) 417-8742
Attorney for Defendant-Appellee
**PAYTON GENDRON**

**DANIEL HABIB,**
Of Counsel

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ............................................................ 4

STATEMENT OF THE ISSUES ................................................................. 4

STATEMENT OF THE CASE .................................................................... 5

STATEMENT OF FACTS ........................................................................... 6

    A. Gendron plans and commits the Tops shooting, then pleads guilty to New York State offenses and accepts life without parole. ........... 6

    B. The district court grants Gendron's motion to strike three non-statutory aggravating factors from the notice of intent ..................... 9

SUMMARY OF ARGUMENT .................................................................. 18

ARGUMENT .............................................................................................. 20

    I. **This Court should dismiss this appeal for lack of jurisdiction.. 20**

        A. Standard of review ...................................................................... 20
        B. Section 3731 does not authorize this appeal. ............................ 21

    II. **The district court correctly construed § 3593(a) in striking the "Injury To Surviving Victims" factor. .............................................. 30**

        A. Standard of review ...................................................................... 30
        B. Legal framework .......................................................................... 30
        C. The FDPA limits "victim impact" aggravation to the deceased victims of capital homicide offenses. ........................................ 31

i

D.   The government's arguments lack merit. .............................40

III.   **The district court correctly construed § 3593(f) in striking the "Racially-Motivated Killings" factor. ...........................46**

A.   Standard of review.......................................................................46
B.   Legal framework .........................................................................46
C.   The aggravator is invalid because it asks the jury to "consider" the victims' "Black" race, in violation of § 3593(f). ...................47
D.   The government's arguments lack merit.....................................51

IV.   **The district court correctly struck the "Attempt To Incite Violence" factor to avoid punishing First Amendment-protected speech. ...........................................................................62**

A.   Standard of review.......................................................................62
B.   Gendron's speech was constitutionally protected. ....................62
C.   Constitutionally protected conduct cannot supply the sole basis for a non-statutory aggravating factor. ............................64
D.   The government's arguments lack merit.....................................66

CONCLUSION...................................................................................................70

SUPPLEMENTAL APPENDIX............................................................ Supp. A.1

## TABLE OF AUTHORITIES

**Cases**

*Abney v. United States*, 431 U.S. 651 (1977) ........................................................... 27

*Barclay v. Florida*, 463 U.S. 939 (1983) ................................... 57, 59, 60, 67

*Booth v. Maryland*, 482 U.S. 496 (1987) ........................................................ 38, 54

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1953) ........................................ 6

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .......................................... 16, 18, 20, 62

*Brown v. Sanders*, 546 U.S. 212 (2006) ........................................................... 64

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ................................... 42, 43

*Coker v. Georgia*, 433 U.S. 584 (1977) ........................................................... 36

*Dawson v. Delaware*, 503 U.S. 159 (1992) ........................................................ 67

*Dickerson v. United States*, 530 U.S. 428 (2000) ................................................ 59

*Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 3d 342 (S.D.N.Y. 2013) ........... 33

*Esteras v. United States*, 606 U.S. 185 (2025) .................................................... 23

*Fischer v. United States*, 603 U.S. 480 (2024) .................................................... 42

*Gregg v. Georgia*, 428 U.S. 153 (1976) ........................................................... 54

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) .................................................... 35

*Hess v. Indiana*, 414 U.S. 105 (1975) ........................................................... 63

*Holt v. Hobbs*, 574 U.S. 352 (2015) ........................................................... 59

*INS v. Phinpathya*, 464 U.S. 183 (1984) ........................................................ 25

*John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394 (2d Cir. 2018) ................... 23

*Jones v. United States*, 527 U.S. 373 (1999) ..................................................... 47

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ...................................................... 36

*Landau v. Eisenberg*, 922 F.3d 495 (2d Cir. 2019) .............................................. 21

*Maye v. City of New Haven*, 89 F.4th 403 (2d Cir. 2023) ..................................... 20

*McCleskey v. Kemp*, 481 U.S. 279, 286–87 (1987) ........................................... 50, 52

*Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161 (2014) ................. 56

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, (1982) ................................... 68

*National Foods, Inc. v. Rubin*, 936 F.2d 656 (2d Cir. 1991) ................................. 33

*Payne v. Tennessee*, 501 U.S. 808 (1991) ........................................................ *passim*

*Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017) ............................................ 53

*Quituizaca v. Garland*, 52 F.4th 103 (2d Cir. 2022) ........................................... 35

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ......... 40

*Ronen v. RedRoute, Inc.*, 763 F. Supp. 3d 319 (E.D.N.Y. 2025)............................25

*Sanabria v. United States*, 437 U.S. 54 (1977)........................................24

*Sanders v. Madison Square Garden, L.P.*,
    525 F. Supp. 2d 364 (S.D.N.Y. 2007)..................................................49

*SEC v. KPMG LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) .............................32

*Sinclair v. United States*, 279 U.S. 749 (1929)......................................58

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ......................................46

*South Carolina v. Gathers*, 490 U.S. 805 (1989) ...............................39, 42

*State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
    374 F.3d 158 (2d Cir. 2004) ...........................................................63

*Stromberg v. California*, 283 U.S. 359 (1931) .......................................64

*Terminiello v. Chicago*, 337 U.S. 1 (1949)...........................................64

*United States ex rel. Weiner v. Siemens AG*, 87 F.4th 157 (2d Cir. 2023) .............24

*United States v. Abdur-Rahman*, 708 F.3d 98 (2d Cir. 2013)............................52

*United States v. Aslam*, 936 F.2d 751 (2d Cir. 1991) .............................21, 22

*United States v. Coonan*, 143 F.4th 119 (2d Cir. 2025) ...............................27

*United States v. Delatorre*, 157 F.3d 1205 (10th Cir. 1998) .........................28

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) ...............................62

*United States v. Fell*, 360 F.3d 135 (2d Cir. 2004)..............................23, 27

*United States v. Fell*, 531 F.3d 197 (2d Cir. 2008)..................................17

*United States v. Ferri*, 686 F.2d 147 (3d Cir. 1982).................................24

*United States v. Gooch*, 2006 WL 3780781 (D.D.C. Dec. 20, 2006) ..................13, 34

*United States v. Kahn*, 5 F.4th 167 (2d Cir. 2021) ..................................48

*United States v. Lemon*, 723 F.3d 922 (D.C. Cir. 1983) ..............................68

*United States v. Lett*, 944 F.3d 467 (2d Cir. 2019) .................................30

*United States v. Levy*, 947 F.2d 1032 (2d Cir. 1991) ................................21

*United States v. MacDonald*, 435 U.S. 850 (1978)....................................21

*United States v. Martin Linen Supply Co.*, 430 U.S. 564 (1977) ..................21, 24

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) .......................23, 26, 27

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004).......................36

*United States v. Shakir*, 98 Cr. 38 (M.D. Tenn.)....................................34

*United States v. Stewart*, 686 F.3d 156 (2d Cir. 2012) ..........................54, 68

*United States v. Taveras*, 2006 WL 8435839 (E.D.N.Y. March 21, 2006) ...............60

*United States v. Tsarnaev*, 13 Cr. 10200 (D. Mass.)................................36

*United States v. Whitten*, 610 F.3d 168 (2d Cir. 2010) ............................... *passim*
*United States v. Wilson*, 420 U.S. 332 (1975)............................................. 22, 24, 65
*United States v. Woolard*, 981 F.2d 756 (5th Cir. 1993).........................................26
*VDARE Foundation v. James*, 162 F.4th 77 (2d Cir. 2025).....................................9
*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) .........................................................17, 54
*Yates v. United States*, 354 U.S. 298 (1957)...........................................................62
*Yates v. United States*, 574 U.S. 528 (2015)...........................................................29
*Yselta del Sur Pueblo v. Texas*, 596 U.S. 685 (2022)...............................................59
*Zant v. Stephens*, 462 U.S. 862 (1983) ......................................................... 20, 64, 65

**Statutes**
18 U.S.C. § 245................................................................................................56
18 U.S.C. § 247................................................................................................56
18 U.S.C. § 249................................................................................................37
18 U.S.C. § 249(a)(1)(B) ..................................................................................28
18 U.S.C. § 249(a)(1)(B)(i)............................................................................9, 61
18 U.S.C. § 249(a)(1)(B)(ii) .........................................................................9, 32
18 U.S.C. § 3231................................................................................................4
18 U.S.C. § 3510..........................................................................................45, 46
18 U.S.C. § 3551(b).........................................................................................36
18 U.S.C. § 3553(a)(1) .....................................................................................37
18 U.S.C. § 3591(a) .........................................................................................10
18 U.S.C. § 3591(a)(2) ................................................................................26, 33
18 U.S.C. § 3591(a)(2)(A) .......................................................................10, 33, 34
18 U.S.C. § 3591(a)(2)(B) .......................................................................10, 33, 34
18 U.S.C. § 3591(a)(2)(C) .......................................................................10, 33, 34
18 U.S.C. § 3591(a)(2)(D).......................................................................10, 33, 34
18 U.S.C. § 3592(a)(2) ................................................................................34, 54
18 U.S.C. § 3592(a)(7) .....................................................................................34
18 U.S.C. § 3592(c) ............................................................................... *passim*
18 U.S.C. § 3592(c)(5)...............................................................................10, 32, 34
18 U.S.C. § 3592(c)(6) .....................................................................................35
18 U.S.C. § 3592(c)(8) .....................................................................................54
18 U.S.C. § 3592(c)(9)..............................................................................10, 14, 55

18 U.S.C. § 3592(c)(11) ............................................................. 10, 35

18 U.S.C. § 3592(c)(16) ............................................................. 10, 32

18 U.S.C. § 3592(d) ......................................................................... 46

18 U.S.C. § 3593 ................................................................ 35, 36, 56

18 U.S.C. § 3593(a) ................................................................. *passim*

18 U.S.C. § 3593(a)(2) ..................................................................... 31

18 U.S.C. § 3593(c) ................................................................. *passim*

18 U.S.C. § 3593(e) ................................................................. *passim*

18 U.S.C. § 3593(e)(2) ..................................................................... 10

18 U.S.C. § 3593(f) .................................................................. *passim*

18 U.S.C. § 3663A(b)(2) .................................................................. 37

18 U.S.C. § 3731 ....................................................................... *passim*

18 U.S.C. § 3771(a)(4) ...................................................................... 37

18 U.S.C. § 924(c)(1)(A)(i) ................................................................ 9

18 U.S.C. § 924(c)(1)(A)(iii) ......................................................... 9, 32

18 U.S.C. § 924(j)(1) ...................................................................... 9, 62

21 U.S.C. § 848(o)(1) (1988 ed.) ..................................................... 50

21 U.S.C. § 848(o)(2) (1988 ed.) ..................................................... 50

34 U.S.C. § 20141(e)(2) .................................................................... 45

N.Y. Penal Law § 110.00 .................................................................... 9

N.Y. Penal Law § 125.25(1) ................................................................ 9

N.Y. Penal Law § 125.27(1)(a)(viii) .................................................. 8

N.Y. Penal Law § 265.03(3) ............................................................... 9

N.Y. Penal Law § 490.28 .................................................................... 8

### Rules

Fed. R. Crim. P. 32 ............................................................................ 35

Fed. R. Crim. P. 32(i)(4)(B) .............................................................. 37

### United States Sentencing Guidelines

U.S.S.G. § 2H1.1(a)(3)(A) ................................................................. 37

### Other Authorities

Anti-Drug Abuse Act of 1988, Pub. L. No. 110–690, 102 Stat. 4387 .......... 50, 59

Br. for Pet'r, *Barclay v. Florida*, No. 81–6908 (U.S. Dec. 29, 1982), *available at*
    https://tinyurl.com/3mfsv38c ........................................................ 58

Comprehensive Violent Crime Control Act of 1991, *reprinted in* H.R. Doc. No. 102–58 ..............................................................................................39

Consider, Merriam-Webster's Dictionary, https://tinyurl.com/mv8wyrj8....48

Exclude, Merriam-Webster's Dictionary, https://tinyurl.com/u2msyvb2.....29

Grosso et al., *The Influence of the Race of Defendant and the Race of Victim on Capital Charging and Sentencing in California*, 21 J. Empirical Legal Studies 482 (2024) ..........................................................................................53

H.R. Doc. No. 102–58 (1991) ...........................................................................40

Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347 (1999).......................51

SCALIA & GARDNER, READING LAW (Thomson/West 2012) ..............................25

Suppress, Black's Law Dictionary (12th ed. 2024) ............................................29

## INTRODUCTION

Payton Gendron has admitted unspeakable crimes and he will spend the rest of his life in prison. In 2022, Gendron, 18 years old and mired in a poisonous online world of disinformation and hate, shot and killed 10 Black people at a Tops Friendly Markets grocery store in Buffalo, New York—Roberta Drury, Pearl Young, Heyward Patterson, Ruth Whitfield, Celestine Chaney, Aaron W. Salter, Jr., Andre Mackniel, Margus Morrison, Katherine Massey, and Geraldine Talley. His actions caused immeasurable and irremediable harm to his victims, their families, and their community. He pleaded guilty to 10 counts of first-degree murder in New York State court and accepted a sentence of mandatory life imprisonment without the possibility of parole. Nothing in this appeal—nothing in this entire federal prosecution—will change any of that. This case is about the federal government's determination to further punish Gendron with death.

The order appealed from does not stand in the government's way. Having earlier denied Gendron's motions to dismiss the indictment's death-eligible counts, the district court below denied Gendron's motion to

1

strike the statutory aggravating factors, clearing the path for a capital penalty phase under the Federal Death Penalty Act ("FDPA"). The court did not exclude any evidence from that proceeding. Rather, the court emphasized—as the defense had conceded—that proof of how Gendron planned the shooting, his "racist motives," and the injuries that he inflicted on his victims was "absolutely going to come in" at trial. Instead, the court issued only a modest ruling striking three non-statutory aggravating factors from the government's notice of intent to seek the death penalty.

First, the district court ruled that 18 U.S.C. § 3593(a), the FDPA provision addressed to victim-impact evidence, limits non-statutory aggravators to those concerning the impact of "the offense" (that is, the death-eligible offense) on "the victim" (that is, the homicide victim). Accordingly, Judge Vilardo struck the aggravator concerning injuries to the surviving victims of Gendron's non-capital offenses, while specifying that he would consider these injuries when imposing any non-capital sentences. Second, the court ruled that 18 U.S.C. § 3593(f), the FDPA's antidiscrimination provision, by its plain terms bars all jury consideration

2

of the "race" "of any victim." The court therefore struck the aggravator that asked the jury to weigh Gendron's hatred of "Black persons" and the role that his animus toward "Black persons" played in the shooting. Once again, Judge Vilardo added a caveat: the government could "offer evidence about Gendron's racist motives" at the penalty phase. And third, the court determined that Gendron's online dissemination of a "manifesto" setting forth his misbegotten beliefs about white "replacement" and his reprehensible reasons for the shooting was speech protected by the First Amendment. In light of that ruling, which the government doesn't challenge on appeal, the court struck an aggravator that would have punished Gendron for attempting to incite violence, because clear precedent prohibits the use of constitutionally-protected activity as aggravation in a capital case. These narrow rulings were correct. If this Court does not dismiss this appeal for lack of jurisdiction, it should affirm.

3

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 and issued an order striking three non-statutory aggravating factors from the government's notice of intent to seek the death penalty. SA.1–27.[1] The government timely filed notices of appeal, 2A.442–43, and invokes this Court's jurisdiction under 18 U.S.C. § 3731. OB.4–8. Gendron contends that this Court lacks jurisdiction. *See infra* Argument § I.

## STATEMENT OF THE ISSUES

I.      18 U.S.C. § 3731 authorizes a government appeal from an order "dismissing an indictment or information" or "excluding evidence." Does § 3731 permit this appeal, where the order below did neither?

II.     18 U.S.C. § 3593(a) allows non-statutory aggravating factors concerning the effect of the death-eligible "offense" on the homicide "victim." Did the district court correctly strike an aggravator concerning injuries to the surviving victims of non-capital offenses— injuries that, the judge promised, he would consider when sentencing

---

[1] The government's opening brief is cited "OB." Volume I of the appendix (pp.1–298) is cited "1A." Volume II of the appendix (pp.299–443) is cited "2A." The special appendix attached to the government's opening brief is cited "SA." The supplemental appendix attached to this response brief is cited "Supp. A." Entries on the district court docket, *United States v. Gendron*, 22 Cr. 109 (LJV) (W.D.N.Y.) are cited "DE" or "Sealed DE." In quotations from caselaw, this brief omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

4

Gendron for those non-capital offenses?

III.   18 U.S.C. § 3593(f) mandates that a jury "shall not consider" a victim's "race" in deciding whether to impose a death sentence. Did the district court correctly strike an aggravator asking the jurors to consider Gendron's hatred of "Black persons" and the role that his animus toward "Black persons" played in the shooting?

IV.   Due process prohibits imposing a death sentence "if the government invites the jury to find the existence of an aggravating factor based on inferences from conduct that is constitutionally protected." *United States v. Whitten*, 610 F.3d 168, 194–95 (2d Cir. 2010). Did the district court correctly strike an aggravator based solely on Gendron's First Amendment-protected communicative activities?

## STATEMENT OF THE CASE

A grand jury in the United States District Court for the Western District of New York returned an indictment charging Gendron with multiple offenses, some death-eligible, arising from the Tops shooting. 1A.13–24. The government filed a notice of intent to seek the death penalty. 1A.25–29. The district court (Vilardo, J.) granted Gendron's motion to strike three non-statutory aggravating factors from the notice of intent. SA.1–27. The government took this interlocutory appeal. 2A.442–43.

## STATEMENT OF FACTS

A.   <u>Gendron plans and commits the Tops shooting, then pleads guilty to New York State offenses and accepts life without parole.[2]</u>

On May 14, 2022, Gendron, an 18-year-old college student with no criminal history, committed a mass shooting at a Tops Friendly Markets grocery store in Buffalo. 1A.4. Wearing "a tactical-style helmet, camouflage clothing, body armor, and a GoPro video camera"—which he used to livestream the shooting—"and carrying a loaded Bushmaster XM–15 .223 caliber rifle and multiple loaded magazines," Gendron shot and killed 10 Black people inside and outside the store. 1A.4–5; 1A.13–16. He shot and wounded three more people, one Black and two white. 1A.4; 1A.14; 1A.17–19. Buffalo police arrested him at the scene. 1A.6.

In the months before the attack, Gendron compiled a 180-page online "manifesto"— ███████████████████████████████

████████████████████████████████████████

─────────────────

[2] For purposes of this appeal, which arises on a motion to strike non-statutory aggravating factors, Gendron assumes the truth of the government's allegations. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1953).

████—in which he rationalized his actions. 1A.7–8; Sealed DE.411–1. Gendron wrote that his "Goals" for the attack were to "Kill as many blacks as possible," "Avoid dying," and "Spread ideals." 1A.8. He focused on ████ ████████████ because it ████████████████████ ████████████████ 1A.8; Sealed DE.411–1:59. He selected the Tops market because it ████████████████████ ██████████████████████████ 1A.8; Sealed DE.411– 1:59. During visits he made to the Tops market before the attack, Gendron drew "a diagram of the interior layout of the store," which he reproduced in his manifesto. 1A.9; Sealed DE.411–1:61. He discussed "the clothing and equipment" that he would use, ████████████████ ████████████████████████ ██████████████ 1A.7–9; Sealed DE.411–1:60–62.

████████████████████

████████████████████████

██████████████████

████████████████ Sealed DE.411–1:14. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ Sealed DE.411–1:14. ████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████ Sealed DE.411–1:5, 14. He sought "to incite violence, retaliation, and further divide between the European people and the replacers." SA.15. Before the shooting, Gendron published the manifesto, an online journal containing similar material, and a link to the livestream of the shooting to 65 users on the real-time messaging service Discord, in order "to increase coverage and spread [his] beliefs." SA.15.

Soon after his arrest, Gendron pleaded guilty in New York State court to one count of first-degree domestic act of terrorism motivated by hate, N.Y. Penal Law § 490.28; 10 counts of first-degree murder, N.Y. Penal Law § 125.27(1)(a)(viii); three counts of attempted second-degree murder as a

8

hate crime, N.Y. Penal Law §§ 110.00 and 125.25(1); and one count of second-degree criminal possession of a weapon, N.Y. Penal Law § 265.03(3). The State court sentenced him principally to life without parole. Supp. A.1–2.[3]

B.      The district court grants Gendron's motion to strike three non-statutory aggravating factors from the notice of intent.

1.      A grand jury in the Western District of New York returned a 27-count indictment charging Gendron with 10 counts of hate crime acts resulting in the deaths of the 10 murder victims, in violation of 18 U.S.C. § 249(a)(1)(B)(i) (Counts 1–10); 10 corresponding counts of discharging a firearm to commit murder, 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(iii), and 924(j)(1) (Counts 11–20); three counts of hate crime acts involving attempts to kill Z.G., C.B., and J.W., § 249(a)(1)(B)(ii) (Counts 21–23); three corresponding counts of using and discharging a firearm during and in relation to a crime of violence, §§ 924(c)(1)(A)(i) and 924(c)(1)(A)(iii) (Counts 24–26); and one count of a hate crime act involving an attempt to kill "Black

---

[3] This Court may "take judicial notice of filings and judgments made in state courts." *VDARE Foundation v. James*, 162 F.4th 77, 83 (2d Cir. 2025).

people in and around Tops," § 249(a)(1)(B)(ii). *See* 1A.13–19.[4]

Under the FDPA, if a defendant is convicted of a capital offense, he may be sentenced to death if: (i) he was at least 18 years old at the time of the offense, *see* 18 U.S.C. § 3591(a); (ii) he acted with one of four culpable mental states, *see* 18 U.S.C. §§ 3591(a)(2)(A)–(D); and (iii) at least one statutory aggravating factor exists, *see* 18 U.S.C. §§ 3592(c) and 3593(e)(2). As to Counts 11–20, the death-eligible counts, the indictment alleged special findings to this effect, including four statutory aggravating factors:

- "[I]n the commission of the offenses, [Gendron] knowingly created a grave risk of death to one or more persons in addition to the victims of the offenses." § 3592(c)(5).

- Gendron "committed the offenses after substantial planning and premeditation to cause the death of a person." § 3592(c)(9).

- Gendron committed the murders charged in Counts 12–15 and 19 "against victims who were particularly vulnerable due to old age." § 3592(c)(11).

- Gendron "intentionally killed and attempted to kill more than one person in a single criminal episode." § 3592(c)(16).

1A.22–24.

---

[4] Gendron moved to dismiss Counts 11–20, the sole capital counts, for failure to state an offense. The district court denied the motion. DE.447.

10

The government later filed a notice of intent to seek the death penalty. *See* § 3593(a); 1A.25–29. The notice repeated the special findings and statutory aggravating factors alleged in the indictment. The FDPA also allows the government to include in a notice of intent non-statutory aggravating factors—not presented to a grand jury and not necessary to the imposition of the death penalty—which, if proved, a jury must weigh in deciding the ultimate sentence. *See* §§ 3592(c), 3593(a), 3593(c), and 3593(e). Here, the notice added five non-statutory aggravating factors:

- "Victim Impact. [Gendron] caused injury, harm, and loss to the families and friends of [the 10 murder victims]. The injury, harm, and loss caused by [Gendron] with respect to each victim is evidenced by the victim's personal characteristics and by the impact of the victim's death upon his or her family and friends." *See* § 3593(a).

- "Injury to Surviving Victims. [Gendron] caused serious physical and emotional injury, and severe psychological impact to individuals who survived the attack and are listed in Counts 21 through 26 of the Indictment (Z.G., C.B., and J.W.)."

- "Racially-Motivated Killings. [Gendron] expressed bias, hatred, and contempt toward Black persons and his animus toward Black persons played a role in the killings of [the 10 murder victims]."

- "Attempt To Incite Violence. [Gendron], in preparation for and in committing the acts of violence charged in this case, attempted to

incite violent action by others."

- "Selection of Site. [Gendron] selected the Tops Friendly Market, located at 1275 Jefferson Avenue in Buffalo, New York, in order to maximize the number of Black victims of the offense."

1A.28–29.

Gendron moved to strike all the aggravating factors except "Victim Impact." *See* SA.1. As relevant, he moved to strike "Injury to Surviving Victims" on the ground that "[t]he FDPA ... preclude[s] the use of evidence of the impact upon victims of *non-capital crimes* as a basis upon which to seek a death sentence for other, *death-eligible offenses*." 1A.64 (emphases added). He moved to strike "Racially-Motivated Killings," arguing that "placing 'express[ions] of bias, hatred, and contempt toward Black persons' at issue, and seeking a death sentence because 'animus toward Black persons played a role in the killings,' compels jurors to consider the victims' race and skin color when making their sentencing determination in direct violation of ... § 3593(f)." 1A.227. And he moved to strike "Attempt to Incite Violence," contending that "it penalizes speech that is protected by the First Amendment." 1A.228.

12

2.      The district court denied in part and granted in part Gendron's motion to strike. The court upheld all four statutory aggravating factors but struck the four challenged non-statutory aggravating factors. SA.4–21.[5]

As to "Injury to Surviving Victims," the district court reasoned that in § 3593(a)—which allows non-statutory aggravating factors "concerning the effect of the offense on the victim and the victim's family"—"offense" means "a death-eligible offense." SA.10. Accordingly, the court "agree[d]" with *United States v. Gooch*, 2006 WL 3780781, at *22 (D.D.C. Dec. 20, 2006), that "victim impact evidence relating to the non-capital crimes is not relevant to the capital sentencing." SA.10. But not irrelevant altogether: "If the jury finds Gendron guilty of the offenses relating to Z.G., C.B., and J.W., evidence of the impact of those crimes on the victims and their families will be important and relevant to the sentencing for those offenses. But the Court, not the capital jury, will determine Gendron's sentence for those offenses in a separate sentencing proceeding during which Z.G., C.B., and

---

[5] The government hasn't appealed the ruling striking "Selection of Site." OB.17 n.8.

J.W. will have an opportunity to be heard." SA.10.

As to "Racially-Motivated Killings," the district court agreed that the FDPA, which "forbids the jury from 'considering the race ... of the defendant or of any victim' when it 'consider[s] whether a sentence of death is justified,'" barred the factor. SA.11–13 (quoting § 3593(f)). The court heeded the limited scope of Gendron's argument. Gendron was "not arguing that the antidiscrimination clause precludes the death penalty for racially motivated murders," only that § 3593(f) "precludes the government from using racial motivation as a specific aggravating factor." SA.12. Likewise, the court noted Gendron's concession that "'the fact that these crimes were committed because of the race of the victims is absolutely go[ing to] come in,'" both to prove guilt of the hate crime offenses and to prove the "substantial planning and premeditation" aggravator. SA.12 n.5 (quoting 2A.307; 2A.311; 2A.323); *see* § 3592(c)(9). The court confirmed that "the government may offer evidence about Gendron's racist motives in connection with other factors relevant to those motives." SA.13.

However, the district court rejected the government's argument that

14

§ 3593(f) only prohibits jurors from acting out of "'racial bias.'" SA.12. This cramped interpretation "reads out the requirement not to 'consider' race at all." SA.12 (quoting § 3593(f)). The court also rejected the government's efforts to finesse the aggravator to avoiding contravening § 3593(f).

For example, the government suggested that the aggravator "does not ask the jury to select a death sentence because the victims were Black but instead because 'Gendron killed the victims because of their race and his desire to eliminate Black people living on white lands.'" SA.12–13 (quoting 1A.184). This "difficult word problem" (the government's words, *see* 2A.321) was "perplexing" to Judge Vilardo and "would be even more perplexing to a lay jury." SA.13. Trying a different tack, the government posited a "'difference between allowing a jury to punish an offender more seriously because of the defendant's racist motives and not permitting the jury to act with any racial biases of their own." SA.13 (quoting 2A.384). The court rejected that maneuver, too: "[A]s framed by the government in its notice of intent, this factor is not about a general racist motive but about bias and animus toward 'Black persons.' And it is that specific focus on the

15

victims' race that conflicts with the FDPA.'" SA.13.

As to "Attempt to Incite Violence," the district court initially determined that the First Amendment protected Gendron's speech, which did not satisfy the test for incitement set forth in *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (to fall outside First Amendment, speech advocating violence must be "directed to inciting or producing imminent lawless action" and be "likely to incite or produce such action"). SA.14. The court found "ample evidence" of Gendron's intent to incite violence, pointing to his manifesto, which "lists as a reason for the attack 'to incite violence,'" and his journal, which "says that he livestreamed the attack and published his manifesto online 'to increase coverage and spread [his] beliefs.'" SA.15. However, the court concluded that the government's evidence failed to satisfy *Brandenburg*'s "likelihood and imminence" requirements. SA.16. The government "has not argued that there was a 'high probability that Gendron's incitement would be effective, nor has it argued that any violence occurred—or even that it was likely to occur—within the temporal bounds of *Brandenburg*." SA.18. Thus, "a jury could not find that what

16

Gendron did constituted incitement." SA.14. On appeal, the government hasn't challenged this determination. *See infra* Argument § IV.B.

The district court also rejected the government's backup argument that Gendron's communicative activities—even if protected—could support the aggravator. The court acknowledged that "'the First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.'" SA.19 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)). And the court also agreed that "'[t]he government may introduce evidence of beliefs or associational activities, so long as they are relevant to prove ... motive or aggravating circumstances.'" SA.19 (quoting *United States v. Fell*, 531 F.3d 197, 228 (2d Cir. 2008)). However, the court distinguished the evidentiary use of protected speech from what the government proposed here—the treatment of speech itself as the aggravator: "[A] defendant's beliefs and protected speech cannot be used *as* an aggravating factor, but they can be used to *prove* another aggravating factor." SA.19. Here, "the aggravating factor that the government seeks to prove is that Gendron attempted to incite violence." But Gendron's speech

17

did not rise to the level of constitutionally unprotected incitement, so "the speech cannot successfully be used to prove that aggravating factor. And that leaves only the protected speech *as* the aggravating factor, which would amount to punishing Gendron for his protected speech." SA.19–20. "That is precisely what the law prohibits." SA.20 (citing *Brandenburg*).

## SUMMARY OF ARGUMENT

This Court should dismiss this appeal for lack of jurisdiction because the district court's order doesn't fall within any of the categories of appealable orders enumerated in § 3731. Judge Vilardo didn't "dismiss[] an indictment or information" or "exclud[e] evidence." This capital prosecution will proceed with all of the allegations necessary to the imposition of the death penalty intact—all 10 death-eligible counts, all four gateway mental states, and all four statutory aggravating factors. The evidence proffered to support the stricken non-statutory aggravators remains admissible to prove Gendron's guilt and other, valid aggravators.

If this Court reaches the merits, the district court's order should be affirmed. As to "Injury to Surviving Victims," § 3593(a) limits victim-impact

18

aggravators to those concerning the effect of the death-eligible "offense" on the homicide "victim" and his family. The FDPA consistently uses the unmodified term "victim" to mean "homicide victim." That limitation makes perfect sense as applied to § 3593(a), which designs an alternate sentencing scheme for capital offenses alone, leaving non-capital offenses and their victims to ordinary judicial sentencing proceedings. This interpretation aligns with § 3593(a)'s obvious historical source—the Supreme Court's then-recent decision in *Payne v. Tennessee*, 501 U.S. 808 (1991), which permitted the use of homicide victim impact evidence in sentencing proceedings for capital offenses.

As to "Racially-Motivated Killings," § 3593(f) states a simple, mandatory rule. A federal capital jury "shall not consider the race ... of any victim" in deciding whether to impose a death sentence. But the government drafted an aggravator asking the jury to weigh Gendron's hatred of "Black persons" and the role that his animus toward "Black persons" played in the shooting. The district court reasonably determined that a lay jury wouldn't be capable of reconciling these conflicting concepts.

(Even the government conceded that doing so presented a "difficult word problem" that was "hard to explain.") So, the court enforced the statute. Even so, the court confirmed that it would admit ample evidence of Gendron's "racist motives" at the guilt and penalty phases.

As to "Attempt To Incite Violence," the district court concluded—and the government does not now contest—that Gendron's communicative activities did not satisfy the *Brandenburg* incitement test and thus enjoyed First Amendment protection. The court then ruled, in line with clear precedent, that constitutionally protected conduct cannot form the basis for an aggravating factor. *E.g.*, *Zant v. Stephens*, 462 U.S. 862, 885 (1983); *Whitten*, 610 F.3d at 194–95.

## ARGUMENT

### I.    This Court should dismiss this appeal for lack of jurisdiction.

A.    <u>Standard of review</u>

"Before considering the merits of an appeal, we are obliged to assure ourselves that appellate jurisdiction exists." *Maye v. City of New Haven*, 89 F.4th 403, 406 (2d Cir. 2023). "This Court reviews issues of subject matter

20

jurisdiction, which turn on questions of law, *de novo*." *Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019).

B.      Section 3731 does not authorize this appeal.

1.      "Interlocutory appeals in criminal cases are 'disfavored.'" *United States v. Levy*, 947 F.2d 1032, 1034 (2d Cir. 1991) (quoting *United States v. MacDonald*, 435 U.S. 850, 853 (1978)). And "it is well settled that 'the United States cannot appeal in a criminal case without express congressional authorization.'" *United States v. Aslam*, 936 F.2d 751, 754 (2d Cir. 1991) (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568 (1977)).

Here, the government premises jurisdiction on § 3731. OB.4–8. Section 3731 supplies a limited exception to the final judgment rule, authorizing the government to take an interlocutory appeal "[i]n a criminal case" from certain enumerated classes of orders, two of which the government invokes: (i) "a decision, judgment, or order of a district court dismissing an indictment or information … , as to any one or more counts, or any part thereof"; and (ii) "a decision or order of a district court suppressing or excluding evidence." OB.4–8. Section 3731 also states: "The provisions of

21

this section shall be liberally construed to effectuate its purposes."

In *United States v. Wilson*, the Supreme Court held that § 3731 conferred jurisdiction over the government's appeal from an order dismissing an indictment on speedy trial grounds. 420 U.S. 332 (1975). In dictum—and it was dictum, because § 3731 expressly encompassed the dismissal order under review—the Court spoke more broadly: "While the language of the ... Act is not dispositive, the legislative history makes it clear that Congress intended to remove all statutory barriers to government appeals and to allow appeal whenever the Constitution would permit." *Id.* at 337. *See also id.* at 338–39 (after discussing legislative history, concluding, "[i]n light of this background, ... Congress was determined to avoid creating nonconstitutional bars to the Government's right to appeal").

This Court has seized upon *Wilson*'s dictum to adopt an expansive construction of § 3731. *E.g.*, *Aslam*, 936 F.2d at 754 ("Thus, despite its rather detailed wording, [§] 3731 becomes, not a specification of circumstances in which the Government may appeal in criminal cases, but a broad authorization to appeal unless prohibited by the Double Jeopardy Clause.").

In line with this construction, this Court has held that § 3731 permits an appeal from a pretrial order striking a notice of intent to seek the death penalty. OB.4 (citing *United States v. Quinones*, 313 F.3d 49, 57 (2d Cir. 2002)); *see also United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004).

Gendron acknowledges these precedents, but for purposes of preservation, respectfully maintains that they are wrongly decided. Section 3731 limits appellate jurisdiction to specifically enumerated orders. "[T]he interpretive canon of *expressio unius est exclusio alterius* instructs that Congress's expression of one or several items in an enumerated list typically reflects an intent to exclude another left unmentioned.'" *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 405 (2d Cir. 2018). *See also, e.g., Esteras v. United States*, 606 U.S. 185, 195 (2025). Here, the canon's application is straightforward: Congress's decision to list certain appealable orders excludes those not listed. Section 3731 "cannot be construed to authorize a Government appeal from any and every District Court order," because "[t]o so construe [§] 3731 would do violence to Congress's express intention to carefully identify and define the situations in which the government might

23

appeal." *United States v. Ferri*, 686 F.2d 147, 151 (3d Cir. 1982).

This Court's reliance on *Wilson* to adopt a broader reading is unsound. For one thing, the cited language in *Wilson* is dictum. For another, the decision's key language—"Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit," 420 U.S. at 337—rests not on statutory text but on legislative history. *Wilson* said exactly this: "[T]he language of the ... Act is not dispositive," but "the legislative history is clear." *Id.* That language shows the decision's staleness. As countless subsequent cases make clear, "whatever the expectations of the drafters, a statute's legislative history cannot overcome the plain meaning of the text." *United States ex rel. Weiner v. Siemens AG*, 87 F.4th 157, 162–63 (2d Cir. 2023). In addition, the Supreme Court itself cabined the *Wilson* dictum two years later, explaining that § 3731 "was 'intended to remove all statutory barriers' to appeals from orders *terminating prosecutions*." *Sanabria v. United States*, 437 U.S. 54, 63 n.16 (1977) (quoting *Martin Linen*, 430 U.S. at 568) (emphasis added).

Section 3731's concluding sentence, which calls for the statute to be

24

"liberally construed," doesn't change the analysis. "Even a statute that is to be construed liberally still must be interpreted based on its plain meaning." *Ronen v. RedRoute, Inc.*, 763 F. Supp. 3d 319, 329 (E.D.N.Y. 2025). "[I]dentifying what a 'liberal construction' consists of is impossible—which means that it is an open invitation to engage in 'purposive' rather than textual interpretation, and generally to engage in judicial improvisation." SCALIA & GARDNER, READING LAW 365–66 (Thomson/West 2012). The Supreme Court has thus rejected the "liberal interpretation" of even remedial statutes that would override plain meaning and override express textual provisions. *INS v. Phinpathya*, 464 U.S. 183, 192, 195 (1984).

2.     Even under current law, this appeal is barred and no controlling precedent holds to the contrary. This Court should therefore apply § 3731 according to its terms and dismiss because the district court's order doesn't fall within any of the categories enumerated in the statute. First, the order doesn't "dismiss[] an indictment or information" in whole or in part. The order strikes non-statutory aggravating factors from the government's notice of intent to seek the death penalty. Non-statutory aggravating factors

25

are not like counts in "an indictment or information." Unlike gateway intent factors and statutory aggravating factors, *see* §§ 3591(a)(2) and 3593(e), non-statutory aggravating factors are neither necessary to nor sufficient for a federal death sentence. They are not "'discrete bas[e]s of criminal liability.'" OB.8 (quoting *United States v. Woolard*, 981 F.2d 756, 757 (5th Cir. 1993)). They need not be (and were not here) presented to a grand jury.

Glossing over these differences, the government relies on *Quinones* to make a greater-includes-the-lesser argument: "If § 3731 permits the government to appeal the dismissal of a notice to seek the death penalty, § 3731 should necessarily also permit the government to appeal the dismissal of *part* of a notice to seek the death penalty." OB.7–8. But the government cites no case so holding. Dismissal of the notice of intent terminates a capital prosecution altogether. Likewise, dismissal of a statutory aggravating factor—at least one of which must be found before a jury may impose of the death penalty, *see* § 3593(e)—could obviate a penalty phase. Here, in contrast, the district court's order allows this capital prosecution to proceed, preserves all four statutory aggravating factors

26

alleged in the indictment, and leaves a fifth non-statutory aggravator intact.

The distinction matters. *Fell* and *Quinones* rest upon § 3731's exhortation that the statute be "liberally construed to effectuate its purposes." *See Fell*, 360 F.3d at 138–39; *Quinones*, 313 F.3d at 56–57. But "no legislation pursues its purposes at all costs." *United States v. Coonan*, 143 F.4th 119, 126 (2d Cir. 2025). And the costs of interlocutory appeals in criminal cases are steep. "The delays and disruptions attendant upon intermediate appeal … are especially inimical to the effective and fair administration of the criminal law." *Abney v. United States*, 431 U.S. 651, 657 (1977). Section 3731 may tolerate those costs when the alternative is premature termination of a capital prosecution, but may not when the government has lost only a non-statutory aggravating factor inessential to imposition of the sought-for death sentence.

Nor does the district court's order "exclud[e] evidence." Contrary to the government's assertion (OB.4–7), evidence associated with each of the stricken non-statutory aggravating factors will come in at trial (subject, of course, to the Rules of Evidence and § 3593(c)). Evidence of the physical

27

injuries suffered by surviving victims is relevant to prove the attempted murder and firearms offenses (Counts 21–26) as to those victims. It is also relevant to prove the "grave risk of death to additional persons" and "multiple killings or attempted killings" statutory aggravating factors. Evidence of Gendron's racial bias and his efforts to incite others are relevant to the hate crime offenses (Counts 1–10, 21–23, 27), which require proof that Gendron acted "willfully," and that he caused bodily injury "because of" the victims' "actual and perceived race and color." § 249(a)(1)(B). And the same evidence is likely relevant to the "substantial planning and premeditation" statutory aggravating factor. *See* SA.12 n.5; SA.13; SA.19.

Citing out-of-Circuit cases, the government contends that § 3731 authorizes appeal from an order "that excludes evidence for some, but not all, purposes." OB.4–5. These cases are not persuasive because they deviate from the statute's text in favor of loose conceptions of Congress's purpose divined from legislative history. For example, in *United States v. Delatorre*, 157 F.3d 1205, 1208 (10th Cir. 1998), the court chided the defendant for "ask[ing] us to add to § 3731's plain language the requirement that an order

28

suppressing or excluding evidence must do so for all purposes." *Delatorre* got it backwards. The natural meaning of "exclude" is "to bar from ... consideration or inclusion"—not to "to bar in part." *See* Exclude, Merriam-Webster's Dictionary, https://tinyurl.com/u2msyvb2. The court, not the defendant, was adding words to the text. The court wanted the statute to read "suppressing or excluding evidence *in whole or in part*."

The natural meaning of "excluding" becomes clearer still when "excluding" is read alongside its neighbor, "suppressing," which has a settled legal definition—"to prohibit; to prevent (something) from being seen, heard, known, or discussed." Suppress, Black's Law Dictionary (12th ed. 2024). *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."). Both words convey full, not partial, prohibitions.

Below, the government itself grasped the distinction between "excluding" or "precluding" evidence outright and admitting evidence for

a limited purpose: "To the extent the Court may find that the evidence is admissible for one purpose but not another, ... preclusion of the evidence is not warranted: rather, the appropriate remedy is, instead, a limiting instruction." 1A.162 n.8. Section 3731 applies to orders "suppressing or "excluding" evidence in full, which is not what Judge Vilardo did.

## II. The district court correctly construed § 3593(a) in striking the "Injury To Surviving Victims" factor.

### A. Standard of review

This Court reviews questions of law, including questions of statutory construction, *de novo*. *United States v. Lett*, 944 F.3d 467, 470 (2d Cir. 2019).

### B. Legal framework

As explained above, before a federal defendant may be sentenced to death, a jury must find a culpable mental state and at least one statutory aggravating factor. The FDPA also contemplates non-statutory aggravating factors, which cannot themselves support a death sentence but can be weighed, along with statutory aggravating factors, in deciding the penalty.

Section 3592(c), after listing 16 statutory aggravating factors applicable to homicide offenses, provides: "The jury ... may consider

30

whether any other aggravating factor for which notice has been given

exists." Section 3593(a)(2), in turn, specifies that the "notice" must "set[]

forth the aggravating factor or factors that the government, if the defendant

is convicted, proposes to prove as justifying a sentence of death." Section

3593(a) addresses "victim impact" aggravation specifically:

> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

C.    <u>The FDPA limits "victim impact" aggravation to the deceased victims of capital homicide offenses.</u>

The FDPA limits non-statutory aggravating factors concerning

"victim impact" to factors addressing the impact of death-eligible offenses

on victims who have died and their families. That doesn't mean that the

surviving victims will play no role in this case, or that the district court

"precluded the government from introducing evidence" regarding the

"effects" of Gendron's attack on them. OB.46. To the contrary, they may

testify at the guilt phase to prove that Gendron attempted to kill them. *See*

31

1A.17–19 (Counts 21–26, charging §§ 249(a)(1)(B)(ii) and 924(c)(1)(A)(iii)).

They may testify at the penalty phase to prove that Gendron's actions

created a grave risk of death to one or more persons, and that he attempted

to kill more than one person in a single criminal episode. *See* 1A.23–24

(alleging §§ 3592(c)(5) and 3592(c)(16) aggravating factors). And they may

speak again when Judge Vilardo sentences Gendron on the non-capital

counts. SA.10. That procedure fully implements Congress's intent as

reflected in the FDPA's statutory text, context, structure, and history.

      1.     Start with the text. Section 3593(a) says that non-statutory

aggravating factors may include those concerning "the effect of the offense

on the victim." As Judge Vilardo reasoned, "the offense" means the "death-

eligible offense" that triggers the § 3593 hearing. SA.10. "A statutory

provision's use of the definite article 'the,' as opposed to the indefinite 'a,'

'an,' or 'any,' indicates that Congress intended the term modified to have a

singular referent." *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 387–88 (S.D.N.Y.

2006). "The most obvious place to look for the identity of a referent is

elsewhere in the statute in which the term appears." *Id.* at 388. "The use of

the definite article 'the' to modify a noun tends ... to refer back to a previous appearance of the noun." *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 3d 342, 351 (S.D.N.Y. 2013). In *National Foods, Inc. v. Rubin*, 936 F.2d 656, 660 (2d Cir. 1991), this Court applied this principle to a statute that referred in one provision to "a court of competent jurisdiction," and then a few sentences later to "the court." "Absent some reason to conclude otherwise, and we see none, 'the court' referred to the second time ... should be the same one referred to the first time—a 'court of competent jurisdiction.'" *Id.*

Here, "the offense" refers to the previous appearance of the word "offense" in § 3593's first sentence: "an offense described in section 3591." In this case, all of the death-eligible offenses are "described in" § 3591(a)(2). And that provision makes clear that to be death-eligible, an "offense" must result in the death of a "victim." *See* § 3591(a)(2)(A) ("intentionally *killed the victim*"); § 3591(a)(2)(B) ("intentionally inflicted serious bodily injury that resulted in *the death of the victim*"); § 3591(a)(2)(C) ("intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a

33

person, ... and *the victim died* as a direct result of the act"); § 3591(a)(2)(D) ("intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, ... and *the victim died* as a direct result of the act") (emphases added). Putting these pieces together, "the offense" means the singular death-eligible offense that triggers the § 3593 hearing, and "the victim" means the singular deceased victim of the death-eligible offense. "The relevant language of the statute in question, 18 U.S.C. § 3592(a)(2), clearly indicates that the 'victim' in question is the victim of the death-eligible murder." Order 3, *United States v. Shakir*, 98 Cr. 38 (M.D. Tenn. Apr. 2, 2008); ECF 3178; *see also Gooch*, 2006 WL 3780781, at *22 ("Clearly, the FDPA refers to the victims of a capital crime.").

2.      Context accords. Whenever the FDPA uses the term "victim," the statute makes clear that the term refers to a homicide victim who has died. In addition to §§ 3591(a)(2)(A)–(D), just discussed, § 3592(a)(7) lists "Victim's Consent" as a mitigating factor, applicable where "[t]he victim consented to the criminal conduct that resulted in *the victim's death*" (emphasis added). Similarly, § 3592(c)(5), the grave-risk-of-death

34

aggravator, applies where "[t]he defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense." That "victim" must be a homicide victim because § 3592(c) defines the "[a]ggravating factors for homicide." *See also* §§ 3592(c)(6) and 3592(c)(11) (both defining aggravators relating to "victims" in "homicide" cases). It is a "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). Applying that rule, victim means homicide victim throughout the FDPA.

3.     Next, turn to structure. "We generally aim to interpret a statute as a symmetrical and coherent regulatory scheme." *Quituizaca v. Garland*, 52 F.4th 103, 110 (2d Cir. 2022). The FDPA implements the federal death penalty. Section 3593, as its title indicates, delineates the "special hearing" required "to determine whether a sentence of death is justified." Section 3593(c) displaces Fed. R. Crim. P. 32 and substitutes the FDPA penalty phase for ordinary federal sentencing procedure. Section 3593 focuses on

35

the sentencing for the death-eligible offense, which, as both a constitutional and a practical matter, is virtually always a homicide offense. *See Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008); *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (holding death penalty unconstitutional for nonhomicide offenses). A homicide offense under the FDPA always has a victim who dies, and it is that offense, and that victim, to which § 3593 is addressed. Otherwise, "[t]he FDPA makes no express provision for victim impact evidence concerning the victim of a crime for which the defendant is not being sentenced." *United States v. Sampson*, 335 F. Supp. 2d 166, 193 (D. Mass. 2004).

Where a jury returns a death sentence but also convicts the defendant of noncapital crimes, the judge must impose sentence for those latter crimes. *See* 18 U.S.C. § 3551(b) ("An individual found guilty of an offense shall be sentenced" to a "fine," "probation," or "imprisonment"); *see also, e.g.*, Sent'g Tr. 113–14, *United States v. Tsarnaev*, 13 Cr. 10200 (D. Mass. June 24, 2015) (after jury returned death sentence, district judge imposed noncapital sentences "in accordance with the relevant statutes and after consideration of relevant sentencing factors, including Guidelines

36

recommendation"), ECF 1634. As Judge Vilardo recognized, that non-capital sentencing proceeding is the proper forum for consideration of the surviving victims' injuries, because that proceeding punishes the non-capital offenses that caused the survivors' injuries. SA.10.

In this case, at a non-capital sentencing, the surviving victims' injuries would bear on "the nature and circumstances" of the attempted murder and firearms offenses, 18 U.S.C. § 3553(a)(1); the Guidelines range, *see* U.S.S.G. § 2H1.1(a)(3)(A) (enhanced base offense level for § 249 violation "if the offense involved the use or threat of force against a person"); and restitution, *see* 18 U.S.C. § 3663A(b)(2) (reimbursement for medical and psychiatric care, rehabilitative therapy, and lost income "in the case of an offense resulting in bodily injury to a victim"). As Judge Vilardo recognized, the surviving victims would also have the right to be heard. 18 U.S.C. § 3771(a)(4); Fed. R. Crim. P. 32(i)(4)(B).

4. Finally, consider history. Congress enacted § 3593(a) three years after *Payne* held that the Eighth Amendment doesn't prohibit the introduction of victim impact evidence in capital sentencing hearings. 501

37

U.S. at 827. Overruling recent precedent, *Payne* held: "[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* *Payne* did not hold that victim impact evidence "must be admitted, or even that it should be admitted," instead leaving the decision to individual jurisdictions. *Id.* at 831 (O'Connor, J., concurring).

To take advantage of *Payne*'s holding, Congress had to act. And § 3593(a)'s language tracks the decision's, permitting consideration of "the effect of the offense on the victim and the victim's family." Moreover, § 3593(a) captures the types of evidence at issue in each of the Court's trilogy of victim-impact cases: "oral testimony," *see Payne*, 501 U.S. at 814–15; "a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family," *see Booth v. Maryland*, 482 U.S. 496, 498–500 (1987),

*overruled by Payne*; and "other relevant information," *see South Carolina v. Gathers*, 490 U.S. 805, 808–10 (1989) (prosecutorial argument about prayer tract and voter registration card on victim's person), *overruled by Payne*.

Because § 3593(a) hews so closely to the Supreme Court's cases, it is reasonable to infer that Congress meant to encompass exactly what *Payne* permitted—"a quick glimpse of the life which a defendant chose to extinguish," and evidence of "the loss to the victim's family and society which has resulted from the defendant's homicide." 501 U.S. at 822.

Legislative history confirms this understanding. Section 3593(a) originated in federal death penalty legislation proposed by President Bush in 1991, which contained the core of the present statutory language: "factors concerning the effect of the offense on the victim and the victim's family." Comprehensive Violent Crime Control Act of 1991, tit. I, § 102(a), *reprinted in* H.R. Doc. No. 102–58, at 19. The administration's section-by-section analysis made clear that the "victim" was a homicide victim: "The effect on the victim may include the suffering of the victim in the course of the killing or during a period of time between the infliction of injury and resulting

death, and the victim's loss of the opportunity to continue his characteristic activities and enjoyments and to realize his plans and aspirations because of the extinction of his life by the defendant." H.R. Doc. No. 102–58, at 166.

D.     The government's arguments lack merit.

1.     Principally, the government argues that the general language in the FDPA discussed above (*supra* Argument § II.B) authorizes this factor. *See* § 3592(c) (allowing jury to consider "any other aggravating factor"); § 3593(a) (victim-impact aggravator may include "any other relevant information"); § 3593(c) ("[I]nformation may be presented as to any matter relevant to sentencing, including any aggravating or mitigating factor permitted or required to be considered under [§] 3592."). *See* OB.48–50. In the government's view, the FDPA "uses the word 'any'" to indicate "Congress's intent to place few limits on aggravating factors." OB.49.

This position ignores the "well established canon of statutory interpretation" that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). The canon "has full application ... to statutes such as the one here, in which a general

40

authorization and a more limited, specific authorization exist side-by-side." *Id.* In such statutes, "[t]he terms of the specific authorization must be complied with." *Id.* Here, § 3593(a) describes, in specific terms, what aggravating factors relating to victim impact may be alleged: "factors concerning the effect of the offense on the victim and the victim's family." As shown above (*supra* Argument § II.C), this provision refers to death-eligible offenses with deceased victims. Under the specific/general canon, § 3593(a) permits this kind of victim-impact aggravator, but no other.

A related canon, *ejusdem generis*, demonstrates the error in the government's reliance on § 3593(a)'s reference to "any other relevant information." OB.50–51. That phrase doesn't expand the universe of permissible victim-impact aggravators. Rather, understood in context and in light of the *ejusdem generis* canon, that phrase means any other information relevant to the proper victim-impact aggravator: the effect of the capital offense on the deceased victim and his family. "Under the ... canon of *ejusdem generis*, a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific

41

classes that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024).

Thus, "where general words follow specific words in a statutory

enumeration, the general words are construed to embrace only objects

similar in nature to those objects enumerated by the preceding specific

words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001). Here,

the catchall phrase ("any other relevant information") allows the

government to introduce information "similar in nature" to the types of

evidence just listed—"oral testimony" and a "victim impact statement"—in

support of the aggravator, as properly construed.

Congress's inclusion of this catchall clause has a simple historical

explanation. *Gathers* discussed an unusual type of victim-impact

"information"—a prayer tract and a voter registration card that had

belonged to the homicide victim—that the prosecutor highlighted in his

jury argument. 490 U.S. at 808–10. This evidence, the *Gathers* dissent

believed, was properly presented to illustrate "the vulnerability and simple

humanity of the victim," "an ordinary citizen." *Id.* at 820 (op. of

O'Connor, J.). When *Payne* overruled *Gathers*, Congress wrote § 3593(a)

42

broadly enough to accommodate this, and other uncommon evidence.

On this understanding, this Court's decision in *Whitten*, 610 F.3d 168 (cited at OB.46; OB.49), accords. *Whitten* upheld the admission of testimony from police officers who worked with the homicide victims, themselves police detectives, and rejected the defendant's argument that "the FDPA limits victim impact evidence to the impact on family members." 610 F.3d at 188–89. *Whitten* saw § 3593(a) "as language of inclusion, not exclusion," and read the "other relevant information" clause as "a catch-all for what may be deemed relevant by the court." *Id.* at 189. That is, *Whitten* accepted that impact evidence from the homicide victims' police colleagues (their "Brothers in Blue," as the saying goes) was "similar in nature" to impact evidence from their family members. *See Circuit City Stores, Inc.*, 532 U.S. at 114–15. But *Whitten* did not address, let alone approve, stretching that clause to generate new aggravators concerning non-homicide victims.

Sections 3592(c) and 3593(c) do no work independent of § 3593(a). Section 3592(c) refers to "any other aggravating factor *for which notice has been given*" (emphasis added), and § 3593(a) determines what factors may be

43

"notice[d]" and how. Section 3593(c) refers to "any matter relevant to the sentence," and once again, § 3593(a) tells us which victim-impact aggravators fit that bill. Both provisions take us back to our primary textual inquiry. Put differently, the general permissions in both §§ 3592(c) and 3593(c) presuppose the existence of a valid non-statutory aggravating factor, and § 3593(a) supplies the substantive criterion of validity.

2.     Finally, the government disputes Gendron's reading of "victim," but its textual arguments collapse on inspection. The government argues that § 3593(a)'s reference to "the effect of the offense on the victim" must encompass surviving victims because, if limited to deceased victims, the provision would be "nonsensical" and "serve no purpose," as the effect would always be "straightforward and identical in every case: the offense caused the victim's death." OB.52. Not true, as the legislative history reflects, because the "effect of the offense on the victim" encompasses the unique circumstances of each victim's death—the fear, pain, and suffering the victim experienced before dying—and each victim's lost "opportunity" to pursue his own individual "plans and aspirations." *See supra* Argument

44

§ II.C.4. These consequences are far from "identical in every case."

The government also points to the use of "victim" in § 3593(c), which, the government says, "plainly contemplates surviving victims." OB.52–53. Agreed. But that proves Gendron's point. Section 3593(c) achieves this result by using *different language* than the rest of the FDPA to produce a *different meaning*. Section 3593(c) refers to the right of "a victim, *as defined in section 3510*," to attend trial (emphasis added). 18 U.S.C. § 3510 cross-references 34 U.S.C. § 20141(e)(2)'s definition of victim, which includes surviving victims. But everywhere else in the FDPA, including in § 3593(a), the statute uses the unmodified term "victim." If the government were right that the unmodified term "victim" already includes surviving victims, then this cross-reference to § 3510 would have been unnecessary. The government's reading makes the cross-reference superfluous.

The government's position that "victim" has the same meaning in §§ 3593(a) and 3593(c) (OB.52) "runs afoul of the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'"

45

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004). In § 3593(a), Congress used the term "victim." But in § 3593(c), Congress used the term "victim, as defined in section 3510." Under ordinary principles of statutory construction, this Court presumes that Congress meant different things by these different formulations. But the government treats them as identical.

### III. The district court correctly construed § 3593(f) in striking the "Racially-Motivated Killings" factor.

#### A. Standard of review

This Court reviews questions of law, including questions of statutory construction, *de novo*. *See supra* Argument § II.A.

#### B. Legal framework

The FDPA permits non-statutory aggravating factors. *See supra* Argument § II.B. The jury "may consider" such factors and must unanimously find them proved beyond a reasonable doubt. §§ 3592(c)–(d). If the jury does find them proved, the jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or

46

factors alone are sufficient to justify a sentence of death." § 3593(e).

Section 3593(f), however, limits what a jury can "consider":

> In a hearing held before a jury, the court, ... shall instruct the jury that, in considering whether a sentence of death is justified, *it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim* and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be.

(emphasis added). This "explicit command" directs a jury "not to consider race at all in reaching its decision." *Jones v. United States*, 527 U.S. 373, 400 n.14 (1999). Section 3593(f) also requires each juror to sign a "certificate" "that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her decision" regarding the proper penalty.

C.     <u>The aggravator is invalid because it asks the jury to "consider" the victims' "Black" race, in violation of § 3593(f).</u>

The district court's reading of § 3593(f) was straightforward and correct. Section 3593(f) says that a jury "shall not consider" a victim's race in "considering whether a sentence of death is justified." "The word 'shall,'

47

in a statute, indicates a command; what follows the word 'shall' is mandatory, not precatory." *United States v. Kahn*, 5 F.4th 167, 174 (2d Cir. 2021). The word "consider" means "to take into account." Consider, Merriam-Webster's Dictionary, https://tinyurl.com/mv8wyrj8. This language is pellucid. A jury cannot "take into account" a victim's race.

But the aggravator, as drafted, would have Gendron's jury do just that. The aggravator asks the jury find that Gendron "expressed bias, hatred, and contempt toward Black persons," and that "his animus toward Black persons played a role in the killings." 1A.28. If the jury made those findings (which the evidence amply supports, *see supra* Facts §§ A and B.1), the FDPA would require the jury to consider this aggravator in deliberating the penalty: The jury "shall consider any aggravating factor or factors found to exist." § 3593(e). So, the jury would be required to "consider" the aggravating weight of the fact that Gendron hated and killed "Black" victims, and simultaneously to certify that it had not "considered" the victims' races. The FDPA doesn't countenance those "mental gymnastics." 2A.330. Nor should trial judges give jurors "transparently self-

48

contradictory" instructions. *Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364, 369 (S.D.N.Y. 2007) (Lynch, J.). Below, the government acknowledged the difficulty of reconciling the aggravator and the FDPA, calling it a "difficult word problem" that was "hard to explain." 2A.321; 2A.328. Judge Vilardo, a practical trial judge, explained his ruling in more practical terms: "How can I possibly say I think that he gets the death penalty because these people were Black, but the fact that these people were Black had nothing to do with my verdict?" 2A.327.

Just as the statutory text plainly precludes "considering" race, the history does too. Section 3593(f)'s drafters so feared the risk of racial discrimination in the federal death penalty that they chose broad, preclusive language to ensure that "personal characteristics of the victim ... should play no part in the jury's decision." 2A.376 n.3; *see also id.* ("[W]e have placed a great emphasis on insuring that racial ... considerations ... do not play any part in the capital sentencing decision."); 2A.377 n.4 ("[R]ace should play no role whatsoever.") (all quoting legislative materials).

The rationale for this prophylactic rule comes readily to hand. What's

49

now § 3593(f) was first enacted as part of the Anti-Drug Abuse Act of 1988

("ADAA"). Tit. VII, § 7001(a), Pub. L. No. 110–690, 102 Stat. 4387, 4392

(codified at 21 U.S.C. § 848(o)(1) (1988 ed.)). One year earlier, the Supreme

Court had considered "sophisticated statistical studies" demonstrating that

in Georgia, "defendants charged with killing white victims were 4.3 times

as likely to receive a death sentence as defendants charged with killing

blacks." *McCleskey v. Kemp*, 481 U.S. 279, 286–87 (1987). Rejecting

constitutional challenges based on that disparity, *McCleskey* opined that

such arguments were "best presented to legislative bodies," which were

"better qualified to weigh and evaluate the results of statistical studies in

terms of their own local conditions and with a flexibility of approach that is

not available to the courts." *Id.* at 319. In an obvious response, Congress

enacted then-§ 848(o)(1) a year later, an inference confirmed by the

neighboring provision, then-§ 848(o)(2). Section 848(o)(2) directed the

Comptroller General to "conduct a study" of the States' differing capital

punishment schemes and "report to Congress on whether or not any or all

of the various procedures create a significant risk that ... the race of a victim

50

against whom a crime was committed ... influence[s] the likelihood that defendants ... will be sentenced to death." 102 Stat. at 4392. *See* Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 382 & n.197 (1999) (observing that § 848(o)(1) "respond[ed] to *McCleskey* concerns," and that § 848(o)(2) was enacted "directly in response to *McCleskey*"). That backdrop explains why Congress treated jury consideration of race with such circumspection.

D.     The government's arguments lack merit.

1.     Principally, the government argues that § 3593(f) "does not prohibit a capital jury from considering a defendant's *motive*—including his racist motive—for committing a capital crime." OB.26. Rather, § 3593(f) prohibits only racially discriminatory jury behavior, and "simply means that a defendant's or victim's race cannot be a reason for a jury to recommend a death sentence." OB.27–28. If the jury "would have recommended the same sentence if the defendant's and victim's race were different," the government asserts, then § 3593(f)'s work is done. OB.27.

This interpretation ignores half of the text. As the district court noted,

the government's position "reads out" the statutory "requirement not to 'consider' race at all." *See supra* Facts § B.3. Section 3593(f)'s mandated jury instruction and certificate each have *two* components separated by a disjunctive "and." The government highlights the second component: the district court must instruct the jurors that they cannot recommend a death sentence unless they would do so "no matter what the race of the defendant or of any victim," and the jurors must so certify. But the government elides the first component: the court must instruct the jurors that they "shall not consider the race of the defendant or of any victim," and the jurors must certify that they haven't. Section 3593(f) doesn't just bar race discrimination. It bars race consideration. "A statute should be construed so that effect is given to all its provisions." *United States v. Abdur-Rahman*, 708 F.3d 98, 102 (2d Cir. 2013). The government's reading fails that test.

By interpreting § 3593(f) as limited to race discrimination, the government also ignores Congress's judgment that any consideration of race in capital sentencing creates a risk of discrimination. The *McCleskey* studies demonstrated systematic bias in favor of capital punishment for

crimes with white victims. 481 U.S. at 286–87. Contemporary studies accord. *E.g.*, Grosso et al., *The Influence of the Race of Defendant and the Race of Victim on Capital Charging and Sentencing in California*, 21 J. Empirical Legal Studies 482 (2024) (finding "an entrenched pattern of racial disparities in charging and sentencing that privileges white victim cases"). It's easy to imagine how an aggravator that drew a jury's attention to a victim's white race could exacerbate these effects. Congress can reasonably have determined that prohibiting all jury consideration of race—not merely "codify[ing]" a defendant's "right to a jury that acts free of racial stereotypes or animus," OB.27 (quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017))—was the most effective means of eradicating racial bias from its capital scheme.

2. Next, the government argues that "a capital jury's ability to consider a defendant's motive is firmly rooted in case law," including where "a defendant committed his crime out of racial animus." OB.28–29. Of course, motive is generally a proper sentencing consideration. But the "Racially-Motivated Killings" aggravator, as framed by the government's notice of intent, isn't drawn to motive generally. It cites Gendron's anti-

53

Black animus and the victims' Black race in particular. SA.13.

Likewise, the Constitution doesn't bar enhancing a defendant's sentence if racial bias underlies his crime. *Mitchell*, 508 U.S. at 479. But Congress may do more than the constitutional minimum in favor of anti-discrimination policy. *See infra* Argument § III.D.4. And in any case, the district court didn't rely on the Constitution. Instead, the court ruled as a matter of statutory construction that § 3593(f) precludes this aggravator because its "specific focus on the victims' race"—Black—"conflicts with the FDPA." SA.13. *Mitchell*'s constitutional holding—which Judge Vilardo acknowledged (SA.19)—casts no doubt on the court's statutory analysis.

"[D]eterminations of appropriate sentencing considerations are 'peculiarly questions of legislative policy.'" *Booth*, 482 U.S. at 515 (White, J., dissenting) (quoting *Gregg v. Georgia*, 428 U.S. 153, 176 (1976) (op. of Stewart, Powell, and Stevens, JJ.)). Congress, in drafting the FDPA, called for some consideration of a defendant's motive, both in mitigation and aggravation. *E.g.*, §§ 3592(a)(2) (duress as mitigating factor); 3592(c)(8) (pecuniary gain as aggravating factor). But Congress, mindful of the

54

pernicious prevalence of racial bias, can reasonably have chosen to strike a different balance with respect to race. That is, Congress permissibly deemed any reference to race, even if relevant to a defendant's culpable motive, too liable to sow racially discriminatory effects. That determination merits judicial deference, especially against the backdrop of a statutory scheme that, as here, accommodates consideration of such motives in other places. *E.g.*, § 3592(c)(9) (aggravating factor where defendant "committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism"). Finally, recall that the district court ruled on the aggravator "as framed by the government." SA.13. The government chose to draft what it now calls a motive-based factor in facially race-based terms. A differently-framed factor might fare differently.

3. Turning to structure, the government argues that § 3593(f) cannot impose "substantive" limits on the set of permissible non-statutory aggravating factors because it is a mere "procedural rule" in a "procedural section." OB.29–30. Of course, the opening brief goes on to contend that other provisions of the same section, §§ 3593(a) and 3593(c), have a

55

substantive function and authorize a limitless range of non-statutory aggravators. OB.48–49; *see supra* Argument § II.D.1. The government can't have it both ways. Also, there's a simple reason for Congress's decision to put § 3593(f) in § 3593 rather than § 3592. *See* OB.29. Section 3593(f)'s race bar isn't limited to aggravating factors. Congress purged considerations of race from all aspects of the "special hearing" that § 3593 outlines.

The government also contends that § 3593(f), as interpreted by the district court, can't coexist with substantive hate crimes offenses punishable by death. OB.31 (citing 18 U.S.C. §§ 245 and 247). But when Congress enacted § 3593(f)'s predecessor provision in 1988, neither of these offenses included capital penalties, so there was no "tension" with "'existing law.'" OB.31 (quoting *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014)). And the point falls quite flat here: Section 249, the hate crime offense with which Gendron is charged, is not punishable by death. This legislation's proponents "adamantly and successfully resisted all efforts to amend a death penalty provision into the bill, citing the documented history of racial discrimination in the administration of capital punishment

... and its disproportionate application against poor people." DE.180:2 n.1.

4. The government next turns to § 3593(f)'s history. OB.31–34. The argument rests on *Barclay v. Florida*, in which a four-Justice plurality held that the Constitution "does not prohibit a trial judge from taking into account the elements of racial hatred in [a] murder" in deciding whether to impose a death sentence. 463 U.S. 939, 949 (1983) (op. of Rehnquist, J.). In the government's view, when Congress enacted § 3593(f)'s predecessor provision five years later in the ADAA, it must have been aware of *Barclay*. OB.32–33 & n.10. But, the government says, § 3593(f), as interpreted by the district court here, would "overrule *Barclay*," and had that been Congress's intent, the Legislature "surely would have said so explicitly," OB.33–34.

This reasoning is misguided. For starters, the *Barclay* plurality's holding is far more limited than the government's argument requires. The defendant in *Barclay* didn't challenge the State trial judge's consideration of "racial hatred" as such. Rather, he objected to the judge's reliance on a non-statutory aggravating factor—Florida law then "prohibit[ed] consideration of nonstatutory aggravating factors," *see* 463 U.S. at 956—and to the judge's

57

weighing of that factor in light of the judge's own personal experience as a solider who observed concentration camps during World War II. *See* Br. for Pet'r 58–63, *Barclay v. Florida*, No. 81–6908 (U.S. Dec. 29, 1982), *available at* https://tinyurl.com/3mfsv38c. The defendant conceded that "the fact that this killing was racially motivated might certainly have been considered as a proper aggravating circumstance under a statute making it one," but argued that "the Florida legislature chose not to include such a circumstance in its statutory scheme." *Id.* at 59. "[T]he language of an opinion must be read in light of the issues presented." *Sinclair v. United States*, 279 U.S. 749, 767 (1929). And *Barclay* wasn't squarely presented with the question that the government now sees the Court as having resolved.

The plurality did not hold that a sentencer must (or even may) consider the racial hatred underlying a defendant's crime as a standalone aggravating factor. Rather, the plurality held that the State trial judge had permissibly considered racial hatred as "relevant to several statutory aggravating factors"—namely, that the crime had posed a "great risk of death to many persons," had "disrupt[ed] or hinder[ed] the lawful exercise

58

of any governmental function," and was "especially heinous, atrocious, or cruel." 463 U.S. at 949 & n.7. Reviewing a State-court judgment, the plurality held only that the trial judge's decision was "not so wholly arbitrary as to violate the Constitution." *Id.* at 950–51.

On that understanding, the flaws in the government's historical argument become apparent. The four-Justice plurality opinion might not even rise to the level of a "precedent" of which Congress is presumed to be "aware" when legislating, and certainly not on a question that wasn't squarely presented. *See Yselta del Sur Pueblo v. Texas*, 596 U.S. 685, 700 (2022). Put that to one side. The enactment of § 3593(f)'s predecessor provision five years later did not "overrule" *Barclay*. The ADAA said nothing about the Constitution but instead placed a statutory constraint on a federal capital jury's deliberative process. 102 Stat. at 4392. Congress cannot "overrule" the Supreme Court's constitutional decisions, *see Dickerson v. United States*, 530 U.S. 428, 431 (2000), but can provide "greater protection" to individuals than the Constitution demands, *see Holt v. Hobbs*, 574 U.S. 352, 357 (2015). Congress did so in the ADAA itself. *E.g.*, 102 Stat.

59

at 4388–89 (providing for jury determination of penalty unless waived by defendant, even though *Barclay* upheld constitutionality of Florida capital scheme, which provided for ultimate judicial determination, *see* 463 U.S. at 944). *See also United States v. Taveras*, 2006 WL 8435839, at *9–11 (E.D.N.Y. March 21, 2006) (noting that "Congress may provide more protection than does the Constitution," and cataloguing how ADAA does so).

Consequently, the government's ultimate inference—that the district court's interpretation of § 3593(f) must be wrong—is unsupported. There is no reason to believe that Congress was hyper-aware of the *Barclay* plurality or would have "explicitly" flagged conflict with *Barclay* when there was none. The ADAA's anti-discrimination provision did not say, *contra Barclay*, that the Constitution prohibits a sentencer from considering the racial animus underlying a crime. Rather, Congress, in its own legislative judgment, determined that a homicide victim's "race [or] color" isn't a permissible capital sentencing consideration. That judgment conformed to *Barclay*, which expressed only a constitutional minimum.

5.     Last, the government appeals to "common sense," accusing

60

Gendron of "us[ing] a statute meant to prevent prejudice and bigotry as a shield to prevent the jury from considering his racist motives as a stand-alone aggravating factor *in a hate crimes trial*." OB.34. Once again, the government vastly overstates the consequences of the district court's ruling.

The jury will hear abundant evidence of Gendron's "racist motives." As Gendron conceded and the district court confirmed, this evidence will "absolutely" "come in" to prove Gendron's guilt of the hate crime offenses and the substantial planning and premeditation aggravator. SA.12 n.5; SA.13. Given these concessions and the district court's express ruling, the government's contrary suggestion—that it is "unclear whether or to what extent ... the district court will admit evidence of Gendron's racial motivation for *any* purpose at sentencing," OB.6–7 n.2—is implausible.

The penalty phase jury will not decide Gendron's sentence for the hate crime offenses. Judge Vilardo will sentence him for those non-capital crimes. So, there is nothing "incongruous" about the possibility that the jury could: (i) find that Gendron "killed his victims because of their race" in convicting him of § 249(a)(1)(B)(i) offenses at the guilt phase; but (ii) not

consider as a standalone factor aggravating § 924(j)(1) firearms offenses at the penalty phase that his "animus toward Black people" "played a role" in the murder victims' deaths. OB.34–35. Jurors make offense-element findings and judges impose sentences for non-capital offenses every day.

**IV. The district court correctly struck the "Attempt To Incite Violence" factor to avoid punishing First Amendment-protected speech.**

A.      Standard of review

"The district court's application of constitutional standards is reviewed *de novo*." *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001).

B.      Gendron's speech was constitutionally protected.

"The constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. The First Amendment doesn't allow punishment of "mere advocacy, unrelated to its tendency to produce forcible action." *Id*. at 447–48 n.2 (citing *Yates v. United States*, 354 U.S. 298, 320–24 (1957)). *Brandenburg* therefore invalidated on First Amendment

grounds a state statute that "punishe[d] persons ... who 'justify' the commission of violent acts 'with intent to exemplify, spread, or advocate the propriety of the doctrines of criminal syndicalism." *Id.* at 448. Speech that is "not directed to any person or group of persons" is not "advocating, in the normal sense, any action." *Hess v. Indiana*, 414 U.S. 105, 108–09 (1975). And even "advocacy of illegal action at some indefinite future time" is "not sufficient" to bring speech outside the First Amendment's scope. *Id.* at 108.

Below, the district court concluded that Gendron's speech didn't rise to the level of constitutionally unprotected incitement. *See supra* Facts § B.2. The government doesn't dispute that conclusion and indeed argues affirmatively that the "[i]ncitement" doctrine "plays no role here." OB.44. The government has abandoned any argument that the district court erred in this regard. *E.g.*, *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004). So, the single issue before this Court is whether the government may use Gendron's First Amendment-protected speech as an aggravating factor. Clear precedent says no.

C.  Constitutionally protected conduct cannot supply the sole basis for a non-statutory aggravating factor.

With the incitement question resolved in Gendron's favor, this issue resolves easily. The district court correctly struck the "Attempt To Incite Violence" aggravator because it urges the jury to use protected conduct as a reason to return a death sentence. In *Stephens*, the Supreme Court squarely stated that if an aggravating factor "authorizes a jury to draw adverse inferences from conduct that is constitutionally protected," "due process of law would require that the jury's decision to impose death be set aside." 462 U.S. at 885. For examples of what might constitute such invalid "aggravating circumstance[s]," *Stephens* turned to the First Amendment, mentioning "the display of a red [i.e., Communist] flag" and "the expression of unpopular political views." *Id.* (citing *Stromberg v. California*, 283 U.S. 359 (1931), then *Terminiello v. Chicago*, 337 U.S. 1 (1949)). *See also Brown v. Sanders*, 546 U.S. 212, 218–19 (2006) (citing *Stephens*).

In *Whitten*, this Court repeated the *Stephens* principle, explaining that due process would demand vacatur of a death sentence "if the government invites the jury to find the existence of an aggravating factor based on

64

'inferences from conduct that is constitutionally protected.'" 610 F.3d at 194–95 (quoting *Stephens*, 462 U.S. at 885). In *Whitten*, a prosecutor, during jury argument, "used [the defendant's] demand for trial"—as opposed to pleading guilty—"to evidence lack of remorse and refusal to accept responsibility .... The government also emphasized [the defendant's] lack of remorse as support for the aggravating factor of future dangerousness." *Id.* at 195. *Whitten* held that this violated *Stephens* because "Wilson's constitutionally protected decision to go to trial was cited as a reason to sentence him to death," necessitating vacatur of the death sentence. *Id.*

Here, the "Attempt To Incite Violence" aggravator suffers from this very infirmity. The district court ruled that Gendron's communicative activities in disseminating his manifesto, his journal, and a link to the livestream of the shooting were protected because they were not likely to provoke imminent lawless action. SA.15–16. *Stephens* and *Whitten* thus preclude the government from "inviting" the jury to rely on these communicative activities to find the aggravator proved, just as the district court ruled. *Stephens*, 462 U.S. at 885; *Whitten*, 610 F.3d at 194–95; *see* SA.19

65

("[T]he evidence does not meet the high standard of incitement. Thus, the speech cannot successfully be used to prove that aggravating factor."). The government proffered no other evidence, so the aggravator must fall.

D.   The government's arguments lack merit.

The government proceeds from a fundamental misunderstanding of the district court's order. The opening brief's point heading argues that the court "erred in holding that the First Amendment precludes the government from *introducing evidence* showing that, in preparing for and committing his attack, Gendron was motivated by a desire to incite violence." OB.37 (emphasis added). But the court's order did not exclude any evidence. *See* SA.13–20. All that Judge Vilardo did was to "strike[] the alleged attempt to incite violence as an aggravating factor." SA.20. That is all he did because that is all Gendron moved him to do: "strike the 'attempt to incite violence' non-statutory aggravating factor." 1A.228.

Consequently, much of the government's argument misses the point. For example, the government repeatedly argues that "[t]he First Amendment does not prohibit the evidentiary use of Gendron's speech."

OB.39. *See also* OB.40 (arguing that "[t]his is classic motive evidence for which the First Amendment offers no protection."). Granted, "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs ... at sentencing simply because those beliefs ... are protected by the First Amendment." *Dawson v. Delaware*, 503 U.S. 159, 165 (1992). Rather, in both *Barclay* and *Dawson*, the Supreme Court indicated that such evidence could be admissible at a capital sentencing proceeding where relevant to prove other aggravating factors. *See Barclay*, 463 U.S. at 949 (evidence of defendant's "racial hatred" was "relevant to several statutory aggravating factors"); *Dawson*, 503 U.S. at 166 (positing, in dicta, that evidence of defendant's membership in racist prison gang "might serve a legitimate purpose in showing that a defendant represents a future danger to society" or "might be relevant in proving other aggravating circumstances"). Judge Vilardo grasped this too. SA.19.

The problem for the government is that Gendron's words weren't being proffered to prove another valid aggravator—they were the aggravator. *See* SA.19–20 (district court's incitement ruling "leaves only the

67

protected speech *as* the aggravating factor, which would amount to punishing Gendron for his protected speech"). "That is precisely what the law forbids." SA.20. "We again emphasize the complete bar on the use of protected speech, belief, or association at sentencing for the purpose of punishment based on the feature that warrants its First Amendment protection." *United States v. Stewart*, 686 F.3d 156, 169 (2d Cir. 2012). *See also, e.g., United States v. Lemon*, 723 F.3d 922, 938 (D.C. Cir. 1983) ("A sentence based to any degree on activity or beliefs protected by the first amendment is constitutionally invalid.").

The government contends that the "Attempt to Incite Violence" factor wouldn't punish Gendron for protected speech, but for his motive in carrying out the shooting. OB.38. Yet all the evidence supporting this factor is, the district court found, communicative activity. And "[t]he fact that such activity is constitutionally protected ... imposes a special obligation on this Court to examine critically the basis on which liability [would be] imposed." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915–16 (1982). "In particular," this Court must consider "the effect" of the district court's

68

conclusion that Gendron's speech was First-Amendment-protected "on the ability of the State to impose liability" for his unprotected acts. *Id.* at 916. Because this factor "would impose liability on the basis of a public address—which predominantly contained highly charged political rhetoric lying at the core of the First Amendment—we approach this suggested basis of liability with extreme care." *Id.* at 926–27. Here, the district court did just that, performing a careful incitement analysis and then ruling, narrowly, that the government could not urge Gendron's protected speech alone as the basis for enhancing his sentence to death.

The district court's ruling does not "protect Gendron from the use of his own words to explain his actions." OB.44. As with the "Injury To Surviving Victims" and "Racially-Motivated Killings" factors, the court did not bar the "evidentiary use" of Gendron's manifesto, his journal, or his livestream, which could be relevant to prove both guilt and proper aggravators, such as substantial planning and premeditation. *See supra* Argument §§ I.B, II.C, III.D.5. There is nothing inequitable about the order.

69

## CONCLUSION

This Court should dismiss this appeal for lack of jurisdiction. In the alternative, the district court's order should be affirmed.

Dated:     New York, New York
           March 16, 2026

                    Respectfully submitted,

                    FEDERAL DEFENDERS OF NEW YORK, INC.
                     APPEALS BUREAU

                    By: /s/ Daniel Habib
                    Attorney for Defendant-Appellee
                         **Payton Gendron**
                    52 Duane Street, 10th Floor
                    New York, New York 10007
                    Tel.: (212) 417-8742

70

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limit of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this brief contains **13,269** words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using **Microsoft Word** in **14-point font** in **Palatino Linotype** type style.

<u>/s/ Daniel Habib</u>
Attorney for Defendant-Appellee
**Payton Gendron**

Dated:      New York, New York
            March 16, 2026

---

## CERTIFICATE OF SERVICE

I certify that a copy of this brief has been served by email on the United States Attorney/W.D.N.Y.; Attention: **TIFFANY H. LEE, ESQ**.

<u>/s/ Daniel Habib</u>
Attorney for Defendant-Appellee
**Payton Gendron**

Dated:      New York, New York
            March 16, 2026

71

# SUPPLEMENTAL APPENDIX

IND-71645-22/001 – UCS-854 – 02/15/2023                                    Page 1 of 2

## UNIFORM SENTENCE & COMMITMENT

STATE OF NEW YORK
ERIE COUNTY COURT, COUNTY OF ERIE
PRESENT HON. SUSAN M. EAGAN

Court Part: Part 18
Court Reporter(s): Maureen Duggan
Superior Ct. Case: IND-71645-22/001
DA-00877-2022

| The People of the State of New York |
|---|
| -vs- |
| Payton Gendron |
| Defendant |

| Male | 06/20/2003 | 15557147K | 69949251Z |
|---|---|---|---|
| SEX | D.O.B | NYSID NUMBER | CJTN |

| Accusatory Instrument Charge(s): | Law Section & Subdivision |
|---|---|
| 1. Domestic Act Terror 1 | PL 490.28 AF |
| 2. Murder-1st:Multiple Victims | PL 125.27 1AVIII AF |
| 3. Murder-1st:Multiple Victims | PL 125.27 1AVIII AF |
| 4. Murder-1st:Multiple Victims | PL 125.27 1AVIII AF |
| Date(s) of Offense: | 05/14/2022 |

THE ABOVE NAMED DEFENDANT HAVING BEEN CONVICTED BY PLEA THE MOST SERIOUS OFFENSE BEING A FELONY IS HEREBY SENTENCED ON 02/15/2023 TO:

| Crime | Count No. | Law Section and Subdivision | SMF, Hate or Terror | Indeterminate | Definite/ Determinate | Post-Release Supervision |
|---|---|---|---|---|---|---|
| Domestic Act Terror 1 | 1 | PL 490.28 AF | HateTerror | | Life in prison | |
| Murder-1st:Multiple Victims | 2 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 3 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 4 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 5 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 6 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 7 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 8 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 9 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 10 | PL 125.27 1AVIII AF | | | Life in prison | |
| Murder-1st:Multiple Victims | 11 | PL 125.27 1AVIII AF | | | Life in prison | |
| Attempted Hate Crime/Murder-2:Intent | 22 | PL 110-125.25 01H BF | Hate | | 25 years | 5 years |
| Attempted Hate Crime/Murder-2:Intent | 23 | PL 110-125.25 01H BF | Hate | | 25 years | 5 years |
| Attempted Hate Crime/Murder-2:Intent | 24 | PL 110-125.25 01H BF | Hate | | 25 years | 5 years |
| CPW-2nd: Loaded Firearm | 25 | PL 265.03 03 CF | | | 15 years | 5 years |

NOTE: For each DETERMINATE SENTENCE imposed, a corresponding period of POST RELEASE SUPERVISION MUST be indicated (PL § 70.45)

• Count #'s counts 22, 23,24,25 are consecutive to all other counts shall run **CONSECUTIVELY** to all other counts

Counts 2,3,4,5,6,7,8,9,10,11 shall run **CONCURRENTLY** to count 1

Counts 1,2,3,4,5,6,7,8,9,10,11 are Life in Prison without Parole

• Conviction includes WEAPON TYPE: Firearm

| Paid | Not Paid | Deferred CPL 420.40(5) | Waived CPL 420.35(2-a) | If deferred, must file written order per CPL 420.40(5). If waived, must make finding per CPL 420.35(2-a). | | Paid | Not Paid | Deferred CPL 420.40(5) | Waived CPL 420.35(2-a) | If deferred, must file written order per CPL 420.40(5). If waived, must make finding per CPL 420.35(2-a). |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☑ | ☐ | ☐ | Mandatory Surcharge | $300.00 | ☐ | ☑ | ☐ | ☐ | Crime Victim Assistance Fee  $25.00 |
| ☐ | ☑ | ☐ | ☐ | DNA Fee | $50.00 | ☐ | ☐ | ☐ | ☐ | Sex Offender Registration Fee |
| ☐ | ☐ | ☐ | ☐ | DWI/Other: | | ☐ | ☐ | ☐ | ☐ | Supp. Sex Off. Victim Fee |
| ☐ | ☐ | ☐ | N/A | Fine | | ☐ | ☐ | ☐ | N/A | Restitution |

**THE DEFENDANT IS HEREBY COMMITTED TO THE CUSTODY OF THE** Department of Corrections and Community Supervision (DOCCS) until released in accordance with law, being a person eighteen (18) years of age or older at the time the offense was committed sentenced to a period of incarceration in excess of one (1) year and presently in the custody of DOCCS, and the defendant shall remain in the custody of DOCCS.

## Supp. A.1

IND-71645-22/001 – UCS-854 – 02/15/2023

**TO BE HELD UNTIL THE JUDGEMENT OF THIS COURT IS SATISIFED**
**REMARKS:**

| | | | | Sentence & Commitment and indicated attachments received by custodial authority |
|---|---|---|---|---|
| Pre-sentence investigation report Attached: | Yes | □ Amended Commitment | | |
| Order of Protection Issued: | No | | | Officer Name |
| Order of Protection Attached: | No | | | Shield No. |

| 02/15/2023 | Billie Jo Zakia | By: | | Court Clerk_ |
|---|---|---|---|---|
| Date | Clerk of the Court | | Signature | Title |



**Supp. A.2**